C. Kevin Marshall* (DCSBN 476266)
John C. Brinkerhoff Jr.* (DCSBN 1765474)
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939

David J. Hacker (SBN 249272)
Jeremiah G. Dys* (TXSBN 24096415)
Kayla A. Toney* (TXSBN 24141332)
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy, Ste. 1600
Plano, TX 75075
(972) 941-4444

Attorneys for Plaintiffs Christian & Jewish
Alliance, Ezra Ministries, and Ruth Mastron

*Pro Hac Vice Motion forthcoming

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Christian and Jewish Alliance Inc., a California not-for-profit corporation, Ezra Ministries, a California not-for-profit religious corporation, d/b/a The Mission Church, and Ruth Mastron, <br><br> *Plaintiffs,* <br><br> v. <br><br> Daniel Brunner, Aimee Magda Werth, Kristina Turner-Brown, Patrick Hartley, Sasha Spite Miller, Jacob Pagaduan, Esmat "Essie" Baradar, Jonathan Provance, Maya Karalius, and Does 1-40, <br><br> *Defendants.* | Case No. **'25CV2992 W    AHG** <br><br> **COMPLAINT FOR:** <br><br> 1. **Violations of 18 U.S.C. § 248(a)(1)** <br> 2. **Trespass** <br><br> **DEMAND FOR JURY TRIAL** |

# INTRODUCTION

1.      As worshipers have gathered at three separate events this year, a mob has targeted Plaintiffs The Mission Church (the "Church") of Carlsbad and The Christian & Jewish Alliance (the "Alliance") of the San Diego area, interfering with their worship services, intimidating their members and guests, and obstructing their access to gather safely. This mob targeted the Church and the Alliance due to the sincere religious beliefs of their members that require support for Israel. Plaintiff Ruth Mastron, a Jewish resident of Oceanside, was assaulted as she attempted to enter one of these events.

2.      The campaign of disruption and harassment was perpetrated by Defendants Daniel Brunner, Aimee Magda Werth, Sasha Spite Miller, Kristina Turner-Brown, Patrick Hartley, Jacob Pagaduan, Essie Baradar, Jonathan Provance, Maya Karalius, and Does 1-40.

3.      On March 19, Christian congregants and Jewish visitors at the Church who hoped to worship together and learn about religious persecution in Israel instead endured unsolicited vitriol and harassment. Once the event started, Defendants Brunner, Hartley, and Does 1-17 began loudly protesting outside the front door of the Church, which abuts a narrow sidewalk that abuts the street. Once the outside protesters were audible in the Sanctuary, Defendants Turner-Brown, Miller, Pagaduan, Baradar, and Does 17-20, who had obtained access to the Church by providing false names and pretending to be event attendees, began disrupting the event from inside the sanctuary in staggered intervals—screaming, threatening congregants, and physically resisting removal. Once the event ended, all attending Defendants blockaded egress from the Church to the parking lot, intentionally creating a chaotic and violent environment for hundreds of guests seeking to leave.

4.      One month later, on Easter Sunday, Defendants Brunner, Turner-Brown, Hartley, and Does 21–25 returned to the Church to spoil the holiest day on the Christian calendar. Defendants and other disruptors shouted with bullhorns on

the sidewalk, targeting children's activities in the parking lot, obstructing access to the overflow parking lot, and deterring visitors from attending the Church's Easter services. This four-hour disruption had its intended effect: to further intimidate the members and guests (including small children) who attended the Church's services.

5.      On September 7, 2025, Defendants Brunner, Werth, Miller, Turner-Brown, Hartley, Provance, Karalius, and Does 26–40 disrupted another worship event, which the Alliance hosted, the Church sponsored, and Mastron attended. Defendants and other disruptors blocked off one of the entrances to the worship venue and surrounded the other entrance, jumping on Mastron's car and hitting and blocking other guests' cars as they tried to enter. The disruptors then gathered at the back of the amphitheater, blaring imitation police sirens and hurling epithets for three hours during the interfaith prayer and worship service.

6.      Defendants' actions have created a culture of anxiety and fear within both the Church and the Alliance, causing both to cancel religious events and expend additional resources to ensure the safety of their members. The Church has also lost membership as a result of Defendants' disruptions, while the Alliance has found it increasingly difficult to secure safe locations to host interfaith worship and prayer events.

7.      Defendants' actions have likewise caused severe stress and lingering anxiety for Mastron, who experiences heightened situational awareness and anxiety when in public in her own community, due to the threat posed by Defendants.

8.      Defendants have no regrets about their actions. They have publicly vowed to continue "doing our part to fight the war against Zionism, which is an abomination ... We ain't shuttin' up and we ain't goin nowhere."

9.      Federal and California law do not tolerate Defendants' conduct, which violated the civil rights of The Mission Church, the Christian & Jewish Alliance, and their members and guests, including Mastron. Defendants' conduct violates,

and is actionable under, the Freedom of Access to Clinic Entrances Act ("FACE Act"), 18 U.S.C. § 248, as well as California tort law.

10. Defendants have committed and are almost certain to continue committing violations of the FACE Act, by their injury, intimidation, and obstruction of Jews and Christians seeking to exercise their First Amendment rights of religious freedom at places of religious worship.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. It has authority to provide compensatory, punitive, declaratory, injunctive, and other relief in this action, including under 18 U.S.C. § 248(c)(1)(B); 28 U.S.C. §§ 1343, 2201, 2202; and Cal. Civ. Code §§ 3294, 3333.

12. Venue is proper under 28 U.S.C. § 1391(b) because all events giving rise to the claims detailed in this Complaint occurred within the Southern District of California, and at least eight Defendants reside in the District.

## PARTIES

### *The Mission Church*

13. Plaintiff The Mission Church is a non-denominational Christian church and a California not-for-profit religious corporation registered under the name Ezra Ministries. Its principal location is 825 Carlsbad Village Dr., Carlsbad, CA 92008. The Church owns and operates its place of religious worship.

14. The Church serves the Carlsbad community and region through worship services, prayer, community events, and outreach.

15. Established in 2011 as a home Bible study, and moving to its current facility in 2018, the Church holds a "simple" guiding philosophy of ministry: "We love Jesus and we love people."

16. Since its founding, the Church has grown to a congregation of 3,000, becoming an integral part of the Carlsbad community. Attendance on a typical Sunday, including children, exceeds 1,000 worshipers. In addition to weekly

services, Bible studies, and ministry work, the Church hosts a wide range of community service and social events.

17.   Pastor David Menard is the founding and lead pastor of the Church. He leads the team that established and nurtured the Church into a thriving resource for Christians in Carlsbad and beyond.

18.   Pastor JC Cooper is an assistant pastor at the Church, where he has served since 2018.

### *The Christian & Jewish Alliance*

19.   Plaintiff The Christian & Jewish Alliance Inc. is an interfaith organization and a California not-for-profit corporation.

20.   The Alliance was founded in May 2024 in the wake of the horrific massacre of over 1,200 Jews on October 7, 2023, and the surge in antisemitic attacks worldwide in the months after.

21.   In the aftermath of the October 7 attacks, members of the Jewish community in the San Diego area felt isolated and alone, having witnessed not only the largest massacre of Jews since the Holocaust, but also widespread hatred even among their own neighbors after that massacre.

22.   Refusing to believe that Jews were alone in their struggle, a local Jewish leader, Liat Cohen-Reeis, felt called to reach out to churches and synagogues in the San Diego area with a proposal to create an interfaith organization to support Israel and the Jewish community.

23.   A number of synagogues and churches, including The Mission Church, answered Cohen-Reeis's call, acting out of sincere religious beliefs to support Israel. These groups formed the Alliance.

24.   Cohen-Reeis serves as the President of the Alliance, which also has a Vice President and Treasurer.

25.   The Alliance hosts a wide range of events, ranging from relatively intimate Shabbat dinners for 50 to 60 persons at Catholic and Protestant Churches to larger interfaith worship services that hundreds of Jews and Christians attend.

### Ruth Mastron

26.   Plaintiff Ruth Mastron is a resident of Oceanside, California. She is a devout Jew and a committed member of her local Chabad synagogue. She attends events of the Alliance as an expression of her sincere religious beliefs.

27.   Mastron's religious beliefs obligate her to support the Nation of Israel. She was born to committed Jewish parents who taught her the principles of Judaism and Zionism at a young age.

28.   Mastron's faith is central to her life and identity; she actively studies Hebrew, faithfully celebrates Jewish holidays, refrains from eating pork and other prohibited foods, displays mezuzot on the doors of her home in keeping with Torah commandments, and lives out her sincere religious beliefs by volunteering her time in support of Israel.

29.   For several decades, Mastron served as the president of the House of Israel in Balboa Park, a beloved destination in San Diego. Since 1948, this all-volunteer organization has educated and inspired visitors from all over the world about the Jewish faith and the Nation of Israel. Mastron continues to volunteer whenever possible, teaching tourists, children on field trips, and San Diego locals about the beautiful heritage, diversity, faith, and resilience of the Jewish people.

30.   Every year, Mastron spends about six weeks in Israel. For four weeks, she volunteers her time to provide medical and operational support as an expression of her sincere religious beliefs. She spends the remaining two weeks visiting sacred sites and family members.

31.   Mastron attended the September 7, 2025, worship service as an expression of her Jewish faith, and she suffered lasting harm from Defendants' actions.

***Defendants***

32.   Defendant *Daniel Brunner* is a resident of San Diego, California. He led the other Defendants in the illegal conduct at the Church during the March 19 and Easter Sunday events, and at the interfaith worship service on September 7. Targeting churches and worshipers, he has maintained a campaign to recruit others to join his "war against Zionism, which is an abomination."

33.   Defendant *Aimee Magda Werth* is a resident of La Jolla, California. She led the other Defendants in the illegal conduct interfering with the interfaith worship service on September 7. She likewise recruits others to join her efforts to intimidate supporters of Israel, even when gathered in worship.

34.   Defendant *Kristina Turner-Brown* is a resident of Escondido, California. She participated alongside the other Defendants in the illegal conduct interfering with worship at the Church during the March 19 and Easter Sunday events, as well as at the interfaith worship service on September 7.

35.   Defendant *Patrick Hartley* is a resident of San Diego, California. He participated alongside the other Defendants in the illegal conduct interfering with worship at the Church during the March 19 and Easter Sunday events, as well as at the interfaith worship service on September 7.

36.   Defendant *Sasha Spite Miller* is a resident of Escondido, California. She participated alongside the other Defendants in the illegal conduct interfering with worship at the Church on March 19 and at the interfaith worship service on September 7.

37.   Defendant *Jacob Pagaduan* is a resident of San Diego, California. He participated alongside the other Defendants in the illegal conduct interfering with worship at the Church on March 19.

38.   Defendant *Esmat "Essie" Baradar* is a resident of San Diego, California. She participated alongside the other Defendants in the illegal conduct interfering with worship at the Church on March 19.

39.   Defendant *Jonathan Provance* is a resident of San Diego, California. He participated alongside the other Defendants in the illegal conduct interfering with worship at the interfaith worship service on September 7.

40.   Defendant *Maya Karalius* is a resident of Kenwood, California. She participated alongside the other Defendants in the illegal conduct interfering with worship at the interfaith worship service on September 7.

41.   Defendants John Does 1-20 are disruptors who participated in the planning, coordination, and execution of the disruptions to the March 19 Worship Service and will be specifically named as Defendants when their true identities are ascertained.

42.   Defendants John Does 21–25 are disruptors who participated in the planning, coordination, and execution of the disruptions to the Easter Worship Services and will be specifically named as Defendants when their true identities are ascertained.

43.   Defendants John Does 26–40 are disruptors who participated in the planning, coordination, and execution of the disruptions to the September 7 Worship Service and will be specifically named as Defendants when their true identities are ascertained.

## **FACTUAL BACKGROUND**

### *The Mission Church's Religious Beliefs*

44.   The Church believes as part of its statement of faith that "the Scriptures of the Old Testament and New Testament are divinely inspired by God and inerrant in their original writings."

45.   The Church adheres to dispensationalist Christian beliefs. It thus believes that God chose Israel to be his representation to the world and has uniquely blessed it. *See, e.g.*, Deuteronomy 7:6 (New King James) ("For you are a holy people to the Lord your God; the Lord your God has chosen you to be a people for Himself, a special treasure above all the peoples on the face of the earth.");

8

Genesis 12:2 ("I will make you a great nation; I will bless you And make your name great; And you shall be a blessing.").

46.   Likewise, the Church believes that God "will bless those who bless [Israel], and … will curse him who curses [Israel]." Genesis 12:3; *see also, e.g.*, Zechariah 2:8–9 ("[F]or he who touches [Israel] touches the apple of His eye. For surely I will shake My hand against them, and they shall become spoil for their servants.").

47.   Under these dispensationalist beliefs, supporting the Jewish people and the Nation of Israel is deeply and sincerely ingrained in the Church's theological teaching and activities. The Church regularly hosts events with local Jewish groups, and its pastors are involved in the Christian & Jewish Alliance.

### *The Christian and Jewish Alliance's and Ruth Mastron's Religious Beliefs*

48.   The Christian & Jewish Alliance formed for the religious purpose of uniting Christians and Jews in their religious beliefs to stand with Israel and against antisemitism. "[D]riven by a moral imperative to speak out and act," the Alliance's core belief is "that Israel is not only the historic and ancestral home of the Jewish people but also central to the unfolding plan of God."

49.   To further this religious mission, the Alliance holds itself out as a religious organization and hosts interfaith events involving prayer, worship, and messages from local faith leaders including rabbis and pastors. For example, Pastor David Menard has spoken at several events that the Alliance hosted.

50.   For the Christian members of the Alliance, many of whom are members of San Diego-area churches, standing with Israel is a core expression of their Christian faith. These members follow dispensationalist beliefs like those of The Mission Church. *See supra* ¶¶ 44–47.

51.   For the Jewish members of the Alliance, including Mastron, their faith includes traditional Torah beliefs that practicing Jews have held for millennia. Torah and Talmudic teaching are clear that Jews are the people of God and that

9
COMPLAINT

the land of Israel is their divinely ordained homeland. To support Israel is a core expression of their faith.

52. Torah and Talmudic teaching instruct that Israel is the land that God promised to the Jewish patriarchs, Abraham, Isaac, and Jacob. *See, e.g.*, Genesis 12:7 (Contemporary Torah) ("I will assign this land to your offspring."); Exodus 3:17 ("I will take you out of the misery of Egypt to the land of the Canaanites, the Hittites, the Amorites, the Perizzites, the Hivites, and the Jebusites, to a land flowing with milk and honey").

53. The modern Nation of Israel is seen as part of God's promise to restore this land to the Jews. *See* Ezekiel 36:24 ("I will take you from among the nations and gather you from all the countries, and I will bring you back to your own land."); *see also, e.g.*, Babylonian Talmud, Ketubot 110b ("[A]nyone who resides in Eretz Yisrael is considered as one who has a God.").

54. Observant Jews pray three times a day facing Jerusalem for a return to Israel as their physical and spiritual homeland. Nissan Mendel, *The Three Daily Prayers*, https://tinyurl.com/mrseu5z5. Those prayers likewise seek God's "[r]eturn in mercy to Jerusalem" to "rebuild it, soon in our days, as an everlasting edifice." *Amidah (Weekday Morning Service)*, in *The Koren Siddur* 114 (J. Sacks trans. 2009). Every religious festival or holy day that Jews celebrate throughout the calendar year includes prayers for restoring the holy temple in Jerusalem. Many Torah commandments can only be performed in the Holy Land. Rabbi Aharon Lichtenstein, *Laws Dependent Upon the Land of Israel* (D. Strauss trans. 2015).

55. Under these religious beliefs, supporting the Nation of Israel and longing for a return to this physical and spiritual homeland is sincerely ingrained in the Jewish members of the Alliance, including Mastron, and informs their religious activities. Supporting Israel is a core expression of devout Jewish faith.

***The Increasingly Violent Climate of Antisemitism Since October 7, 2023***

56.   Although Jews have long been outsized targets of race- and religion-based attacks, the number of antisemitic hate crimes has dramatically increased since the October 7, 2023, attack on Israeli civilians. The number of anti-Jewish hate incidents in the United States increased 63% in 2023, and another 5% in 2024. The thousands of anti-Jewish hate crimes recorded in 2023 represent the highest number ever recorded since the Federal Bureau of Investigation began collecting data in 1991, a record attributed to a surge following October 7.

57.   According to the California Department of Justice, anti-Jewish hate crimes accounted for 73% of all hate crimes in the State tied to religious bias in 2023, with an outsized number occurring after October 7.

58.   In San Diego County, antisemitic incidents dramatically rose following the October 7, 2023, attack, setting new records in both 2023 and 2024.

59.   Among the thousands of antisemitic incidents that have occurred since October 7, 2023, are high-profile bomb threats against Southern California synagogues, attempted murders in Los Angeles, and the murder of an engaged couple employed by the Israeli Embassy in broad daylight.

60.   Anti-Israel protests have been focal points for antisemitic activity. In early 2024, protesters at a California university caused a campus-wide shutdown as they occupied a central administrative building for over a week—committing vandalism throughout the building and violently clashing with law enforcement. Anti-Israel protesters have engaged in similarly dangerous and lawbreaking activity across the country, including protests that block traffic and devolve into assaults on bystanders.

61.   Antisemitic disruptions have targeted religious services of Jews and Christians who support Israel. Since the October 7 massacre, multiple suits have been filed seeking relief from violent mobs that harassed, intimidated, and harmed worshipers seeking to exercise the right to freely exercise their religion. *See, e.g.*,

*United States v. Party for Socialism & Liberation N.J.*, No. 2:25-cv-16049 (D.N.J., filed Sept. 29, 2025); *Pollak v. CODEPINK Women for Peace*, 2:24-cv-06253 (C.D. Cal., filed July 24, 2024).

62.   Unchecked antisemitism expands, adding to its target any who show solidarity with the Jewish people and the nation of Israel. Christians, like those of The Mission Church, make easy targets for those hoping to isolate the Jewish people, intimidating those who would otherwise be their closest supporters. Such anti-Christian prejudice thus becomes a subset of antisemitism.

63.   Blaming the victims for what they have suffered is a common antisemitic tactic, also called "inversion." Because Jews suffered a genocide during the Holocaust, Defendants' accusation that Jews are committing "genocide" is especially offensive. Because Jews were slaughtered by Nazis, Defendants' calling them "Nazis" is deeply hurtful. Because Jews have long called themselves Zionists (Zion refers to their biblical homeland as the city of God), Defendants attempting to convert that into a slur is likewise offensive.

64.   Both the broader statistics regarding violent crimes against supporters of Israel and individual high-profile instances of hate crimes and incidents are well known to officers of the Church, Church congregants, the Alliance, and attendees of the Alliance's events.

### *The March 19 Worship Service*

65.   The Church found itself in the crosshairs of this opposition after Pastor David Menard spoke at events for the Alliance and a nearby Jewish center in October 2024. Those events were disrupted by Brunner and other individuals who would later disrupt the Church's events.

66.   On March 19, 2025, the Church hosted an event headlined by Dr. Einat Wilf, who is Jewish, a former member of the Israeli Knesset, a renowned scholar, and an expert on the current conflict in the Middle East.

67.   The purpose of the event was religious. Members of the Church gathered to pray corporately for their Jewish neighbors and the peace of Israel, worship, learn about the ongoing conflict, and encourage the local Jewish community as a part of their Christian duty.

68.   The Church hosted this event during its weekly Wednesday night worship service for young adults.

69.   The Church partnered with the Alliance to host the event.

70.   The Church required guests to pre-register by name to attend, though the event was free. The Church conditioned entrance on asking for the names of individual attendees and checking their responses against the registration list.

71.   Approximately 400 people attended the event, including about 200 members of the local Jewish community. The sanctuary, which ordinarily seats nearly 450 individuals, was nearly full.

72.   Many of those in attendance were young children, including Pastor Cooper's four children.

73.   The event opened with prayer by Pastor Menard and worship using hymns. As part of the worship service, Dr. Wilf provided a discussion of Israel's religious history and current status.

### *Defendants' Disruption of the March 19 Worship Service*

74.   Approximately twenty-five minutes after the event started, several dozen disruptors (the "outside disruptors"), including Defendants Brunner, Hartley, and Does 1-16, began occupying the sidewalk outside of the Church's front door.

75.   The front door of the Church is a few feet from the street. It is separated from the sidewalk by only a small stoop and two steps.

76.   The sidewalk immediately abuts both the stairs and the street. It is five feet, 11 inches wide, providing only a narrow pathway from the front door to the parking lot, without extra space on either side between the church building on one side and a main roadway on the other.

77.  The sidewalk is the only direct path from the front door to access the Church's primary parking lot along the west side of the building. A person leaving the Church through its front door must immediately turn right and walk down that sidewalk to reach that lot.



Image 1: The Mission Church sidewalk



Image 2: The Mission Church

78.  The outside disruptors occupied the sidewalk from outside the front door along the sidewalk leading to the parking lot on the west side of the building.

14

79.   Once in place, the outside disruptors sought to halt the in-progress event by shouting and drowning out the speaker in the auditorium. The outside disruptors wielded bullhorns and graphic signs with bloody images of dismembered children.

80.   Shouting through bullhorns, the outside disruptors warned the Church through loud chants including, "Mission Church, you can't hide! We charge you with genocide!" They also loudly and falsely accused each individual in the sanctuary of being "a Nazi" and one of the church officers of being a "F--king pervert."

81.   The outside disruptors were clearly audible to event attendees, interfering with the worship service inside.

82.   At one opportunity, Pastor Cooper said to one of the outside disruptors, "If you'd like to reasonably talk, I would be happy to." The disruptor responded, "F--- you! F--- you! There's nothing to talk about!"

83.   Defendant Hartley attempted to enter the Church's front doors while wearing a large sign, but he was unable to get around the Church's safety team and returned to the sidewalk.

84.   Separate from the outside disruptors, a group of individuals, including Defendants Turner-Brown, Miller, Pagaduan, Baradar, and Does 17–20 (the "inside disruptors"), had gained entry to the sanctuary under the false pretense of being attendees. These Defendants used pseudonyms to pre-register for the event, posing falsely as guests, as part of a coordinated strategy to intentionally disrupt the event.

85.   Once the outside disruptors were clearly audible to attendees, the inside disruptors began to interfere with the event from the inside. At staggered intervals, the inside disruptors would stand up, begin screaming epithets at the peaceful audience, and film individual congregants. The disruptors would not stop shouting until the Church's safety team escorted them out.

86. Most of the disruptors, including Defendants Turner-Brown and Pagaduan, physically and forcefully fought removal by kicking and hitting members of the Church's safety team. While forcefully resisting, the inside disruptors continued to shout epithets and to accuse the religious attendees, whom they were filming, of supporting genocide.

87. Each time an inside disruptor individually interfered with the service to intimidate and obstruct those gathered in worship, Dr. Wilf had to suspend her planned remarks.

88. Because of the inside disruptors' forceful resistance, multiple members of the Church's safety team had to escort each one out of the sanctuary and building.

89. The first disruptor was a middle-aged man wearing glasses, Doe 17.

90. The second disruptor was a brunette woman wearing a mask, Doe 18.

91. The third disruptor was Defendant Miller, who posted a video of herself on Instagram causing disruption, yelling epithets, and accusing congregants in the sanctuary of "murder."



Image 3: Defendant Miller disrupting the service and resisting removal from sanctuary

92. The fourth disruptor was Defendant Pagaduan, who kicked, fought, and struggled with physical force against the members of the Church's safety team who sought to remove him from the sanctuary. Because Pagaduan is trained in martial arts, several members were needed to restrain and remove him safely. He refused to walk, so they had to carry him to the church door. Pagaduan injured at least one worshiper in the sanctuary as he leaped up and sought to disrupt the service, interfere with the free exercise of worshipers, and intimidate those gathered peacefully for worship.



Image 4: Defendant Pagaduan resisting removal

93. The fifth and sixth disruptors were Does 19–20, both women who began yelling simultaneously and had to be removed from the Church balcony by the safety team.

94. The seventh disruptor was Defendant Kristina Turner-Brown, who physically and forcefully fought against removal by kicking and hitting the Church's safety team.



Image 5: Defendant Turner-Brown disrupting the service and resisting removal by throwing a punch

95. The eighth disruptor was Defendant Esmat "Essie" Baradar.

96. Once removed from the Church, each inside disruptor, including Defendants Miller, Pagaduan, Turner-Brown, and Baradar, joined the outside disruptors in seeking to further interfere with the event and intimidate those gathered peacefully for worship.

97. Because of the effectiveness of each disruptor in halting the event and precluding worshipers from hearing Dr. Wilf, the effort required to remove each disruptor, and the timing of disruptions every few minutes throughout the event, Defendants rendered it nearly impossible for Dr. Wilf to present her message to attendees. Those who had come to receive her message and respond in prayer were similarly thwarted.

98. Fearing for their safety and intimidated by the actions of protesters inside and outside the church, several attendees left early, asking the Church's safety team to escort them to their cars through the narrow back exit.

99. Other attendees did not have that luxury, as the Church parking lot could not accommodate everyone in attendance. Those who parked at the overflow parking lot across the street and wished to leave early were forced to walk through a gauntlet of disruptors at the Church's entrance to reach their vehicles.

100. The disruptors, including Defendants Brunner, Turner-Brown, Miller, Pagaduan, Baradar, and Hartley, did not dissipate when the March 19 Worship Service ended and instead focused on creating an intentionally hostile environment for the Jewish and Christian congregants attempting to leave the event.

101. Approximately twenty-five disruptors, including Defendants Brunner, Turner-Brown, Miller, Pagaduan, Hartley, Baradar, and Does 1-20, occupied the narrow sidewalk between the Church's front door and parking lot, obstructing the only direct path to vehicles.

102. The disruptors, including Defendants, intentionally forced congregants to walk through a phalanx of obstruction and intimidation to reach their cars. The disruptors did not attempt to occupy the sidewalk space on the east side of the front door leading away from the parking lot; they focused on blocking congregants' path toward their cars as they left the Church.

103. One of the three police officers who arrived at the Church after receiving a disturbance call recommended that congregants try to exit through a narrow back door at the back of the Church, to avoid safety threats by the disruptors blocking the main entrance. But it was not logistically possible or safe to redirect several hundred congregants, who were already moving towards the front entrance of the Church, through that back door.

104. In addition to using their bodies, Defendants and other disruptors wielded signs, wagons, and bins to obstruct the narrow sidewalk between the Church's front door and the parking lot.

105. Defendants continued to obstruct the sidewalk after a police officer warned them to cease their obstruction.



Image 6: Defendants Pagaduan and Hartley ignoring commands from a Carlsbad police officer

106. Defendants vehemently screamed at the Jewish and Christian congregants attempting to leave the event, screaming epithets such as "F--- you!" and accusing congregants of being "a Nazi" and "Zionists." Defendants used bullhorns to maximize the chaos and intimidation.

107. Defendant Turner-Brown recorded video of church members and guests on her phone as they left the event, signaling her intent to disseminate their identities to others who are hostile to the beliefs of attendees.

108. Defendant Turner-Brown intentionally struck one congregant leaving the event. The police officer witnessed the battery and detained Defendant Turner-Brown in his vehicle for the remainder of the event.

109. Defendants caused significant fear and intimidation to the members and guests of the Church.

110. On information and belief, Defendant Brunner planned and organized the disruption. Defendant Brunner directed individual disruptors at the event. Individual disruptors asked Defendant Brunner for guidance on how to proceed during the disruption.

111. Defendant Brunner has also taken a leading role in disruptive protests across Southern California, including at other houses of worship, Jewish gatherings, and events supporting Israel, such as an event by The Mission Church and the Christian & Jewish Alliance on October 20, 2024. He, along with Defendants Miller and Werth, holds himself out publicly as a leader of the CODEPINK organization in the San Diego area, which has a pattern of organizing disruptive protests against Jews and their supporters.

### The Church's Easter Sunday Services

112. Just one month later, on Easter Sunday, the Church joined with billions of other Christians around the world to celebrate the resurrection of Jesus of Nazareth, which is the central event in redemptive and Biblical history according to the Church's sincere religious beliefs.

113. The Church hosted three Easter services, welcoming a total of about 1,500 people. This is a significantly higher number than usual attendance.

114. The Church planned special events for the children who would attend. It applied for and received a special permit from the city of Carlsbad to host Easter activities in their parking lot directly abutting the building, including a bounce house with a slide and a petting farm with baby chicks that children could hold.

### Defendants' Disruption of the Easter Services

115. At approximately 10:00 a.m., disruptors returned to the Church shortly after the start of its second service. Several disruptors, including Defendants Turner-Brown and Hartley, occupied the same space on the sidewalk between the front door and adjoining parking lot as at the March 19 Worship Service, holding signs with grotesque images of dead babies and yelling at the children of the church when they saw them outside.

116. Approximately thirty other disruptors, including Defendant Brunner and Does 21–25, were positioned on the other side of the street directly facing the Church. These disruptors again used bullhorns for maximum intimidating effect.

They screamed obscenities and slurs at the children trying to participate in Easter activities in the parking lot immediately adjacent to the church building.

117. The location of the disruptors was close to the children's Sunday school classrooms, and their amplified yelling made it nearly impossible to conduct children's classes inside the Church on Easter Sunday.

118. Concerned for the safety of church members, guests, and especially the children, Pastor Cooper contacted local police; a local officer arrived and told the disruptors to stay across the street.

119. Even when moved across the street, the disruptors were less than 60 feet from the children, shouting and screaming through bullhorns for maximum intimidating effect. Defendants intentionally targeted children who had left the church building, shouting expletives at them and waving signs with grotesque images of bloody children.

120. The disruptors were also in the pathway between the Church and the overflow parking lot the Church leased across the street.

121. Defendants' tactics disrupted the service and intimidated congregants, many of whom had to be escorted to their vehicles by safety officers. There was no way for church members and guests who had parked at the Church's overflow parking on the other side of the street to reach the Church without walking directly past the hostile disruptors and enduring their vitriolic chants and graphic signs.

122. The disruptors continued their disruption through the end of the Church's Easter Sunday services.

123. Many congregants and other guests who intended to attend the service left without entering the Church when they saw the Defendants and other disruptors standing in the path to the front door of the Church.

124. In a coordinated effort to intimidate church members and guests about their Church's beliefs about Israel as God's chosen people, the disruptors also

placed flyers on 30–50 cars in the Church's primary parking lot on Easter Sunday morning accusing the Church and its members of supporting genocide.

125. On information and belief, Defendant Brunner planned and organized the disruption. He directed individual disruptors at the event. Individual disruptors asked him for guidance on how to proceed during the disruption.

### The September 7 Worship Service

126. On September 7, 2025, the Christian & Jewish Alliance hosted an interfaith worship gathering at the amphitheater of the Legacy International Center in San Diego, California. The Center is a Christian religious center in San Diego's Mission Valley. It includes an amphitheater that is primarily used for worship, prayer, and other religious events that require a large outdoor space.

127. The Alliance rented the Center's amphitheater on September 7 for the purpose of hosting a worship and prayer service.

128. The Alliance maintained operational control of the area during on-site preparation, including bringing in a stage for the event, directing how the area would be set up, and employing a security team to handle potential threats.

129. The Alliance held operational control of the worship service throughout the event, including setting the schedule, selecting speakers, and designing the message.

130. The purpose of this interfaith gathering was to worship and pray together about Israel and to enable attendees to better understand how to support Israel in accordance with their religious beliefs.

131. The event opened with a prayer from an Orthodox Rabbi and worship led by multiple praise bands and gospel choirs from local churches.

132. Following worship, several pastors and rabbis from local churches and synagogues, including Pastor Menard, spoke to attendees and led attending worshipers in prayer.

133. The Mission Church sponsored the event along with several other churches and synagogues. Several dozen members of The Mission Church attended, and their praise band led the worshipers in song. Pastor Menard spoke about God's love for Israel as His chosen people, and he shared how, as a matter of Biblical faith, religious congregations need to stand together against hatred and violence.



Image 7: Gospel choir leading worship at Alliance event

134. Mindful of security concerns based on disruption of previous events, the Alliance planned carefully and required online registration. They also checked identification as guests entered the amphitheater space and used a wand metal detector.

### Defendants' Disruption of the September 7 Worship Service

135. In response to the disruptions of the March 19 and Easter services, the Church had retained counsel and sent Defendant Brunner a cease-and-desist letter in early May 2025.

136. Undeterred, Brunner joined with Defendants Turner-Brown, Hartley, and Miller to target the September 7 worship service for disruption. They were

joined by Defendants Aimee Magda Werth, Jonathan Provance, Maya Karalius, and Does 26–40, as well as several dozen other disruptors.

137. According to Defendant Werth, their group chose to target this event because the attendees were "in there, feasting, listening to music, and raising money for genocide . . . . [W]e will not give them a moment of peace. Free Palestine."

138. The September 7 Service was neither a feast nor a fundraiser. It was an interfaith worship event, marred irreparably by hostile disruptors.

139. Defendants' plan for disruption and intimidation proceeded in two phases: (1) obstructing and deterring attendees from reaching the event and (2) interfering with the program itself.

140. Defendants and other disruptors arrived long before the event started and intentionally occupied the road to block both entrances to the venue and then obstruct individuals from attending the event.

141. Defendants and other disruptors fully blocked one of two entrances to the venue parking lots, funneling the vehicles into the only other entrance.

142. Defendants and other disruptors partially blocked the other entrance by occupying the street. This blockage forced guests to drive very slowly to enter the property. Disruptors walked directly in front of and behind guests' cars, yelling through bullhorns statements such as, "Zionists, you're not welcome here!," "Go back to Israel!," "Zionism is Naziism!," "You are a Nazi!," and "You are a baby killer!"

143. As Mastron attempted to enter into the parking lot to the venue with her husband in their small compact car, they were confronted by a group of protesters in the driveway. Doe 26, a pink-haired woman wearing a full black face mask, leaped onto the hood of Mastron's car and began slamming her fist on the windshield while screaming at Mastron and her husband. Mastron's husband rolled

slowly into a nearby parking spot, leading Doe 26 to jump off of their hood and run back to the crowd of disruptors.

144. As another guest was slowly rolling her car into the parking lot, with the tail end still in the street, several disruptors ran in front of her car and surrounded it, and another disruptor slammed his hand on the back of the member's car and cursed at her.



Image 9: Disruptor with a bullhorn.

145. Another church member, also obstructed from accessing the event by disruptors, rolled down her car window as she slowly tried to enter; several disruptors leaned into her vehicle window and yelled, "Christians kill babies!" to dissuade her from entering the event.

146. Multiple other attendees faced obstruction, as Defendants and other disruptors surrounded their cars, screamed at them, and blocked their ability to move forward.

147. Defendant Jonathan Provance walked close to guests' cars, filming them with his phone to intimidate them.

148. Two children's dolls were laid on the path so that cars would have to run over them to enter. Disruptors walked directly in front of and behind guests'

cars, yelling "Shame on you! You have blood on your hands too!" through bullhorns.

149. Many guests who were planning to attend drove away out of fear when they saw the disruptors blocking the entrances and obstructing access to the event. Due to the obstruction and intimidation, the number of persons who ultimately made it to the service was far less than the number of pre-registered guests.



Image 8: Disruptors obstructing the driveway of Legacy.

150. Attendees who managed to park their vehicles then faced further obstruction and harassment from Defendants, who occupied the sidewalk directly between the parking area and the venue and harassed attendees as they attempted to walk into the event.

151. Doe 26 carried a sign stating, "Only C---s Support Israel." Defendant Werth carried a sign that said "FCK NZIS" featuring a swastika combined with a star of David, and other Defendants carried signs stating, "Zionism is the evil cult built on Christian white supremacy and antisemitism" and "America Funds Israel's Genocide."

152. The disruptors also scrawled hostile messages in chalk on the sidewalk along the entrance to the event, private driveway, and outer wall of the event venue,

including "Baby Killers," "Death 2 Israel," "F--- Israel," and "Zionists for Genocide." They also vandalized the private property of Legacy International Center.

153. Defendant Miller, in particular, sought to block attendees' path towards the event, crowding them off the sidewalk onto a busy street and screaming at them at point-blank range with a megaphone.

154. Once the event began, Defendants and other disruptors shifted towards preventing worshipers from hearing the service, effectively denying access to the event.

155. Defendants and other disruptors lined up along the back of the amphitheater, about 30 feet from the guests trying to pray and worship, and about 10 feet from members of the Church's safety team.



Image 10: Disruptors in close proximity to worshipers during the service

156. For more than three hours—nearly the entire event—Defendants Brunner, Werth, Miller, Turner-Brown, Hartley, Provance, Karalius, Does 21–30, along with other disruptors, blared sirens imitating emergency vehicles and banged pots and pans, preventing worshipers from hearing and participating fully in the service. The purpose and effect were to disrupt the event and intimidate worshipers.

157. Defendants Brunner, Werth, Provance, and Baradar also used bullhorns to lead chants criticizing guests for their religious views and calling them "liars."

158. Defendants' noise drowned out the service for a large portion of attendees. Many fled to a nearby building to seek shelter from the noise. Several senior citizens were forced to take out their hearing aids, which precluded them from hearing the event entirely. They remained only to show solidarity at the event.

159. Defendants' hours-long sonic assault caused ongoing physical harm to event attendees and participants due to the dangerous noise levels Defendants produced. Several guests' ears continued ringing the next day. Defendants intended to cause this physical harm: They protected themselves from this harm by wearing ear protection throughout the event, and they never provided attendees any such notice to allow them to do the same.

160. Fearing for their own safety and the safety of all other attendees, worshipers called the police to seek protection. The police told callers that they "don't enforce noise ordinances."

161. When an officer finally arrived and witnessed the scene, he was not able to effectively intervene due to the chaos. He instead called for backup.

162. A police presence was established only midway through the event, and that did not stop the blaring sirens or aggressive disruptions.

163. The disruptors interfered with at least three worshipers' ability to safely exit the event. After the event, Cohen-Reeis was walking toward the exit with two of the event speakers, and a four-door white BMW car began aggressively driving toward them. The three changed course and stepped inside the lobby of the Legacy International Center, asking an armed security guard to escort them to their cars for safety.

### *Defendants' Continued Intimidation and Targeting of Event Attendees*

164. Defendants have had no remorse over their actions and the damage they caused. To the contrary, they expressed pride at their civil rights violations and continued their intimidation online, targeting individual worshipers for retaliation.

165. The day after his disruption of the Church's Easter Services, Defendant Brunner contacted Pastor Menard and threatened to return on Mother's Day, calling it "another wonderful occasion when folks who normally do not attend show up. Any special plans that day?"

166. Pastor Menard responded, "[I]f you ever want to have a genuine conversation, the offer stands. Until then, please leave us alone. What you are doing is not free speech - it is just harassment. If it happens again, we will take legal action against you. But I hope for better things. If you really care about making a positive difference in the world - let's move on to greater good."

167. The Church continued to fear intimidation, interference, and obstruction from these hostile disruptors. For the safety of its members, the Church, as noted, retained counsel and sent Defendant Brunner a cease-and-desist letter regarding any interference with the Church's Mother's Day services. *See supra* ¶ 135. At least one disruptor did show up on Mother's Day, but left when he saw that others had not come.

168. The letter did not dissuade Brunner or any other Defendant from continuing to disrupt the Church's events, as reflected by the disruption of the September 7 Service.

169. The day after the September 7 worship service, Defendants Werth and Brunner posted videos boasting about their actions. Defendant Brunner (@charismaticelisha) posted, "Go live in Israel. We're fine here without that Israeli baggage and cost to our country. PARIAH," and Defendant Werth (@resistthepropaganda) added, "How does it feel to go on record as a supporter of a holocaust of children?"

170. Several Defendants and other disruptors posted photos of Jewish and Christian worshipers to expose their identities, open them up to further attack, and intimidate them from exercising their religious beliefs in support of the Nation of Israel.

171. Another disruptor (@awesomefridge) posted next to a photo of a Christian worshiper at the September 7 event, "this guy works as security at the mission church of Carlsbad."



Image 12: Instagram post on Sept. 7 targeting a member of the Church safety team

172. Defendant Maya Karalius (@mayapapaya66) posted about one Jewish worshiper, saying he was "wearing the black leather arm Tefillin and head Totafot tradition of Orthodox Jew Tradition."

Image 13: Instagram post on Sept. 7 targeting a Jewish worshiper

173. Defendants have harassed other attendees through social media, targeting worshipers' businesses and personal lives to dissuade them from adhering to their religious convictions to support Israel.

174. Since October 2024, Defendant Brunner and the other Defendants have shown a consistent pattern and practice of targeting The Mission Church, the Christian & Jewish Alliance, and similar organizations because of their shared religious beliefs supporting Israel.

175. On August 25, 2025, Defendant Brunner and several other individuals shouted epithets outside a different church in San Diego, challenging the church's religious beliefs about Israel. As he bragged in a video posted on social media, "we're challenging church members to ask their pastors…what is Christian Zionism? What is Christian Nationalism? What do they mean by 'what would Jesus do?'"

176. On September 14, 2025, Defendant Brunner posted the following image:



Image 14: Social media post by Daniel Brunner

177. On September 28, 2025, Defendant Brunner posted a video of himself saying, "We're doing our part to fight the war against Zionism, which is an abomination that says that some people are less human than other people. It uses forms of terror and starvation . . . We ain't shuttin' up and we ain't goin' nowhere. We're going to keep fighting."

178. On September 29, 2025, Defendant Werth posted a video of herself and Defendant Brunner as CODEPINK leaders recruiting new disruptors. Defendant Werth said, "every time we come out here, we have new comrades that are joining us," and Defendant Brunner encouraged viewers to "look us up…it's all about the numbers right now."

### *The Lingering Effects of Defendants' Unlawful Interference*

179. As a result of the ongoing intimidation, interference, and obstruction of religious exercise at the Church and other places of worship that Defendants caused, the Church has cancelled events that were intended to support the local Jewish community.

180. On March 25, one week after the March 19 Worship Service, the Church had planned to host a movie screening of *October 8*, a documentary about the persecution of Jews worldwide. Because of the Church's reasonable fear of further hostile disruption from the Defendants, and fears for the safety of its own

members and the Jewish guests that members would invite, the Church made the difficult decision to cancel this event.

181. The Church has lost members because of the intimidation, interference, and obstruction that Defendants caused on March 19 and Easter.

182. Defendants' actions have created an environment of fear among the Church and its remaining congregants, who remain on edge when attending events at the Church. On one Sunday soon after the disruption of the March 19 Service, a bottle dropping on the floor of the Sanctuary caused severe distress to congregants due to the loud noise it made.

183. The Church has had to expend additional resources and effort on security since the disruptions, training additional members of the safety team and purchasing equipment in anticipation of future disruption.

184. The cities of Carlsbad and San Diego have likewise spent significant resources due to the threat of future disruptions by Defendants. Multiple officers were necessary to escort guests to safety following the March 19 Service. An officer was necessary to protect the Church's congregants during and after the Easter services. And due to Defendant Brunner's Mother's Day threat, the City deployed twenty additional police officers downtown to patrol the area and spent significant resources preparing for disruptions. Multiple San Diego police officers were called to the September 7 event and were needed to physically remove the trespassing disruptors from private property (though they returned to trespassing soon after the police left).

185. The Church's pastors are committed to supporting Israel, but due to ongoing and escalating attacks on places of worship, they are concerned about the safety of their members and guests if they continue hosting events.

186. Because it cannot find a safe venue to host these events, the Alliance cannot safely further its religious mission of bringing Jewish and Christian congregations together to exercise their religious belief to support Israel.

# **FIRST CLAIM FOR RELIEF**

## **VIOLATIONS OF THE FACE ACT (18 U.S.C. § 248)**

187. Plaintiffs hereby incorporate and re-allege paragraphs 1–186.

188. The FACE Act imposes civil liability on anyone who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2).

189. Defendants' disruption of each worship service was motivated by the religious nature of the event and the Jewish and Christian identities of the worshipers.

190. Defendants' actions reflect a pattern of targeting the Church and the Alliance because of their religious beliefs, seeking to interfere with and prevent their religious gatherings.

### ***The March 19 Worship Service***

191. Defendants Brunner, Miller, Turner-Brown, Hartley, Pagaduan, Baradar, and Does 1-20 intentionally used force, threats of force, and physical obstruction to intentionally interfere with egress from the Church and access to the Church's parking lot following the March 19 Worship Service.

192. The Church has an actionable claim against these individuals for their actions on March 19.

193. By physically occupying the narrow sidewalk, Defendants Brunner, Miller, Turner-Brown, Hartley, Pagaduan, Baradar, and Does 1-20 intentionally rendered passage to the Church unreasonably difficult, causing late arrivals to the Worship Service to leave without attempting to enter the Church.

194. By physically occupying the narrow sidewalk, blockading access to the parking lot, and creating a hostile environment through their repeated disruptions of the event, Defendants Brunner, Miller, Turner-Brown, Hartley, Pagaduan,

Baradar, and Does 1-20 intentionally intimidated attendees to leave the event early through a narrow rear entrance from the Church.

195. By obstructing egress from the Church and access to the Church's parking lot following the Worship Service, Defendants Brunner, Miller, Turner-Brown, Hartley, Pagaduan, Baradar, and Does 1-20 intentionally sought to interfere with attendees' free exercise of religion and to intimidate attendees from attending future events at the Church.

196. By forcefully resisting removal from the Sanctuary, Defendants Turner-Brown, Miller, Pagaduan, Baradar, and Does 17–20 intentionally used force to injure and attempt to injure congregants and attendees of the Worship Service for exercising their religious beliefs.

197. By striking congregants seeking to leave the event, Defendant Turner-Brown intentionally used force to injure and attempt to injure attendees of the Worship Service for exercising their religious beliefs.

198. By forcefully resisting removal from the Sanctuary while filming congregants and accusing them of being Nazis, perverts, and proponents of genocide, Defendants Turner-Brown, Miller, Pagaduan, Baradar, and Does 17–20 intentionally sought to intimidate attendees of the Worship Service against exercising their religious freedom by attending future events at the Church or openly adhering to their beliefs regarding Israel.

199. Defendants Brunner, Werth, Miller, Turner-Brown, Hartley, Provance, Karalius, and Does 1–20 are jointly and severally liable for the FACE Act violation in relation to the March 19 Worship Service.

### *The Easter Worship Service*

200. Defendants Brunner, Turner-Brown, Hartley, and Does 21–25 intentionally used physical obstruction to intentionally interfere with access to and egress from the Church and its parking lots during and following the Church's Easter Services.

201. The Church has an actionable claim against these individuals for their actions on Easter Sunday.

202. By occupying the space of the narrow sidewalk between the Church's front doors and parking lot during the Church's Easter services, Defendants Turner-Brown and Hartley intentionally sought to obstruct egress from the Church and ingress to the events the Church had set up for children in the parking lot.

203. By occupying the pathway between the Church and its overflow parking lot across the street, Defendants Brunner, Turner-Brown, Hartley, and Does 21–25 intentionally sought to obstruct access to and from the Church for congregants and attendees during the Church's Easter services.

204. Defendants Brunner, Turner-Brown,  Hartley, and Does 21-25 are jointly and severally liable for the FACE Act violation in relation to the Easter Worship Service.

### The September 7 Worship Service

205. Defendants Brunner, Werth, Miller, Turner-Brown, Hartley, Provance, Karalius, and Does 26–30 intentionally used force, threats of force, and physical obstruction to intentionally interfere with ingress to and egress from the worship venue for the interfaith event hosted that the Christian & Jewish Alliance hosted and Mastron attended.

206. The Alliance and Mastron have actionable claims against these individuals for their actions on September 7.

207. By surrounding guests' cars while yelling hostile epithets, physically striking and jumping on cars in a show of force, blocking the main entrance to the venue, and partially blocking the side entrance to the venue, Defendants Brunner, Werth, Miller, Turner-Brown, Hartley, Provance, Karalius, and Does 26–40 used force and physical obstruction to interfere with the ability of worshipers, including Mastron, to attend the event and exercise their religious freedom.

208. By blaring sirens and generating loud noise in close proximity to the event for more than three hours, Defendants Brunner, Werth, Miller, Turner-Brown, Hartley, Provance, Karalius, and Does 26–40 used these sirens as weapons to drown out the religious service, effectively denying access to the event for many attendees, including Mastron.

209. The conduct of Defendants Brunner, Werth, Miller, Turner-Brown, Hartley, Provance, Karalius, and Does 26–40 caused actual intimidation and interference, leading many individuals to refrain from attending the event out of fear and causing others to avoid further association with the Alliance.

210. The worshipers present at the event, including Mastron, were unable to fully participate as planned due to the disruption of Brunner, Werth, Miller, Turner-Brown, Hartley, Provance, Karalius, and Does 26–40.

211. Defendants Brunner, Werth, Miller, Turner-Brown, Hartley, Provance, Karalius, and Does 26–40 are jointly and severally liable for the FACE Act violation in relation to the September 7 Worship Service.

## SECOND CLAIM FOR RELIEF

### TRESPASS

212. Plaintiffs hereby incorporate and re-allege paragraphs 1–111, 164-186.

213. In California, the "essence of the cause of action for trespass is an unauthorized entry onto the land of another." *Church of Christ in Hollywood v. Superior Court*, 121 Cal. Rptr. 2d 810, 815 (Ct. App. 2002).

214. Defendants Turner-Brown, Hartley, Pagaduan, Miller, Baradar, and Does 17–20 intentionally trespassed on Church property. Defendant Brunner aided and abetted the intentional trespasses of those Defendants.

215. The Church has both legal and possessory interest over the property on which the Church is located.

216. On March 19, 2025, the Church gave limited consent to enter its property to individuals who registered by name and only for the purpose of attending the March 19 Worship Service as audience members.

217. Defendants Turner-Brown, Pagaduan, Baradar, and Does 17–20 each entered the Church's property by deceiving the Church, intentionally providing false names.

218. The Church was not aware that Defendants Turner-Brown, Pagaduan, Baradar, and Does 17–20 had provided false names when they entered Church property.

219. On information and belief, Defendant Miller registered twice, as "Sasha Spite" and "Sasha Miller," gaining entry for another disruptor under false pretenses.

220. Defendants Turner-Brown, Pagaduan, Miller, Baradar, and Does 17–20 each intentionally entered the Church's property for purposes other than to attend the March 19 Worship Service as audience members.

221. The Church was not aware that Defendants Turner-Brown, Pagaduan, Miller, Baradar, and Does 17–20 had entered Church property for purposes other than to attend the March 19 Worship Service as worshipers.

222. Deception aside, Defendants Turner-Brown, Miller, Pagaduan, Baradar, and Does 17–20 each exceeded the scope of the Church's consent for individuals to enter its property as attendees of the March 19 Worship Service when they intentionally began loudly disrupting the event.

223. Reflecting this exceeding of consent, Church safety team members quickly sought to remove Defendants Turner-Brown, Miller, Baradar, and Does 17–20 after each began disrupting the event.

224. Despite seeing that previous disruptors had been escorted off the property, Defendants Turner-Brown, Miller, Pagaduan, Baradar, and Does 18–20

continued the disruption in excess of any consent the Church provided to audience members.

225. After the Church informed Defendants Turner-Brown, Miller, Pagaduan, and Does 17–20 that they were no longer welcome on Church property, Defendants Turner-Brown, Miller, Pagaduan, Baradar, and Does 17–20 intentionally and affirmatively refused to leave the Church's property.

226. Defendants Turner-Brown, Miller, Pagaduan, Baradar, and Does 17–20 continued to resist agents of the Church who sought to remove them peacefully from the property.

227. Defendants Turner-Brown, Miller, Pagaduan, Baradar, and Does 17–20 harmed the Church through decreased membership, the cancellation of events focused on Israel, and increased security costs due to their trespass.

228. Defendants Turner-Brown, Miller, Pagaduan, Baradar, and Does 17–20 are jointly and severally liable for each trespass committed because they formed a civil conspiracy to trespass on the Church, acted in furtherance of that conspiracy, and damaged the Church as a result.

229. Defendant Brunner is liable for each alleged trespass because he joined and acted in furtherance of the civil conspiracy to trespass and because he aided and abetted the actions of Defendants Turner-Brown, Miller, Pagaduan, Baradar, and Does 17–20.

230. Defendant Brunner planned, organized, and coordinated the disruption of the March 19 Worship Service, including the sequential individual disruptions by Defendants Turner-Brown, Miller, Pagaduan, Baradar, and Does 17–20 to maximize disruption of the March 19 Worship Service.

231. On information and belief, Defendant Brunner informed Defendants Turner-Brown, Miller, Pagaduan, Baradar, and Does 17–20 of the March 19 Worship Service and instructed them how to obtain access to the March 19 Worship Service and when to disrupt the event.

232. Defendant Brunner acted to facilitate the intentional trespass by Defendants Turner-Brown, Miller, Pagaduan, Baradar, and Does 17–20.

233. When trespassing, conspiring to trespass, and facilitating trespass, each Defendant acted with malicious disregard of the rights of the Church and event attendees and with an intent to injure and annoy the Church and event attendees.

**JURY DEMAND**

Plaintiffs request a trial by jury of all issues so triable.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

a. Enter judgment declaring that Defendants violated the FACE Act;

b. Enter judgment declaring that Defendants Turner-Brown, Miller, Pagaduan, Baradar, and Does 17–20 trespassed on the Church's property;

c. Enter judgment declaring that Defendant Brunner aided and abetted the trespass by Defendants Turner-Brown, Miller, Pagaduan, Baradar, and Does 17–20;

d. Enter judgment permanently enjoining Defendants from obstructing access to the Church, from entering the Church without advance permission from the Church, from knowingly seeking to intimidate members of the Church from attending religious events at the Church, and from future violations of the FACE Act against the Church or its congregants;

e. Enter judgment permanently enjoining Defendants from obstructing access to religious events hosted by the Alliance at places of worship, from knowingly seeking to intimidate members of the Alliance from attending religious events at places of worship, and from future violations of the FACE Act against the Alliance or its members;

f. Enter judgment permanently enjoining Defendants or their agents from participating in or promoting any demonstration within 500 feet of the Church or an Alliance event;

41

COMPLAINT

g.  Award appropriate relief to Plaintiffs under 18 U.S.C. § 248(c)(1)(B);

h.  Award compensatory damages under 18 U.S.C. § 248(c)(1)(B) and/or Cal. Civ. Code § 3333;

i.  Award punitive damages to Plaintiffs under 18 U.S.C. § 248(c)(1)(B) and Cal. Civ. Code § 3294;

j.  Award attorneys' fees, expert witness fees, and costs under 18 U.S.C. § 248(c)(1)(B) and Cal. Civ. Proc. Code § 1021.5; and

k.  Award any such other relief as the Court may deem just and proper.

Dated: November 4, 2025                    Respectfully submitted,

                                           /s David J. Hacker
C. Kevin Marshall*                         David J. Hacker (SBN 249272)
ckmarshall@jonesday.com                    dhacker@firstliberty.org
John C. Brinkerhoff Jr.*                   Jeremiah G. Dys*
jbrinkerhoff@jonesday.com                  jdys@firstliberty.org
JONES DAY                                  Kayla A. Toney*
51 Louisiana Ave NW                        ktoney@firstliberty.org
Washington, DC 20001                       FIRST LIBERTY INSTITUTE
(202) 879-3939                             2001 W. Plano Pkwy, Suite 1600
                                           Plano, TX 75075
                                           (972) 941-4444

*pro hac vice forthcoming*

Attorneys for Plaintiffs Christian and Jewish Alliance Inc., Ezra Ministries, and Ruth Mastron