C. Kevin Marshall (DCSBN 476266)
John C. Brinkerhoff Jr. (DCSBN 1765474)
Janessa B. Mackenzie (DCSBN 90007987)
**JONES DAY**
51 Louisiana Ave., NW
Washington, DC 20001
Telephone: (202) 879-3939
Email: ckmarshall@jonesday.com

David J. Hacker (SBN 249272)
Jeremiah G. Dys (TXSBN 24096415)
Kayla A. Toney (TXSBN 24141332)
**FIRST LIBERTY INSTITUTE**
2001 W. Plano Pkwy, Ste. 1600
Plano, TX 75075
Telephone: (972) 941-4444
Email: dhacker@firstliberty.org

*Attorneys for Plaintiffs Christian & Jewish Alliance,*
*Ezra Ministries, and Ruth Mastron.*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Christian & Jewish Alliance Inc., a California not-for-profit corporation, Ezra Ministries, a California not-for-profit religious corporation, d/b/a The Mission Church, and Ruth Mastron, <br><br> *Plaintiffs*, <br><br> v. <br> Daniel Brunner, Aimee Magda Werth, Kristina Turner-Brown, Patrick Hartley, Sasha Spite Miller, Jacob Pagaduan, Jonathan Provance, Maya Karalius, and Does 1-40, <br><br> *Defendants*. | Case No. 3:25-cv-02992-AGS-AHG <br><br> **FIRST AMENDED COMPLAINT FOR:** <br><br> 1. **Violations of 18 U.S.C. § 248(a)(2)** <br> 2. **Trespass** <br><br> **DEMAND FOR JURY TRIAL** |

FIRST AMENDED COMPLAINT

## INTRODUCTION

1.    As worshipers gathered at three separate events in 2025, a mob targeted Plaintiffs The Mission Church (the "Church") of Carlsbad and The Christian & Jewish Alliance (the "Alliance") of the San Diego area, interfering with their worship services, intimidating their members and guests, and obstructing their access to gather safely. This mob targeted the Church and Alliance due to the sincere religious beliefs of their members that require support for Israel. Plaintiff Ruth Mastron, a Jewish resident of Oceanside, was obstructed and assaulted as she attempted to enter one of these events.

2.    The campaign of disruption and harassment was perpetrated by Defendants Daniel Brunner, Aimee Magda Werth, Sasha Spite Miller, Kristina Turner-Brown, Patrick Hartley, Jacob Pagaduan, Jonathan Provance, Maya Karalius, and Does 1–40.

3.    On March 19, 2025, Christian and Jewish worshipers joined together at the Church to worship, pray, and learn about religious persecution in Israel; they instead endured unsolicited vitriol and harassment. Once the event started, Defendants Brunner and Does 1–17 began loudly protesting outside the front door of the Church, which abuts a narrow sidewalk that abuts the street. Once the outside protesters were audible in the Sanctuary, Defendants Hartley, Turner-Brown, Miller, Pagaduan, and Does 17–20, who had obtained access to the Church by providing false names and pretending to be event attendees, began disrupting the event from inside the sanctuary in staggered intervals—screaming, threatening congregants, and physically resisting removal. Once the event ended, all attending Defendants blockaded egress from the Church to the parking lot, intentionally bottlenecking hundreds of guests seeking to leave and then forcing them to exit through a chaotic and violent environment.

4.    One month later, on Easter Sunday, Defendants Brunner, Turner-Brown, Hartley, and Does 21–25 returned to the Church to spoil the holiest day on the Christian calendar. Defendants and other disruptors shouted with bullhorns on the sidewalk, targeting children's activities in the parking lot, obstructing access to the

2

FIRST AMENDED COMPLAINT

overflow parking lot, and deterring visitors from attending the Church's Easter services. This four-hour disruption had its intended effect: to further intimidate the members and guests (including small children) who attended the Church's services.

5. On September 7, 2025, Defendants Brunner, Werth, Miller, Turner-Brown, Provance, Karalius, and Does 26–40 disrupted another worship event, which the Alliance hosted, the Church sponsored, and Mastron attended. Defendants and other disruptors blocked the entrance to the parking lot by parading in the entrance and harassing stopped vehicles. Once the service started, the disruptors gathered at the back of the amphitheater, blaring sirens and hurling epithets for three hours during the interfaith prayer and worship service.

6. Defendants' actions have created a culture of anxiety and fear within both the Church and the Alliance, causing both to cancel religious events and expend additional resources to ensure the safety of their members. The Church has also lost membership as a result of Defendants' disruptions, while the Alliance has found it increasingly difficult to secure safe locations to host interfaith worship and prayer events.

7. Defendants' actions have likewise caused severe stress and lingering anxiety for Mastron, who experiences heightened situational awareness and anxiety when in public in her own community, due to the threat posed by Defendants.

8. Defendants have no regrets about their actions. They have publicly vowed to continue "doing our part to fight the war against Zionism, which is an abomination . . . We ain't shuttin' up and we ain't goin nowhere."

9. Federal and California law do not tolerate Defendants' conduct, which violated the civil rights of The Mission Church, the Christian & Jewish Alliance, and their members and guests, including Mastron. Defendants' conduct violates, and is actionable under, the Freedom of Access to Clinic Entrances Act ("FACE Act"), 18 U.S.C. § 248, as well as California tort law.

FIRST AMENDED COMPLAINT

10. Defendants have committed and are almost certain to continue committing violations of the FACE Act, by their injury, intimidation, and obstruction of Jews and Christians seeking to exercise their First Amendment rights of religious freedom at places of religious worship.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. It has authority to provide compensatory, punitive, declaratory, injunctive, and other relief in this action, including under 18 U.S.C. § 248(c)(1)(B); 28 U.S.C. §§ 1343, 2201, 2202; and Cal. Civ. Code §§ 3294, 3333.

12. Venue is proper under 28 U.S.C. § 1391(b) because all events giving rise to the claims detailed in this Complaint occurred within the Southern District of California, and at least eight Defendants reside in the District.

## PARTIES

### *The Mission Church*

13. Plaintiff The Mission Church is a non-denominational Christian church and a California not-for-profit religious corporation registered under the name Ezra Ministries. Its principal location is 825 Carlsbad Village Dr., Carlsbad, CA 92008. The Church owns and operates its place of religious worship.

14. The Church serves the Carlsbad community and region through worship services, prayer, community events, and outreach.

15. Established in 2011 as a home Bible study, and moving to its current facility in 2018, the Church holds a "simple" guiding philosophy of ministry: "We love Jesus and we love people."

16. Since its founding, the Church has grown to a congregation of 3,000, becoming an integral part of the Carlsbad community. Attendance on a typical Sunday, including children, exceeds 1,000 worshipers.

4

FIRST AMENDED COMPLAINT

17. Pastor David Menard is the founder and lead pastor of the Church. He leads the team that established and nurtured the Church into a thriving resource for Christians in Carlsbad and beyond.

18. Pastor Jonathan "JC" Cooper is an associate pastor at the Church, where he has served since 2018.

19. The Church both holds itself out as and in fact operates as a Christian house of worship. It holds multiple worship services every Sunday that, like many Protestant services, focus on prayer, worship, and instruction. During those services and in accordance with religious doctrine, the Church observes the sacrament of communion. The Church also hosts numerous other Christian services, Bible studies, and other ministry work throughout the week.

20. The Church's leadership, including Pastor Menard and Pastor Cooper, are ordained ministers. As part of their professional roles with the Church, they regularly administer holy Christian sacraments, including performing baptisms and officiating weddings. They likewise eulogize funerals, counsel congregants, and minister to the broken and needy.

21. The Church is not designed to be a public forum for the general public to socialize or entertain themselves. Although it welcomes visitors for religious purposes, its mission is ministry.

22. The Church sanctuary does not have features of a traditional public forum. It contains chairs that face the stage in rows, with seating elevating as it gets further from the stage to ensure that all worshipers, including those in the back, have a clear view of the stage. It likewise contains large screens facing the audience that portray what is occurring on stage or display aids that the speaker on stage has selected to show the audience. And it contains a sound system that amplifies the music or messages that are produced by individuals on the stage. The sanctuary is, in short, designed to facilitate unified worship and preaching by focusing the audience on the stage.

FIRST AMENDED COMPLAINT

### *The Christian & Jewish Alliance*

23. Plaintiff The Christian & Jewish Alliance Inc. is an interfaith organization and a California not-for-profit corporation.

24. The Alliance was founded in May 2024 in the wake of the horrific massacre of over 1,200 Jews on October 7, 2023, and the surge in antisemitic attacks worldwide in the months after.

25. In the aftermath of the October 7 attacks, members of the Jewish community in the San Diego area felt isolated and alone, having witnessed not only the largest massacre of Jews since the Holocaust, but also widespread hatred even among their own neighbors after that massacre.

26. Refusing to believe that Jews were alone in their struggle, a local Jewish leader, Liat Cohen-Reeis, felt called to reach out to churches and synagogues in the San Diego area with a proposal to create an interfaith organization to support Israel and the Jewish community.

27. A number of synagogues and churches, including the Church, answered Cohen-Reeis's call, acting out of sincere religious beliefs to support Israel. Together, Cohen-Reeis and these groups formed the Alliance.

28. Cohen-Reeis serves as the President and founder of the Alliance, which also has a Vice President and Treasurer.

29. The Alliance hosts a wide range of events, ranging from relatively intimate Shabbat dinners for 50 to 60 persons at Catholic and Protestant Churches to larger interfaith worship services that hundreds of Jews and Christians attend.

### *Ruth Mastron*

30. Plaintiff Ruth Mastron is a resident of Oceanside, California. She is a devout Jew and a committed member of her local Chabad synagogue. She attends events of the Alliance as an expression of her sincere religious beliefs.

FIRST AMENDED COMPLAINT

31. Mastron's religious beliefs obligate her to support the Nation of Israel. She was born to committed Jewish parents who taught her the principles of Judaism and Zionism at a young age.

32. Mastron's faith is central to her life and identity. She actively studies Hebrew, faithfully celebrates Jewish holidays, refrains from eating pork and other prohibited foods, displays mezuzot on the doors of her home in keeping with Torah commandments, and lives out her sincere religious beliefs by volunteering her time in support of Israel.

33. For several decades, Mastron served as the president of the House of Israel in Balboa Park, a beloved destination in San Diego. Since 1948, this all-volunteer organization has educated and inspired visitors from all over the world about the Jewish faith and the Nation of Israel. Mastron continues to volunteer whenever possible, teaching tourists, children on field trips, and San Diego locals about the beautiful heritage, diversity, faith, and resilience of the Jewish people.

34. Every year, Mastron spends about six weeks in Israel. For four weeks, she volunteers her time to provide medical and operational support as an expression of her sincere religious beliefs. She spends the remaining two weeks visiting sacred sites and family members.

35. Mastron attended the September 7, 2025, worship service as an expression of her Jewish faith, and she suffered lasting harm from Defendants' actions.

### *Defendants*

36. Defendant *Daniel Brunner* is a resident of Lemon Grove, California. He both participated in and directed and coordinated the other Defendants in the illegal conduct during the March 19, 2025, Easter Sunday, and September 7, 2025, services. Targeting churches and worshipers, he has maintained a campaign to recruit others to join his "war against Zionism, which is an abomination."

37. Defendant *Aimee Magda Werth* is a resident of La Jolla, California. She directed and coordinated the other Defendants in the illegal conduct interfering with

FIRST AMENDED COMPLAINT

the interfaith worship service on September 7, 2025. She likewise recruits others to join her efforts to intimidate supporters of Israel, even when gathered in worship. She has vowed that she "will never give" the Church and Alliance "a moment of peace."

38.   Defendant *Kristina Turner-Brown* is a resident of Escondido, California. She participated alongside the other Defendants in the illegal conduct interfering with worship at the Church during the March 19, 2025, and Easter Sunday services, as well as at the interfaith worship service on September 7, 2025.

39.   Defendant *Patrick Hartley* is a resident of San Diego, California. He participated alongside the other Defendants in the illegal conduct interfering with worship at the Church during the March 19, 2025, and Easter Sunday services.

40.   Defendant *Sasha Spite Miller* is a resident of Escondido, California. She participated alongside the other Defendants in the illegal conduct interfering with worship at the Church on March 19, 2025, and at the interfaith worship service on September 7, 2025.

41.   Defendant *Jacob Pagaduan* is a resident of San Diego, California. He participated alongside the other Defendants in the illegal conduct interfering with worship at the Church on March 19, 2025.

42.   Defendant *Jonathan Provance* is a resident of San Diego, California. He participated alongside the other Defendants in the illegal conduct interfering with worship at the interfaith worship service on September 7, 2025.

43.   Defendant *Maya Karalius* is a resident of Kenwood, California. She participated alongside the other Defendants in the illegal conduct interfering with worship at the interfaith worship service on September 7, 2025.

44.   Defendants John Does 1–20 are disruptors who participated in the disruptions to the March 19 worship service. Their identities are unknown. They will be specifically named as Defendants when their true identities are ascertained.

FIRST AMENDED COMPLAINT

45. Defendants John Does 21–25 are disruptors who participated in the disruptions to the Easter worship services. Their identities are unknown. They will be specifically named as Defendants when their true identities are ascertained.

46. Defendants John Does 26–40 are disruptors who participated in the disruptions to the September 7 worship service. Their identities are unknown. They will be specifically named as Defendants when their true identities are ascertained.

## FACTUAL BACKGROUND

### *The Mission Church's Religious Beliefs*

47. The Church believes as part of its statement of faith that "the Scriptures of the Old Testament and New Testament are divinely inspired by God and inerrant in their original writings."

48. The Church adheres to dispensationalist Christian beliefs, a centuries-old body of theology that teaches, among other things, that God chose Israel to be his representation to the world and has uniquely blessed it. *See, e.g.*, Deuteronomy 7:6 (New King James) ("For you are a holy people to the Lord your God; the Lord your God has chosen you to be a people for Himself, a special treasure above all the peoples on the face of the earth."); Genesis 12:2 ("I will make you a great nation; I will bless you And make your name great; And you shall be a blessing.").

49. Likewise, the Church believes that God "will bless those who bless [Israel], and . . . will curse him who curses [Israel]." Genesis 12:3; *see also, e.g.*, Zechariah 2:8–9 ("[F]or he who touches [Israel] touches the apple of His eye. For surely I will shake My hand against them, and they shall become spoil for their servants.").

50. Consistent with dispensationalist teaching, the Church also believes that God's covenant with Abraham includes an everlasting grant of the land of Canaan, where the modern Nation of Israel is located.

51. Under these beliefs, supporting the Jewish people and the Nation of Israel is deeply and sincerely ingrained in the Church's theological teaching and activities.

9

FIRST AMENDED COMPLAINT

52. Understanding the contemporary problems facing Jews and the Nation of Israel is a necessary prerequisite for the Church and its members to translate these theological beliefs into practical application. This support includes understanding the current geopolitical situation in Israel and how the congregation can protect and support its Jewish neighbors. The Church thus preaches about contemporary issues, including the conflict in the Middle East, to help its congregation understand how to be thoughtful and faithful citizens in the present context as part of their religious duties.

53. Because of its religious beliefs, the Church regularly hosts events with local Jewish groups, and its pastors are involved in the Christian & Jewish Alliance.

54. The Church is hardly alone in believing that faith requires understanding and engaging with contemporary problems and disputes. Many religious faiths believe in the spiritual need to educate and equip their membership to live faithfully in view of the wide array of issues confronting the conscience today, from immigration and race relations to abortion and the death penalty.

55. The Church is likewise hardly alone in its beliefs regarding the relationship between Scripture and the Nation of Israel. Dispensationalist theology is and has long been widespread among Protestant churches in the United States. In its modern form, dispensationalist theology originated from the nineteenth-century writings of theologian John Nelson Darby. Dispensationalist ministers were prominent advocates for the creation of Israel in 1948. Dispensationalism remains a common belief among many Christian churches today.

***The Christian & Jewish Alliance's and Ruth Mastron's Religious Beliefs***

56. Cohen-Reeis formed the Christian & Jewish Alliance along with local pastors and rabbis for the religious purpose of uniting Christians and Jews in their religious beliefs to stand with Israel and against antisemitism. "[D]riven by a moral imperative to speak out and act," the Alliance's core belief is "that Israel is not only the historic and ancestral home of the Jewish people but also central to the unfolding plan of God."

FIRST AMENDED COMPLAINT

57. To further this religious mission, the Alliance holds itself out as a religious organization and hosts interfaith events involving prayer, worship, and messages from local faith leaders including rabbis and pastors. For example, Pastor David Menard has spoken at several events that the Alliance hosted.

58. For the Christian members of the Alliance, many of whom are members of San Diego-area churches, standing with Israel is a core expression of their Christian faith. These members follow dispensationalist beliefs like those of The Mission Church. *See supra* ¶¶ 43-50.

59. For the Jewish members of the Alliance, including Mastron, their faith includes traditional Torah beliefs that practicing Jews have held for millennia. Torah and Talmudic teachings are clear that Jews are the people of God and that the land of Israel is their divinely ordained homeland. To support Israel is a core expression of their faith.

60. Torah and Talmudic teachings instruct that Israel is the land that God promised to the Jewish patriarchs, Abraham, Isaac, and Jacob, and that it is the spiritual homeland of the Jewish people. *See, e.g.*, Genesis 12:7 (Contemporary Torah) ("I will assign this land to your offspring."); Exodus 3:17 ("I will take you out of the misery of Egypt to the land of the Canaanites, the Hittites, the Amorites, the Perizzites, the Hivites, and the Jebusites, to a land flowing with milk and honey . . . .").

61. The modern Nation of Israel is seen as part of God's promise to restore this land to the Jews. *See* Ezekiel 36:24 ("I will take you from among the nations and gather you from all the countries, and I will bring you back to your own land."); *see also, e.g.*, Babylonian Talmud, Ketubot 110b ("[A]nyone who resides in Eretz Yisrael is considered as one who has a God.").

62. Observant Jews pray three times a day facing Jerusalem for a return to Israel as their physical and spiritual homeland. Nissan Mendel, *The Three Daily Prayers*, https://tinyurl.com/mrseu5z5. Those prayers likewise seek God's "[r]eturn in mercy to Jerusalem" to "rebuild it, soon in our days, as an everlasting edifice." *Amidah*

11

FIRST AMENDED COMPLAINT

*(Weekday Morning Service)*, in *The Koren Siddur* 114 (J. Sacks trans. 2009). Every religious festival or holy day that Jews celebrate throughout the calendar year includes prayers for restoring the holy temple in Jerusalem. Many Torah commandments can only be performed in the Holy Land. Rabbi Aharon Lichtenstein, *Laws Dependent Upon the Land of Israel* (D. Strauss trans. 2015).

63. Observant Jews understand the support of Israel to be an expression of the biblical covenant between God and the Jewish people.

64. Under these religious beliefs, supporting the Nation of Israel and longing for a return to this physical and spiritual homeland is sincerely ingrained in the Jewish members of the Alliance, including Mastron, and informs their religious activities. Supporting Israel is a core expression of devout Jewish faith.

### *The Increasingly Violent Climate of Antisemitism Since October 7, 2023*

65. Although Jews have long been outsized targets of race- and religion-based attacks, the number of antisemitic hate crimes has dramatically increased since the October 7, 2023, attack on Israeli civilians. The number of anti-Jewish hate incidents in the United States increased 63% in 2023, and another 5% in 2024. The thousands of anti-Jewish hate crimes recorded in 2023 represent the highest number ever recorded since the Federal Bureau of Investigation began collecting data in 1991, a record attributed to a surge following October 7, 2023.

66. According to the California Department of Justice, anti-Jewish hate crimes accounted for 73% of all hate crimes in the State tied to religious bias in 2023, with an outsized number occurring after October 7, 2023.

67. In San Diego County, antisemitic incidents dramatically rose following the October 7, 2023, attack, setting new records in both 2023 and 2024.

68. Among the thousands of antisemitic incidents that have occurred since October 7, 2023, are high-profile bomb threats against Southern California synagogues, attempted murders in Los Angeles, and the murder of an engaged couple employed by the Israeli Embassy in broad daylight.

FIRST AMENDED COMPLAINT

69. Anti-Israel protests have been focal points for antisemitic activity. In early 2024, protesters at a California university caused a campus-wide shutdown as they occupied a central administrative building for over a week—committing vandalism throughout the building and violently clashing with law enforcement. Anti-Israel protesters have engaged in similarly dangerous and lawbreaking activity across the country, including protests that block traffic and devolve into assaults on bystanders.

70. Antisemitic disruptions have targeted religious services of Jews and Christians who support Israel. Since the October 7, 2023, massacre, multiple suits have been filed seeking relief from violent mobs that harassed, intimidated, and harmed worshipers seeking to exercise the right to freely exercise their religion.

71. Unchecked antisemitism expands, adding as a target any who show solidarity with the Jewish people and the nation of Israel. Christians, like members of The Mission Church, make easy targets for those hoping to isolate the Jewish people, intimidating those who would otherwise be their closest supporters. Such anti-Christian prejudice thus becomes a subset of antisemitism.

72. Accusing victims of perpetrating the very wrongs they have historically suffered is a common antisemitic tactic, referred to as "inversion." Because Jews suffered a genocide during the Holocaust, Defendants' accusation that Jews are committing "genocide" is especially offensive. Because Jews were slaughtered by Nazis, Defendants' calling them "Nazis" is deeply hurtful. Because Jews have long called themselves Zionists (Zion refers to their biblical homeland as the city of God), Defendants' attempts to convert "Zionism" into a slur is likewise offensive.

73. Both the broader statistics regarding violent crimes against supporters of Israel and individual high-profile instances of hate crimes and incidents are well known to officers of the Church, Church congregants, the Alliance, and attendees of the Alliance's and Alliance's services.

74. The Church found itself in the crosshairs of this opposition after Pastor David Menard spoke at events for the Alliance in October 2024. Those events were

13

FIRST AMENDED COMPLAINT

disrupted by Brunner, Provance, Hartley, Werth, and other individuals who would later disrupt the Church's events.

### *The March 19, 2025, Worship Service*

75. On March 19, 2025, the Church hosted a worship service that invited its members and members of the Alliance to gather together and pray corporately for their Jewish neighbors and the peace of Israel, worship, learn about the ongoing conflict, and encourage the Jewish community as a part of their religious beliefs.

76. Dr. Einat Wilf, who is Jewish, a former member of the Israeli Knesset, a renowned scholar, and an expert on the current conflict in the Middle East, headlined the event.

77. The Church hosted this event during its weekly Wednesday night worship service for young adults in its sanctuary.

78. The Church partnered with the Alliance to host the event. The Church required guests to pre-register by name to attend, though the event was free. The Church conditioned entrance on asking for the name of each attendee and checking their responses against the registration list.

79. It was likewise clear that guests were allowed to enter the property as attendees to worship together and, as part of that, listen to speakers as audience members. It was clear that entry was not permission to disrupt the service.

80. Approximately 400 people attended the event, including about 200 members of the local Jewish community. The sanctuary, which ordinarily seats nearly 450 individuals, was nearly full.

81. Many of those in attendance were young children, including Pastor Cooper's four children.

82. The event opened with prayer by Pastor Menard.

83. The Church and the Alliance selected worship hymns that were honoring to both faiths. For over twenty minutes, the Jews and Christians in attendance engaged

in joint religious worship, linking arms and holding hands as they sang and praised God.

84. Pastor Menard provided an expository message about why Christians stand in solidarity with Jews because of their faith and instructed attendees to "praise the Lord" for that relationship. He told attendees, "The reason we love Israel is because God loves Israel. He is the same yesterday, today, and forever, and He made a covenant with Israel that lasts forever."

85. Pastor Menard then introduced Cohen-Reeis, praising the "ministry she put together" through the Christian and Jewish Alliance and her dedication to "meaningful, faith-driven advocacy." Cohen-Reeis spoke, stating that "the music was beautiful" and expressing gratitude for "such beautiful Christian friends." She thanked Pastor Menard "for opening up your heart and your Church." She then provided a brief message connecting scripture to the modern Nation of Israel.

86. As part of the worship service, Dr. Wilf then spoke and provided a discussion of Israel's religious history and current geopolitical status.

### *Defendants' Disruption of the March 19 Worship Service*

87. After the service started, several dozen disruptors (the "outside disruptors"), including Defendants Brunner and Does 1–16, began to occupy the sidewalk outside of the Church's front door.

88. The front door of the Church is a few feet from the street. It is separated from the sidewalk by only a small stoop and two steps.

89. The sidewalk immediately abuts both the stairs and the street. It is five feet, 11 inches wide, providing only a narrow pathway from the front door to the parking lot. There is no additional space on either side because the sidewalk runs along the church building on one side and a main roadway on the other.

90. The sidewalk is the only direct path from the front door to access the Church's primary parking lot along the west side of the building. A person leaving the

15

FIRST AMENDED COMPLAINT

Church through its front door must immediately turn right and walk down that sidewalk to reach that lot.



Image 1: The Mission Church sidewalk



Image 2: The Mission Church front

91.   The outside disruptors occupied the sidewalk from outside the front door along the sidewalk leading to the parking lot on the west side of the building.

FIRST AMENDED COMPLAINT

92.  Once in place, the outside disruptors sought to halt the in-progress event by shouting and drowning out the speaker in the auditorium. The outside disruptors wielded bullhorns and graphic signs with bloody images of dismembered children.

93.  Shouting through bullhorns, the outside disruptors warned the Church through loud chants including, "Mission Church, you can't hide! We charge you with genocide!" They also loudly and falsely accused each individual in the sanctuary of being "a Nazi" and one of the church officers of being a "F--king pervert."

94.  The outside disruptors were clearly audible to event attendees, interfering with the worship service inside.

95.  At one opportunity, Pastor Cooper said to one of the outside disruptors, "If you'd like to reasonably talk, I would be happy to." The disruptor responded, "F--- you! F--- you! There's nothing to talk about!"

96.  Separate from the outside disruptors, a group of individuals, including Defendants Hartley, Turner-Brown, Miller, Pagaduan, and Does 17–20 (the "inside disruptors"), had gained entry to the sanctuary under the false pretense of being attendees.

97.  Many of the Defendants used pseudonyms to pre-register for the event, posing falsely as guests and entering the Sanctuary prior to the start of the service, as part of a coordinated strategy to intentionally disrupt the event. Brunner and Miller registered under their own names.

98.  The inside disruptors began to interfere with the event from the inside shortly after Dr. Wilf began speaking. At staggered intervals, the inside disruptors would stand up, begin screaming epithets at the peaceful audience, and film individual congregants.

99.  The Church's safety team told each of the inside disruptors that they were on private property and asked them to leave the sanctuary before resorting to escorting them out of the Church building. Each disruptor refused.

FIRST AMENDED COMPLAINT

100. The Church's safety team would have made the same request of anyone who stood up and began shouting or otherwise making sustained loud noise that inhibited enjoyment of the service, because such a disruption would have interfered with the ability of the Church to exercise its faith and express its message. The decision to remove disruptors was thus rooted in both the Church's sincere religious beliefs regarding the need for its worshipers to hear the message on stage and its property rights allowing it to condition admittance and terminate permission to third parties.

101. The disruptors would not stop shouting until the Church's safety team escorted them out. Once they were outside, members of the Church safety team also asked each disruptor not to block the door.

102. Most of the disruptors, including Defendants Miller, Turner-Brown, and Pagaduan, physically and forcefully fought against removal. While resisting, the inside disruptors continued to shout epithets and to accuse the religious attendees, whom they were filming, of supporting genocide.

103. Each time an inside disruptor individually interfered with the service to intimidate and obstruct those gathered in worship, Dr. Wilf had to suspend her planned remarks.

104. Because of the inside disruptors' resistance, multiple members of the Church's safety team were needed to escort each disruptor out of the sanctuary and building. Members of the safety team who removed each disruptor were otherwise engaged in religious worship. They escorted disruptors out to ensure that they and other worshipers could resume engaging in worship.

105. The first disruptor was Defendant Hartley. He refused to leave the sanctuary when asked by a member of the Church's safety team. As he was being removed, he resisted by planting his feet and leaning his body against members of the safety team. He continued screaming at the speaker during his extended removal.

106. The second disruptor was a brunette woman wearing a mask over her face, Doe 18.

18

FIRST AMENDED COMPLAINT

107. The third disruptor was Defendant Miller, who likewise refused to leave when asked. When an attendee next to her tried to guide her out to the aisle, she hit the attendee, causing him to recoil. She continued resisting as she was removed, planting her feet and shouting. She posted a video of herself on Instagram causing disruption, yelling epithets, accusing congregants in the sanctuary of "murder," and resisting removal. Overlaying that video, she accused the Church of "hiding behind religion to justify [I]srael[']s genocide on Palestine."



Image 3: Defendant Miller disrupting the service and resisting removal from sanctuary

108. The fourth disruptor was Defendant Pagaduan, who injured at least one worshiper in the sanctuary as he leaped up and sought to disrupt the service. He likewise refused to leave when asked. Instead, he kicked, fought, and struggled with physical force against the members of the Church's safety team who sought to remove him from the sanctuary. Several members were needed to restrain and remove him safely. He refused to walk, so they had to carry him to the church door.

FIRST AMENDED COMPLAINT

109. The fifth and sixth disruptors, Does 19 and 20, were women who began yelling simultaneously and had to be removed from the Church balcony by the safety team.

110. The seventh disruptor was Defendant Turner-Brown, who screamed "f*ck you" repeatedly when asked to leave. She physically and forcefully fought against removal by shoving and elbowing the Church's safety team. She likewise screamed "Love thy Neighbor" as she was removed. She fought so forcefully while in the balcony that those asking her to leave nearly fell down the stairs.



Image 4: Defendant Turner-Brown disrupting the service and resisting removal

111. The eighth disruptor was an elderly woman using a walker, Doe 16.

112. Once removed from the Church, each inside disruptor, including Defendants Hartley, Miller, Pagaduan, and Turner-Brown, joined the outside disruptors in seeking to further interfere with the event and intimidate those gathered peacefully for worship.

113. When he was escorted out of the sanctuary, Defendant Hartley was wearing black glasses, a forest green shirt, and a black jacket. Later, he removed his

20

glasses and put on a green jacket and covered his face with a red bandana. He also was holding a large sign that read, "America Funds Israel's Genocide," which contained graphic images of injured children.

114. At one point, Hartley came back onto Church property when he walked up the steps leading to the front door and attempted to re-enter the Church while holding a large sign. When he was unable to get around the Church's safety team, he returned to the sidewalk. After being escorted out of the Church building, Miller and Turner-Brown also repeatedly attempted to walk back up the Church stairs to further interfere with those gathered inside. A Church safety team member warned them that this was trespassing and asked them to back away from Church property repeatedly. Nevertheless, Turner-Brown repeatedly came back on Church property after receiving this warning.

115. Because of the effectiveness of each disruptor in halting the event and precluding worshipers from hearing Dr. Wilf, the effort required to remove each disruptor, and the timing of disruptions every few minutes throughout the event, Defendants rendered it nearly impossible for Dr. Wilf to effectively present her message to attendees. Those who had come to receive her message and respond in prayer were similarly thwarted.

116. Fearing for their safety and intimidated by the actions of protesters inside and outside the church, several attendees left early, asking the Church's safety team to escort them to their cars through the narrow back exit that leads to the parking lot.

117. Most attendees did not have that luxury. In order to access the main parking lot or the overflow parking lot across the street, those who left early through the main doors were forced to walk through a gauntlet of disruptors at the Church's entrance to reach their vehicles.

118. The disruptors, including Defendants Brunner, Turner-Brown, Miller, Pagaduan, and Hartley, did not dissipate when the March 19 Worship Service ended.

FIRST AMENDED COMPLAINT

Instead, they focused on creating an intentionally hostile environment for the Jewish and Christian congregants attempting to leave the event.

119. Approximately twenty-five disruptors, including Defendants Brunner, Turner-Brown, Miller, Pagaduan, Hartley, and Does 1–20, crowded the steps in front of the Church entrance and occupied the narrow sidewalk between the Church's front door and parking lot.

120. During the event, multiple prospective attendees turned around and did not attend the service after seeing the obstruction in front of the Church that Defendants Brunner, Turner-Brown, Miller, Pagaduan, Hartley, and Does 1–20 created.

121. Because the narrow sidewalk runs between the Church and a main roadway, Defendants Brunner, Turner-Brown, Miller, Pagaduan, Hartley, and Does 1–20 were able to crowd the stairs at the Church's front door and the nearby sidewalk to block access to the parking lot. The disruptors, including Defendants, intentionally forced congregants to walk through a phalanx of obstruction and intimidation to reach their cars. This obstruction caused a severe bottleneck inside the Church as hundreds of terrified attendees sought to leave.

122. In addition to using their bodies, Defendants and other disruptors wielded signs, wagons, and bins to obstruct the narrow sidewalk between the Church's front door and the parking lot.

123. For example, Defendant Miller waved a large Palestinian flag around like a weapon, which took up the entire width of the sidewalk, precluding attendees from seeing beyond it. In order to get past, attendees had to move the flag aside to proceed to the parking lot.

124. Defendants continued to obstruct the sidewalk after a police officer warned them to cease their obstruction.

FIRST AMENDED COMPLAINT

Image 5: Carlsbad police officer shouting at the disruptors to make room, with Pagaduan and Hartley directly behind him

125. One of the police officers who arrived at the Church after receiving a disturbance call recommended that congregants try to exit through a narrow back door at the back of the Church, recognizing that the blockade in front of the Church created a safety risk and would halt egress. But it was not feasible or safe to redirect several hundred congregants, who were already moving toward the front entrance of the Church, through that back door.

126. Police officers and members of the safety team eventually were able to move the disruptors away from the sidewalk and create a narrow path for attendees to leave.

127. Due to their continuous blockage and, even after a narrow path was created, Brunner, Turner-Brown, Miller, Pagaduan, Hartley, and Does 1–20 created a severe bottleneck at the inside entrance to the Church, as terrified attendees tried to leave.

128. Defendants amplified the harassment even after being forced to stop completely blocking the entrance.  They vehemently screamed at the Jewish and Christian congregants attempting to leave the event, screaming epithets such as "F--- you!" and accusing congregants of being "a Nazi" and "Zionists." Defendants used bullhorns to maximize the chaos and intimidation.

FIRST AMENDED COMPLAINT

129. Defendant Turner-Brown recorded video of church members and guests on her phone as they left the event, signaling her intent to disseminate their identities to others who are hostile to the beliefs of attendees.

130. After the police arrived, Defendant Turner-Brown continued to stand in front of people trying to exit and screamed at them. She also moved around the police line and obstructed the movement of the officers. As a result, one of the officers arrested and detained Defendant Turner-Brown in his vehicle.

131. Defendants caused significant fear and intimidation to the members and guests of the Church.

132. On information and belief, Defendant Brunner planned and organized the disruption. Information regarding Defendant Brunner's planning of the disruption and guidance to other Defendants is peculiarly within the possession and control of Defendants.

133. Defendants Brunner, Miller, and Werth have taken a leading role in disruptive protests across Southern California, including at other houses of worship, Jewish gatherings, and events supporting Israel, such as an event coordinated by The Mission Church and the Christian & Jewish Alliance on October 20, 2024. Defendants Brunner, Miller, and Werth hold themselves out publicly as leaders of the CODEPINK organization in the San Diego area. CODEPINK has a history of organizing disruptive protests against Jews and their supporters.

### *The Church's Easter Sunday Services*

134. Just one month later, on Easter Sunday, the Church joined with billions of other Christians around the world to celebrate the resurrection of Jesus of Nazareth, which is the central event in redemptive and Biblical history according to the Church's sincere religious beliefs.

135. The Church hosted three Easter services, welcoming a total of about 1,500 people. Attendance at Easter services is significantly higher than attendance at ordinary weekly worship services.

24

FIRST AMENDED COMPLAINT

136. The Church planned special events for the children who would attend. It applied for and received a special permit from the city of Carlsbad to host Easter activities in its parking lot directly abutting the building, including a bounce house with a slide and a petting farm with baby chicks that children could hold.

### *Defendants' Disruption of the Easter Services*

137. At approximately 10:00 a.m., disruptors arrived at the Church shortly after the start of its second service. Several disruptors, including Defendants Brunner, Turner-Brown, and Hartley, occupied the same space on the sidewalk between the front door and adjoining parking lot that they occupied at the March 19 Worship Service, holding signs with grotesque images of dead babies and yelling at the children of the church when they saw them outside.

138. Approximately thirty other disruptors, including Does 21–25, were positioned on the side of the street opposite the Church. These disruptors again used bullhorns for maximum intimidating effect. They screamed obscenities and slurs at the children trying to participate in Easter activities in the parking lot immediately adjacent to the church building. Defendant Brunner joined the disruptors on this side of the street for part of the morning.

139. The location of the disruptors was close to the children's Sunday school classrooms, and the disruptors' amplified yelling made it nearly impossible to conduct children's classes inside the Church on Easter Sunday.

140. Concerned for the safety of church members, guests, and especially the children, Pastor Cooper contacted local police. A local officer arrived and told the disruptors to stay across the street.

141. Even after they moved across the street, the disruptors were less than 60 feet from the children in attendance.  The disruptors shouted and screamed through bullhorns for maximum intimidating effect. Defendants intentionally targeted children who had left the church building, shouting expletives at them and waving signs with grotesque images of bloody children.

FIRST AMENDED COMPLAINT

142. The disruptors were also in the pathway between the Church and the overflow parking lot the Church leased across the street, blocking people from reaching their vehicles.

143. Defendants' tactics disrupted the service and intimidated congregants, many of whom had to be escorted to their vehicles by safety officers. There was no way for church members and guests who had parked at the Church's overflow parking on the other side of the street to reach the Church without walking directly past the hostile disruptors and enduring their vitriolic chants and graphic signs.

144. The disruptors continued their disruption through the end of the Church's Easter Sunday services.

145. Many congregants and other guests who intended to attend the service left without entering the Church when they saw the Defendants and other disruptors standing in the path to the front door of the Church.

146. In a coordinated effort to intimidate church members and guests about their Church's beliefs about Israel as God's chosen people, the disruptors also placed flyers on 30–50 cars in the Church's primary parking lot on Easter Sunday morning accusing the Church and its members of supporting genocide.

147. On information and belief, Defendant Brunner planned and organized the disruption. He directed individual disruptors at the event. Individual disruptors asked him for guidance on how to proceed during the disruption. Information regarding Defendant Brunner's guidance to other Defendants is peculiarly within the possession and control of Defendants.

### *The September 7 Worship Service*

148. On September 7, 2025, the Christian & Jewish Alliance and Church hosted an interfaith worship gathering at the Legacy International Center in San Diego, California. The Center is a Christian religious center in San Diego's Mission Valley. The Center's meeting spaces are primarily used for worship, prayer, and other religious events that require a large space.

149. The Alliance selected the Center because it is owned by Morris Cerullo Ministries, which, like its founder, firmly espouses the belief that the Nation of Israel was and remains central to God's plan.

150. The Alliance rented the Center's amphitheater on September 7, 2025, for the purpose of hosting a worship and prayer service.

151. The Alliance maintained operational control of the area during on-site preparation, including bringing in a stage for the event, directing how the area would be set up, and employing a security team to handle potential threats.

152. The Alliance held operational control of the worship service throughout the event, which included setting the schedule, selecting speakers, and crafting the message.

153. The purpose of this interfaith gathering was to worship and pray together about Israel and to enable attendees to better understand how to support Israel in accordance with their religious beliefs.

154. The event opened with a prayer from an Orthodox Jewish Rabbi.

155. Attendees then participated in worship led by multiple praise bands and gospel choirs from local churches.

156. Following worship, several pastors and rabbis from local churches and synagogues, including Pastor Menard, spoke to attendees and led attending worshipers in prayer.

157. The Mission Church sponsored the event along with several other churches and synagogues. Several dozen members of the Church attended, and their praise band led the worshipers in song. Pastor Menard spoke about God's love for Israel as His chosen people, and he shared how, as a matter of Biblical faith, religious congregations need to stand together against hatred and violence.

FIRST AMENDED COMPLAINT



Image 6: Gospel choir leading worship on September 7

158. Mindful of security concerns based on disruption of previous events, the Alliance planned carefully and required online registration. They also checked identification as guests entered the amphitheater space and used a wand metal detector.

### *Defendants' Disruption of the September 7 Worship Service*

159. In response to the disruptions of the March 19 and Easter worship services, the Church had retained counsel and sent Defendant Brunner a cease-and-desist letter in early May 2025.

160. Undeterred, Brunner returned with Defendants Turner-Brown, Hartley, and Miller to target the September 7 Worship Service for disruption. They were joined by Defendants Aimee Werth, Jonathan Provance, Maya Karalius, and Does 26–40, as well as several dozen other disruptors.

161. Many of the disruptors wore coverings over their faces to conceal their identities.

162. Doe 26 wore a black shirt with gray shorts. She had pink colored hair and covered her face with a black face mask.

163. Doe 27 wore a pink shirt, black pants, and a light-colored hat. She covered her face with a black face mask and a light-colored scarf or bandana.

164. Doe 28 wore a black shirt, a neon yellow vest, jean shorts, and a black hat. He covered his face with a black face mask and carried a neon pink bullhorn.

165. Doe 29 wore a blue shirt, a black, white, and red scarf, and a dark-colored hat. He carried a neon green bullhorn and pots and pans.

166. Doe 30 wore a pink shirt, blue jeans, and a dark-colored hat. He had his hair braided in the back and had a beard.

167. Doe 31 wore a neon yellow vest, cargo pants, and a purple and light blue floral hat. He covered his face with a blue face mask and carried a red bullhorn.

168. Doe 32 wore a red shirt and light-colored leggings. She covered her face with a black face mask and a white and black scarf tied around her head.

169. Doe 33 wore a white shirt, a neon yellow vest, gray pants, an orange and white scarf, and a black bucket hat. He covered his face with a black face mask.

170. Does 34–44 also blocked vehicles and harassed attendees as they entered.

171. According to Defendant Werth, their group chose to target this event because the attendees were "in there, feasting, listening to music, and raising money for genocide . . . . [W]e will not give them a moment of peace. Free Palestine."

172. The September 7 Worship Service was neither a feast nor a fundraiser. As Defendants were well aware, it was an interfaith worship event at which those gathered were actively singing worship songs, praying to God, and receiving religious instruction—all marred irreparably by hostile disruptors.

173. Defendants' plan for disruption and intimidation proceeded in two phases: (1) obstructing and deterring attendees from reaching the event and (2) interfering with the program itself.

174. Defendants and other disruptors arrived long before the event started and intentionally occupied the road to block access to the parking lot and deck at the venue, precluding worshipers from entering.

29

FIRST AMENDED COMPLAINT

175. Defendants and other disruptors blocked the entrance to the parking area near the amphitheater.

176. To block this entrance, Defendants Miller, Turner-Brown, Werth, Provance, Karalius, and Does 26–40 purposely marched slowly back and forth across the entrance to the parking lot while holding large signs and bullhorns, turning around right as they reached the sidewalk on the other side. In so doing, the disruptors formed a loop by which they could collectively maintain the blockage at all times.

177. The blockage forced guests to stop because there was no space to drive through. Only when the disruptors allowed it could guests then drive very slowly to enter the property in order to avoid hitting any disruptors. This caused a backup of vehicles into the road.

178. While cars tried to slowly get through the blockage, disruptors walked directly in front of and behind guests' cars, yelling through bullhorns statements such as, "Zionists, you're not welcome here!," "Go back to Israel!," "Zionism is Naziism!," "You are a Nazi!," and "You are a baby killer!"

179. Defendants and other disruptors also shoved signs in car windows, screamed at attendees, and followed cars into the lot as they blasted bullhorn sirens.

180. Defendant Miller repeatedly shoved her bullhorn into car windows and at attendees on foot while shouting at them. One of her victims was an elderly Jewish man who is deaf in one ear and, thus, desperately tries to protect his hearing in the other. Defendant Miller placed the bullhorn within inches of his good ear and blared the bullhorn's siren.

181. Defendant Provance struck vehicles with his hands as they attempted to make their way into the parking area. He likewise walked close to guests' cars, filming them with his phone to intimidate them. He shoved his phone into cars while filming when guests opened their car windows.

182. As Mastron attempted to enter into the parking lot to the venue with her husband in their small compact car, they were confronted by a group of protesters in

the driveway. Doe 26 leaped onto the hood of Mastron's car and began slamming her fist on the windshield while screaming at Mastron and her husband. Mastron's husband proceeded slowly into a nearby parking spot, prompting Doe 26 to jump off of their hood and run back to the crowd of disruptors.

183. As another guest was slowly driving her car into the parking lot, several disruptors stood in front of her car and waved signs in front of her vehicle and screamed at her, halting the vehicle. Defendant Provance slammed his hand on the window of her car, while others screamed at her and shoved a sign into her car window.

184. Disruptors surrounded another attendee as she slowly tried to enter in her vehicle. After some effort to get through and park successfully, she returned on foot to try to persuade the disruptors from blocking the entrance. Several of the disruptors, including Defendants Provance, Miller, Doe 26, and Doe 28, came up very close to her and surrounded her. Miller and Doe 26 blared sirens and shouted at her through bullhorns in close proximity. Provance shoved his phone in her face. Two other disruptors shoved signs in her face. Miller, Provance, and the two other disruptors followed the attendee when she tried to retreat.



Image 7: Doe 28 with a bullhorn.

185. Multiple other attendees were obstructed, as Defendants and Does 26–40 surrounded their cars, screamed at them, and blocked their ability to move forward.

31
FIRST AMENDED COMPLAINT

186. The disruptors strategically placed two dolls resembling infants across the entrance to the parking lot so that cars would have to run over them to enter.

187. Many guests who were planning to attend drove away out of fear when they saw the disruptors blocking the entrance and obstructing access to the event. Due to the obstruction and intimidation, the number of persons who ultimately made it to the service was far smaller than the number of pre-registered guests.

188. Doe 26 carried a sign stating, "Only C---s Support Israel." Defendant Werth carried a sign that said "FCK NZIS" featuring a swastika combined with a star of David, and other Defendants carried signs stating, "Zionism is the evil cult built on Christian white supremacy and antisemitism" and "America Funds Israel's Genocide."



Image 8: Disruptors obstructing the driveway of Legacy.

189. The disruptors also scrawled hostile messages in chalk on the sidewalk along the entrance to the event, the Church's private driveway, and the outer wall of the event venue, including "Baby Killers," "Death 2 Israel," "F--- Israel," and "Zionists for Genocide." The disruptors also vandalized the private property of Legacy International Center.

190. Defendant Miller also sought to block an attendee's path towards the event, crowding him off the sidewalk onto a busy street and screaming at him at point-blank range with a megaphone while she followed him.

191. Once the event began, Defendants and other disruptors sought to prevent worshipers from hearing the service, effectively denying access to the event.

192. Defendants and other disruptors lined up along the back of the amphitheater, about 30 feet from the guests trying to pray and worship, and about 10 feet from members of the Church's safety team.

193. For more than three hours—nearly the entire event—Defendants Brunner, Werth, Miller, Turner-Brown, Provance, Karalius, Does 26-40, along with other disruptors, blared sirens, screamed through bullhorns, and banged pots and pans, preventing worshipers from hearing and participating fully in the service. The purpose and effect were to disrupt the event and intimidate worshipers.



Image 9: Disruptors in close proximity to worshipers during the service

194. Defendants Brunner, Werth, and Provance also used bullhorns to lead chants criticizing guests for their religious views and calling them "liars."

195. Defendants' noise drowned out the service for a large portion of attendees. Many attendees fled to a nearby building to seek shelter from the noise. Several senior citizens were forced to take out their hearing aids, which entirely precluded them from hearing the event. They remained only to show solidarity at the event.

196. Defendants' hours-long sonic assault caused ongoing physical harm to event attendees and participants due to the dangerous noise levels it produced. Several guests' ears continued ringing the next day. Defendants intended to cause this physical

33

FIRST AMENDED COMPLAINT

harm: They protected themselves from this harm by wearing ear protection throughout the event, leaving unsuspecting attendees exposed and vulnerable to the damaging sound levels of the disruptors' cacophony.

197. After one worshiper contacted a police lieutenant and told him that the disruptors were going to "stay & attempt to keep us from leaving," a group of officers arrived to secure the exit.

198. Doe 34 interfered with at least three worshipers' ability to safely exit the event. After the event, Cohen-Reeis was walking toward the exit with two of the event speakers, and a four-door white BMW car began aggressively driving toward them. The three changed course, forced to divert their path to exit, and stepped inside the lobby of the Legacy International Center, asking an armed security guard to escort them to their cars for safety.

199. On information and belief, Defendant Brunner directed and coordinated the blockage.  He was present at the event and provided guidance to other disruptors while there. He also regularly takes a leading role in protests and disruptions, many of which involve the same Defendants present on September 7. Information regarding Defendant Brunner's guidance to other Defendants is peculiarly within the possession and control of Defendants.

### *Defendants' Broader Campaign of Disruption and Harassment*

200. Defendants have demonstrated no remorse for their actions and the damage they caused. Instead, their disruptions are part of a much larger campaign against Israel and those, as here, who would support Israel for religious reasons.

201. Many of the same agitators, including Defendants Brunner, Hartley, Provance, and Werth, disrupted the Alliance's first worship service, held in October 2024 in the San Diego area.  They sought to drown out the event with sirens and shouting through bullhorns. Because a field separated them from the event, their attempts were largely ineffective. The "codepinksd" Instagram account posted a public-relations video of the disruption on its account declaring that "[w]e needed to

disrupt their peace" and, acknowledging the religious nature of the event, the video criticized the Alliance's members, saying they "preach & preach they're better than everyone else."

202. Defendants Provance and Miller both commented to praise the disruption and their "comrades" who were present to disrupt.

203. Defendant Werth reposted the same videos to her Instagram account along with a rant against "Christian Zionism" and "mega church grifters."  According to Werth, "Christian Zionists are useful idiots" "[t]o Jewish Zionists."

204. The same month, Defendants Brunner, Provance, and others disrupted a book talk by Nancy Pelosi using the same tactics as the March 19 service: serial interruptions throughout the event, paired with a loud outdoor disruption.  As Provance was removed, he screamed, among other things, "F--- you!" at Pelosi.

205. When posting a video of his disruption, Provance bragged that Pelosi was "interrupted 7 times during a 45 minute talk" and that "the Zionist moderator was definitely getting upset."

206. After the event, Defendants Provance and Brunner joined several other disruptors to confront an event attendee.  Both Defendants Provance and Brunner forced themselves within inches of the attendee's face.  Provance screamed "attack me you little bitch!" Brunner yelled at the attendee to "face your sins" and that the attendee was a "baby killing" Zionist.

207. In November 2024, many of the same disruptors blocked traffic by walking in front of vehicles, waving flags, shoving signs in windows, and shouting through bullhorns at an event hosted by Friends of the IDF.

208. Defendant Provance and other disruptors repeated the feat later that month by blocking the entrance to the parking deck for a gala hosted by StandWithUs, an Israel-advocacy organization.  Pacing with signs and Palestinian flags, Provance and others in the mob walked in front of cars, causing traffic to back up.

FIRST AMENDED COMPLAINT

209. Defendant Provance and others repeated the feat yet again at a church's Easter service, where he interrupted the service and began screaming "Free Palestine!" after he was asked to leave the service.  When posting the video to social media, he stated, "No Easter during a genocide!"

210. And after the March, April, and September disruptions, Defendants continued to express pride at their civil rights violations and continued their intimidation online, targeting individual worshipers for retaliation.

211. The day after his disruption of the Church's Easter Services, Defendant Brunner contacted Pastor Menard and threatened to return on Mother's Day, calling it "another wonderful occasion when folks who normally do not attend show up." He asked whether the Church had "[a]ny special plans that day?"

212. Pastor Menard responded, "[I]f you ever want to have a genuine conversation, the offer stands. Until then, please leave us alone. What you are doing is not free speech—it is just harassment. If it happens again, we will take legal action against you. But I hope for better things. If you really care about making a positive difference in the world—let's move on to greater good."

213. After March 19, 2025, the Church continued to fear intimidation, interference, and obstruction from these hostile disruptors. For the safety of its members, the Church, as noted, retained counsel and sent Defendant Brunner a cease-and-desist letter regarding any interference with the Church's Mother's Day services. *See supra* ¶ 159. At least one disruptor did show up on Mother's Day, but left when he saw that others had not come.

214. The letter did not dissuade Defendant Brunner or any other Defendant from continuing to disrupt the Church's events, as reflected by the disruption of the September 7 Service.

215. The day after the September 7 worship service, Defendants Werth and Brunner posted videos boasting about their actions. Defendant Brunner (@charismaticelisha) posted, "Go live in Israel. We're fine here without that Israeli

36

baggage and cost to our country. PARIAH," and Defendant Werth (@resistthepropaganda) added, "How does it feel to go on record as a supporter of a holocaust of children?"

216. Several Defendants and other disruptors posted photos of Jewish and Christian worshipers to expose their identities, open them up to further attack, and intimidate them from exercising their religious beliefs that compel them to support the Nation of Israel.

217. Another disruptor (@awesomefridge) posted next to a photo of a Christian worshiper at the September 7, 2025, event, "this guy works as security at the mission church of Carlsbad."



Image 10: Instagram post on Sept. 7 targeting a member of the Church

218. Defendant Maya Karalius (@mayapapaya66) posted about one Jewish worshiper, saying he was "wearing the black leather arm Tefillin and head Totafot tradition of Orthodox Jew Tradition."

Image 11: Instagram post on Sept. 7 targeting a Jewish worshiper

219. Defendants have harassed other attendees through social media, targeting worshipers' businesses and personal lives to dissuade them from adhering to their religious convictions to support Israel.

220. Since October 2024, Defendant Brunner and the other Defendants have manifested a consistent pattern and practice of targeting The Mission Church, the Christian & Jewish Alliance, and similar organizations because of their shared religious beliefs supporting Israel.

221. On August 25, 2025, Defendant Brunner and several other individuals shouted epithets outside a different church in San Diego, challenging the church's religious beliefs about Israel.

222. Defendant Brunner the posted a video on social media where he bragged, "We're challenging church members to ask their pastors . . . what is Christian Zionism? What is Christian Nationalism? What do they mean by 'what would Jesus do?'"

FIRST AMENDED COMPLAINT

223. On September 14, 2025, Defendant Brunner posted the following image:



Image 12: Social media post by Daniel Brunner

224. On September 28, 2025, Defendant Brunner posted a video of himself saying, "We're doing our part to fight the war against Zionism, which is an abomination that says that some people are less human than other people. It uses forms of terror and starvation . . . We ain't shuttin' up and we ain't goin' nowhere. We're going to keep fighting."

225. On September 29, 2025, Defendant Werth posted a video of herself and Defendant Brunner as CODEPINK leaders recruiting new disruptors. Defendant Werth said, "[E]very time we come out here, we have new comrades that are joining us," and Defendant Brunner encouraged viewers to "look us up . . . it's all about the numbers right now."

226. In December 2025, after this suit was filed, Werth, Provance, Hartley, and other disruptors targeted Mastron specifically, constructing a mock nativity scene with a bloody baby Jesus right outside of the House of Israel.

### *The Lingering Effects of Defendants' Unlawful Interference*

227. As a result of the ongoing intimidation, interference, and obstruction of religious exercise at the Church and other places of worship that Defendants caused, the Church has cancelled events that were intended to support the local Jewish community.

228. On March 25, 2025, one week after the March 19 Worship Service, the Church had planned to host a movie screening of *October 8*, a documentary about the

persecution of Jews worldwide. Because of the Church's reasonable fear of further hostile disruption from the Defendants and its fear for the safety of its own members and the Jewish guests that members would invite, the Church made the difficult decision to cancel this event.

229. The Church has lost members because of the intimidation, interference, and obstruction that Defendants caused at its worship services.

230. Defendants' actions have created an environment of fear among the Church and its remaining congregants, who remain on edge when attending events at the Church. On one Sunday soon after the disruption of the March 19 Service, a bottle dropping on the floor of the Sanctuary caused severe distress to congregants due to the loud noise it made.

231. The Church has had to expend additional resources and effort on security since the disruptions, such as training additional members of the safety team and purchasing equipment in anticipation of future disruption.

232. The Alliance is similarly affected. Because it cannot find a safe venue to host these events, the Alliance cannot safely further its religious mission of bringing Jewish and Christian congregations together to exercise their religious belief to support Israel. It has been unable to host worship services since the disruption of the September 7 worship service. It has likewise lost members due to Defendants' disruptions.

233. The cities of Carlsbad and San Diego have likewise expended significant resources to address the threat of future disruptions by Defendants. Multiple officers were necessary to escort guests to safety following the March 19 Service. An officer was necessary to protect the Church's congregants during and after the Easter services. And due to Defendant Brunner's Mother's Day threat, the City deployed twenty additional police officers downtown to patrol the area and spent allocated resources preparing for disruptions. Multiple San Diego police officers were called to the September 7, 2025, event and were needed to physically remove the trespassing

disruptors from private property (though they resumed their trespass soon after the police left).

234. The Church's pastors are committed to supporting Israel, but due to ongoing and escalating attacks on places of worship, they are concerned about the safety of their members and guests if the Church continues to host events.

## FIRST CLAIM FOR RELIEF:

## VIOLATIONS OF THE FACE ACT (18 U.S.C. § 248)

235. Plaintiffs hereby incorporate and re-allege paragraphs 1–234.

236. The FACE Act imposes civil liability on anyone who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2).

237. Defendants' actions reflect a pattern of targeting the Church and the Alliance because of their religious beliefs, seeking to interfere with and prevent their religious gatherings.

### *The March 19, 2025 Worship Service*

238. Defendants Brunner, Miller, Turner-Brown, Hartley, Pagaduan, and Does 1-20 intentionally used force, threats of force, and physical obstruction to intentionally interfere with egress from the Church and access to the Church's parking lot following the March 19 Worship Service.

239. The Church and Alliance have actionable claims against these individuals for their actions on March 19.

240. By physically occupying the narrow sidewalk, Defendants Brunner and Does 1–20 intentionally blocked ingress and egress and both rendered passage and attempted to render passage to the Church unreasonably difficult, causing late arrivals to the Worship Service to leave without attempting to enter the Church.

41

FIRST AMENDED COMPLAINT

241. By physically occupying the narrow sidewalk, crowding the stairs at the entrance, blockading access to the parking lot, and creating a hostile environment through their repeated disruptions of the event, Defendants Brunner, Miller, Turner-Brown, Hartley, Pagaduan, and Does 1–20 intentionally intimidated, or attempted to intimidate, attendees to leave the event early through a narrow rear entrance from the Church.

242. By physically occupying the narrow sidewalk, crowding the stairs at the entrance, blockading access to the parking lot, and creating a hostile environment on the sidewalk, Defendants Brunner, Miller, Turner-Brown, Hartley, Pagaduan, and Does 1–20 intentionally obstructed egress, rendered passage unreasonably difficult, and attempted to obstruct and render passage unreasonably difficult, from the Church and to the Church's parking lot following the Worship Service.  In doing so, they intentionally sought, or attempted, to interfere with attendees' free exercise of religion and to intimidate attendees from attending future events at the Church.

243. By forcefully resisting removal from the Sanctuary, Defendants Turner-Brown, Miller, Pagaduan, and Does 17–20 intentionally used force to injure, attempt to injure, and intimidate worshipers of the Worship Service seeking to exercise their religious beliefs.

244. Defendants Brunner, Miller, Turner-Brown, Hartley, Pagaduan, and Does 1–20 are jointly and severally liable for the FACE Act violation in relation to the March 19 Worship Service.

### *The Easter Worship Service*

245. Defendants Brunner, Turner-Brown, Hartley, and Does 21–25 intentionally used physical obstruction to intentionally interfere, or attempt to interfere, with access to and egress from the Church and its parking lots during and following the Church's Easter Services.

246. The Church has an actionable claim against these individuals for their actions on Easter Sunday.

FIRST AMENDED COMPLAINT

247. By occupying the space of the narrow sidewalk between the Church's front doors and parking lot during the Church's Easter services, Defendants Turner-Brown and Hartley intentionally sought to obstruct, and attempted to obstruct, egress from the Church and ingress to the events the Church had set up for children in the parking lot.

248. By occupying the pathway between the Church and its overflow parking lot across the street, Defendants Brunner, Turner-Brown, Hartley, and Does 21–25 intentionally sought, and attempted, to obstruct access to and from the Church for congregants and attendees during the Church's Easter services.

249. Defendants Brunner, Turner-Brown, Hartley, and Does 21–25 are jointly and severally liable for the FACE Act violation in relation to the Easter Worship Service.

### *The September 7, 2025 Worship Service*

250. Defendants Brunner, Werth, Miller, Turner-Brown, Provance, Karalius, and Does 26–30 intentionally used force, threats of force, and physical obstruction to intentionally interfere, or attempt to interfere, with ingress to and egress from the worship venue for the interfaith event that the Church and the Christian & Jewish Alliance hosted and that Mastron attended.

251. The Church, Alliance, and Mastron have actionable claims against these individuals for their actions on September 7, 2025.

252. By blocking and surrounding guests' cars, including Mastron's vehicle, while yelling hostile epithets, physically striking and jumping on cars in a show of force, and blocking the main entrance to the venue, Defendants Werth, Miller, Turner-Brown, Provance, Karalius, and Does 26–40 used, or attempted to use, force and physical obstruction to interfere with the ability of worshipers, including Mastron, to attend the event and exercise their religious freedom. By directing and guiding Defendants and other disruptors in this obstruction, Defendant Brunner is liable.

253. By blaring sirens and generating loud noise in close proximity to the event for more than three hours, Defendants Brunner, Werth, Miller, Turner-Brown, Provance, Karalius, and Does 26–40 used, or attempted to use, these sirens as weapons to drown out the religious service, effectively denying access to the event for many attendees, including Mastron.

254. The conduct of Defendants Brunner, Werth, Miller, Turner-Brown, Provance, Karalius, and Does 26–40 caused, or attempted to cause, actual intimidation and interference, leading many individuals to refrain from attending the service out of fear and causing others to avoid further association with the Alliance.

255. The worshipers present at the event, including Mastron, were unable to fully participate as planned due to the disruption, or attempted disruption, of Brunner, Werth, Miller, Turner-Brown, Provance, Karalius, and Does 26–40.

256. Defendants Brunner, Werth, Miller, Turner-Brown, Provance, Karalius, and Does 26–40 are jointly and severally liable for the FACE Act violation in relation to the September 7 Worship Service.

## SECOND CLAIM FOR RELIEF

### TRESPASS

257. Plaintiffs hereby incorporate and re-allege paragraphs 1–133, 200–34.

258. In California, the "essence of the cause of action for trespass is an unauthorized entry onto the land of another." *Church of Christ in Hollywood v. Superior Court*, 121 Cal. Rptr. 2d 810, 815 (Ct. App. 2002).

259. Defendants Turner-Brown, Pagaduan, Miller, and Does 17–20 intentionally trespassed on Church property.

260. The Church has both legal and possessory interest over the property on which the Church is located.

261. On March 19, 2025, the Church gave limited consent to enter its property only to individuals who registered by name and only for the purpose of attending the March 19 Worship Service as audience members.

262. The names of Defendants Turner-Brown, and Pagaduan did not appear on the Church's registration list for the event. They entered the Church's property by deceiving the Church, intentionally providing false names.

263. The Church was not aware that Defendants Turner-Brown, and Pagaduan had provided false names when they entered Church property.

264. Defendant Miller registered twice, as "Sasha Spite" and "Sasha Miller," for the purpose of allowing another disruptor to gain entry under false pretenses.

265. Defendant Brunner registered under his own name, for the purpose of allowing another disruptor to gain entry under false pretenses.

266. Defendants Turner-Brown, Pagaduan, Miller, and Does 17–20 each intentionally entered the Church's property for purposes other than to attend the March 19 Worship Service as audience members.

267. The Church was not aware that Defendants Turner-Brown, Pagaduan, Miller, and Does 17–20 had entered Church property for purposes other than to attend the March 19 Worship Service as worshipers.

268. Defendants Turner-Brown, Miller, Pagaduan, and Does 17–20 each exceeded the scope of the Church's consent for individuals to enter its property as attendees of the March 19 Worship Service when they intentionally began loudly disrupting the event. This disruption interfered with the Church's property rights and expressive activity.

269. Reflecting this exceeding of consent, Church safety team members quickly sought to remove Defendants Turner-Brown, Miller, Pagaduan, and Does 17–20 after each began disrupting the event.

270. Despite seeing that previous disruptors had been escorted off the property and thus receiving firsthand confirmation that their permission to be on the property did not include disrupting the service, Defendants Turner-Brown, Miller, Pagaduan, and Does 17–20 continued the disruption in excess of any consent the Church provided to audience members.

45

FIRST AMENDED COMPLAINT

271. After the Church informed Defendants Turner-Brown, Miller, Pagaduan, and Does 17–20 that they were no longer welcome on Church property, Defendants Turner-Brown, Miller, Pagaduan, and Does 17–20 intentionally and affirmatively refused to leave the Church's property.

272. Defendants Turner-Brown, Miller, Pagaduan, and Does 17–20 continued to resist agents of the Church who sought to remove them peacefully from the property.

273. Defendants Turner-Brown, Miller, Pagaduan, and Does 17–20 severely interfered with the Church's property rights by disrupting the service in its Sanctuary. They likewise severely interfered with the ability of the Church, its leadership, and attendees to freely exercise their faiths by inhibiting the peaceful exercise of religion during the service.  They likewise severely interfered with the Church's expressive activity by altering and disrupting the message it sought to send through the worship service.

274. Defendants Turner-Brown, Miller, Pagaduan, and Does 17–20 harmed the Church through decreased membership, the cancellation of events focused on Israel, and increased security costs due to their trespass.

275.  Defendants Turner-Brown, Miller, Pagaduan, and Does 17–20 are jointly and severally liable for each trespass committed because they formed a civil conspiracy to trespass on the Church, acted in furtherance of that conspiracy, and damaged the Church as a result.

276. On information and belief, Defendant Brunner planned, organized, and coordinated the disruption of the March 19 Worship Service, including the sequential individual disruptions by Defendants Turner-Brown, Miller, Pagaduan, and Does 17–20 to maximize disruption of the March 19 Worship Service.

277. On information and belief, Defendant Brunner acted to facilitate the intentional trespass by Defendants Turner-Brown, Miller, Pagaduan, and Does 17–20.

FIRST AMENDED COMPLAINT

Defendant Brunner likewise registered for the event under his own name but did not trespass himself.  He did so to facilitate the trespass of another Defendant.

278. Defendants Turner-Brown, Hartley, Werth, and Miller frequently attend CODEPINK protests that Defendant Brunner has led.  Defendant Brunner has likewise been actively engaged in disruptions of other events involving Israel with other Defendants for which CODEPINK has taken credit, including the disruption of the book talk with Nancy Pelosi.  He is aware of and deeply opposed to the Church's beliefs regarding Israel, and he attended disruptions of the Church's and Alliance's events both before and after March 19.

279. Further information regarding Defendant Brunner's guidance and assistance to other Defendants is peculiarly within the possession and control of Defendants.

280. When trespassing, conspiring to trespass, and facilitating trespass, each Defendant acted with malicious disregard of the rights of the Church and event attendees and with an intent to injure and annoy the Church and event attendees.

### JURY DEMAND

Plaintiffs request a trial by jury of all issues so triable.

### PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

a.  Enter judgment declaring that Defendants violated the FACE Act;

b.  Enter judgment declaring that Defendants Turner-Brown, Miller, Pagaduan, and Does 17–20 trespassed on the Church's property;

c.  Enter judgment permanently enjoining Defendants from obstructing access to the Church, from entering the Church without advance permission from the Church, from knowingly seeking to intimidate members of the Church from attending religious events at the Church, and from future violations of the FACE Act against the Church or its congregants;

FIRST AMENDED COMPLAINT

d. Enter judgment permanently enjoining Defendants from obstructing access to religious events hosted by the Alliance at places of worship, from knowingly seeking to intimidate members of the Alliance from attending religious events at places of worship, and from future violations of the FACE Act against the Alliance or its members;

e. Enter judgment permanently enjoining Defendants or their agents from participating in or promoting any demonstration within 100 feet of the Church or an Alliance event;

f. Award appropriate relief to Plaintiffs under 18 U.S.C. § 248(c)(1)(B);

g. Award compensatory damages under 18 U.S.C. § 248(c)(1)(B) and/or Cal. Civ. Code § 3333;

h. Award punitive damages to Plaintiffs under 18 U.S.C. § 248(c)(1)(B) and Cal. Civ. Code § 3294;

i. Award attorneys' fees, expert witness fees, and costs under 18 U.S.C. § 248(c)(1)(B) and Cal. Civ. Proc. Code § 1021.5; and

j. Award any such other relief as the Court may deem just and proper.

Dated: March 23, 2026                    Respectfully submitted,
                                         /s David J. Hacker

C. Kevin Marshall                        David J. Hacker (SBN 249272)
ckmarshall@jonesday.com                  dhacker@firstliberty.org
John C. Brinkerhoff Jr.                  Jeremiah G. Dys
jbrinkerhoff@jonesday.com                jdys@firstliberty.org
Janessa B. Mackenzie                     Kayla A. Toney
jmackenzie@jonesday.com                  ktoney@firstliberty.org
**JONES DAY**                            **FIRST LIBERTY INSTITUTE**
51 Louisiana Ave NW                      2001 W. Plano Pkwy, Suite 1600
Washington, DC 20001                     Plano, TX 75075
(202) 879-3939                           (972) 941-4444

*Attorneys for Plaintiffs Christian and Jewish Alliance Inc.,
Ezra Ministries, and Ruth Mastron*