C. Kevin Marshall (DCSBN 476266)
John C. Brinkerhoff Jr. (DCSBN 1765474)
Janessa B. Mackenzie (DCSBN 90007987)
**JONES DAY**
51 Louisiana Ave., NW
Washington, DC 20001
Telephone: (202) 879-3939
jbrinkerhoff@jonesday.com

David J. Hacker (SBN 249272)
Jeremiah G. Dys (TXSBN 24096415)
Kayla A. Toney (TXSBN 24141332)
**FIRST LIBERTY INSTITUTE**
2001 W. Plano Pkwy, Ste. 1600
Plano, TX 75075
Telephone: (972) 941-4444
dhacker@firstliberty.org

*Attorneys for Plaintiffs Christian & Jewish Alliance,*
*Ezra Ministries, and Ruth Mastron*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Christian & Jewish Alliance Inc., a California not-for-profit corporation, Ezra Ministries, a California not-for-profit religious corporation, d/b/a The Mission Church, and Ruth Mastron,<br><br>*Plaintiffs,*<br><br>v.<br><br>Daniel Brunner, Aimee Magda Werth, Kristina Turner-Brown, Patrick Hartley, Sasha Miller, Jacob Pagaduan, Jonathan Provance, Maya Karalius, and Does 1-40,<br><br>*Defendants.* | Case No. 3:25-cv-02992-AGS-AHG<br>Judge: Hon. Andrew G. Schopler<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date: June 4, 2026<br>Time: 2:00 p.m.<br>Location: Courtroom 5C |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND ..............................................................................................................2

ARGUMENT....................................................................................................................9

I.      Plaintiffs Are Highly Likely To Succeed On The Merits.......................................9

        A.      Defendants Interfered With Free Exercise Through Obstruction..........11

        B.      Defendants Used Force To Intimidate Worshippers................................14

II.     Plaintiffs Face Ongoing And Likely Future Irreparable Harm...........................15

III.    The Balance of the Equities Sharply Tips in Plaintiffs' Favor...........................21

IV.     The Public Interest Favors Injunctive Relief. ........................................................24

CONCLUSION ...............................................................................................................25

RULE 5 CERTIFICATE OF COMPLIANCE .............................................................27

# TABLE OF AUTHORITIES

**CASES**                                                                                   **PAGE(S)**

*Arc of Cal. v. Douglas*,
757 F.3d 975 (9th Cir. 2014) ...........................................................................................21

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016) ................................................................................. 18, 21

*Brock v. Big Bear Mkt.*,
825 F.2d 1381 (9th Cir. 1987) ........................................................................................19

*Burson v. Freeman*,
504 U.S. 191 (1992) .........................................................................................................23

*Cal. Chamber of Com. v. Council for Educ.*,
29 F.4th 468 (9th Cir. 2022) ...........................................................................................15

*Cameron v. Johnson*,
390 U.S. 611 (1968) .........................................................................................................23

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
508 U.S. 520 (1993) .........................................................................................................16

*Cottonwood Christian Ctr. v. Cypress Redev. Agency*,
218 F. Supp. 2d 1203 (C.D. Cal. 2002) .........................................................................25

*Cuviello v. Vallejo*,
944 F.3d 816 (9th Cir. 2019) ..........................................................................................17

*Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) ..................................................................................................... 16, 25

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ..........................................................................................22

*Doe v. Wolf*,
432 F. Supp. 3d 1200 (S.D. Cal. 2020)...........................................................................22

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02992-AGS-AHG

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*,
  82 F.4th 664 (9th Cir. 2023) (en banc)......................................................................*passim*

*FemHealth USA, Inc. v. Williams*,
  2022 WL 4241269 (M.D. Tenn. 2022)............................................................ 14, 22, 24

*Flathead-Lolo-Bitterroot v. Montana*,
  98 F.4th 1180 (9th Cir. 2024)......................................................................... 17, 21

*Foti v. Menlo Park*,
  146 F.3d 629 (9th Cir. 1998)...................................................................................23

*Frisby v. Schultz*,
  487 U.S. 474 (1988)..................................................................................................23

*Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*,
  512 F.3d 1112 (9th Cir. 2008)................................................................................25

*Helmann v. Codepink Women for Peace*,
  2025 WL 3030582 (C.D. Cal. 2025)........................................................................10

*Hunter v. U.S. Dep't of Educ.*,
  115 F.4th 955 (9th Cir. 2024)..................................................................... 23, 25

*Index Newspapers LLC v. Portland*,
  480 F. Supp. 3d 1120 (D. Or. 2020).................................................. 18, 21, 24

*Index Newspapers LLC v. U.S. Marshals Serv.*,
  977 F.3d 817 (9th Cir. 2020) .................................................................................17

*James v. Rescue*,
  705 F. Supp. 3d 104 (S.D.N.Y. 2023) .........................................................*passim*

*Lucero v. Trosch*,
  121 F.3d 591 (11th Cir. 1997).................................................................................22

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) ......................................................................22, 23, 24, 25

*Mayweathers v. Newland,*
   258 F.3d 930 (9th Cir. 2001) ..........................................................................25

*NWF v. Nat'l Marine Fisheries Serv.,*
   886 F.3d 803 (9th Cir. 2018) ..........................................................................24

*Phillips v. Ornoski,*
   673 F.3d 1168 (9th Cir. 2012) ........................................................................19

*Pl. P'hd Shasta-Diablo, Inc. v. Williams,*
   898 P.2d 402 (Cal. 1995) .................................................................................24

*Ramirez v. Collier,*
   595 U.S. 411 (2022) ................................................................................. 22, 25

*Regents v. ABC, Inc.,*
   747 F.2d 511 (9th Cir. 1984) ..........................................................................17

*Schenck v. Pro-Choice Network,*
   519 U.S. 357 (1997) .....................................................................22, 23, 24, 25

*Sharpe v. Conole,*
   386 F.3d 482 (2d Cir. 2004) ...........................................................................10

*Singh v. Berger,*
   56 F.4th 88 (D.C. Cir. 2022) ..................................................................... 15, 21

*Spitzer v. Cain,*
   418 F. Supp. 2d 457 (S.D.N.Y. 2006) ....................................................... 14, 15

*Spitzer v. Kraeger,*
   160 F. Supp. 2d 360 (N.D.N.Y. 2001) ..................................................*passim*

# TABLE OF AUTHORITIES

**CASES**     **PAGE(S)**

*Spitzer v. Op. Rescue Nat'l,*
273 F.3d 184 (2d Cir. 2001) ...................................................................................12

*Su v. USPS,*
2023 WL 3172867 (W.D. Wash. 2023) ...............................................................19

*Tandon v. Newsom,*
593 U.S. 61 (2021) ...................................................................................................16

*TVA v. Hill,*
437 U.S. 153 (1978) ................................................................................................25

*United States v. Balint,*
201 F.3d 928 (7th Cir. 2000) ................................................................................10

*United States v. Gregg,*
226 F.3d 253 (3d Cir. 2000) .................................................................................10

*United States v. Gregg,*
32 F. Supp. 2d 151 (D.N.J. 1998) ............................................................. 10, 14, 15

*United States v. Laerdal Mfg. Corp.,*
73 F.3d 852 (9th Cir. 1995) ..................................................................................18

*United States v. Lemus,*
93 F.4th 1255 (9th Cir. 2024) ...............................................................................10

*United States v. Lindgren,*
883 F. Supp. 1321 (D.N.D. 1995) .................................................................. 12, 19

*United States v. Mahoney,*
247 F.3d 279 (D.C. Cir. 2001) ......................................................................*passim*

*United States v. McMillan,*
946 F. Supp. 1254 (S.D. Miss. 1995) ..................................................................23

# TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE(S)**

*United States v. Nutri-Cology, Inc.*,
982 F.2d 394 (9th Cir. 1992) ................................................................................................25

*United States v. Op. Rescue Nat'l*,
111 F. Supp. 2d 948 (S.D. Ohio 1999) ............................................................. 10, 12, 13

*United States v. Roy*,
2007 WL 164539 (E.D. Cal. 2007) ...............................................................................19

*United States v. Scott*,
2012 WL 224500 (D. Colo. 2012) ................................................................................11

*United States v. Scott*,
958 F. Supp. 761 (D. Conn. 1997) ................................................................. 14, 24, 25

*United States v. White*,
893 F. Supp. 1423 (C.D. Cal. 1995) .............................................................................18

*Vietnamese Buddhism Study Temple in Am. v. City of Garden Grove*,
460 F. Supp. 2d 1165 (C.D. Cal. 2006) .......................................................................16

**STATUTES**

18 U.S.C. § 248,
Freedom of Access to Clinic Entrances Act ("FACE Act") .............................*passim*

**OTHER AUTHORITIES**

Wright & Miller, 11A Federal Practice and Procedure § 2948.1
(3d ed. 2025).................................................................................................................17

U.S. CONST. amend. I ..............................................................................................*passim*

**INTRODUCTION**

Plaintiffs The Mission Church and the Christian and Jewish Alliance ("Plaintiffs") believe that the modern Nation of Israel is a sacred part of God's eternal covenant with Abraham in Genesis, which compels them to affirmatively support Israel. Adhering to their religious convictions, the Church and Alliance jointly hosted interfaith worship services to bring Christians and Jews together to support Israel in March and September 2025. In response, Defendants Sasha Spite Miller, Jonathan Provance, Aimee Werth, and Kristina Turner-Brown ("Defendants") joined with others to launch a campaign to obstruct these services. The stated goal of this campaign was to "not give them a moment of peace."

Miller, Turner-Brown, and six others infiltrated the Church during the March service and individually began screaming at designated times, halting the service each time until the disruptor was removed. After resisting removal, they joined a mob outside the Church's entrance that tried to drown out the service with noise and block worshipping families from leaving. In September, all four Defendants wreaked further havoc by joining a mob of others to block and harass worshippers trying to park their vehicles and enter the worship service. They then drowned out the worship service by blaring sirens, banging pans, and screaming through bullhorns. These tactics mirror those that they and others have taken at a series of other Jewish events in the San Diego area.

Defendants' disruption campaign succeeded. They turned what should have been holy times for religious growth and unity into periods of harassment and fear. And moving forward, Defendants have put Plaintiffs and their members to a choice: either suppress their religious beliefs or face a screaming mob that will intentionally put them and their children in danger. Fearing for the safety of their members, both the Church and Alliance halted services and events supporting Israel.

The Church and Alliance cannot sustain their current silence, however. To them, God's command to support Israel is not optional, especially in times when His chosen

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02292-AGS-AHG

people are most threatened. They have planned an interfaith worship service focused on the conflict in Israel on June 10, 2026. And they plan to continue hosting similar services with the Jewish community in the future. But Plaintiffs reasonably fear that Defendants are likely to return, and they likewise will have to tell concerned worshippers that they cannot guarantee their safety.

Defendants' actions violate the Freedom of Access to Clinic Entrances (FACE) Act, which protects Plaintiffs' right to peacefully exercise their faith. Plaintiffs respectfully seek a preliminary injunction enjoining Turner-Brown, Miller, Provance, Werth, and all other persons acting on their behalf or in concert with them during the pendency of this action: (1) from trespassing on, blocking, impeding, or obstructing access to, ingress into, or egress from the Mission Church; and (2) from demonstrating on the sidewalk abutting the Church entrance and its parking lot that parallels Carlsbad Village Drive. *See* Cooper Decl. ¶¶ 64-68; Ex. 48 (map of proposed zone); *infra* at 22. The request is narrow. Plaintiffs seek this injunction against four Defendants who stood out for their aggression, involvement, and likelihood to repeat the disruptions. And its scope would be limited to only a narrow sidewalk in front of the Church, which falls well within the bounds of precedent.

This motion—and indeed this suit—is not about weighing the value of deeply held beliefs, much less resolving international conflicts. It is about how people act upon their beliefs. Plaintiffs simply want to worship in peace together. That can happen only if they are protected from Defendants' unlawful harassment that is, by stated design, intended to "not give them a moment of peace." This Court should grant the requested injunctive relief.[1]

## BACKGROUND

The Church and Alliance both believe that God commands them and their members to support the nation of Israel as part of His covenant with Abraham. *See*

---

[1] To focus the issues, only the Alliance and Church bring this motion and only against four Defendants. They likewise do not rely on every alleged theory of liability.

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02992-AGS-AHG

Cooper Decl. ¶¶ 9-12; Cohen-Reeis Decl. ¶¶ 3-8. In the wake of the October 7, 2023, massacre of Jews and others in Israel, both groups came together to act on their beliefs by hosting interfaith worship events expressing their support for Israel on March 19 and September 7, 2025. *See id.* ¶¶ 21, 29; Cooper Decl. ¶¶ 13-17.

Defendants abhor Plaintiffs' religious beliefs. Each holds deep-seated and longstanding views that Israel's recent actions in Palestine constitute genocide. *See infra* at 20-21. Much more important than any difference in belief, Defendants sharply differ from Plaintiffs in how they act on their beliefs. As part of a broader campaign of harassment, Defendants sought to disrupt the Church and Alliance's services supporting Israel.

The March 19 service occurred at the Church, and hundreds of Christians and Jews attended. Cooper Decl. ¶ 18. From the hymns selected to the message delivered, the service was carefully designed to honor both the Christian and Jewish faiths. *Id.* ¶ 17. The event began with twenty minutes of worship by singing hymns and listening to a message on God's promise to Israel by Pastor Menard. *Id.* ¶¶ 19-24; Ex. 46 (March 19 service recording). The guest speaker for the evening was Dr. Einat Wilf, a former member of the Israeli Knesset, renowned scholar, and expert on the conflict in Israel. *Id.* ¶ 16.

Miller and Turner-Brown joined at least six others in deceptively posing as good-faith attendees to access the sanctuary. *Id.* ¶ 26. They were silent as they listened to the prayer, worship, and sermon. Meanwhile, a mob began forming outside the Church's front entrance. Its members screamed epithets and violent language through bullhorns, creating a disruptive cacophony. *Id.* ¶¶ 31-34.

After Wilf began speaking, one of the infiltrators stood up and began shouting at her. *Id.* ¶ 27. He refused to leave when asked, forcing the Church's safety team to escort him out. *Id.* Wilf had to pause while he was removed. *Id.* ¶ 29. Several minutes later, a second infiltrator repeated the act—shouting down the speaker and halting the event until she could be removed. *Id.* ¶ 28. The disruptors repeated this process seven times,

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02992-AGS-AHG

interrupting at strategic intervals to maximize disruption and prevent the speaker from communicating. *Id.* ¶¶ 26, 29. With each disruption, anxiety rose, and numerous fearful worshippers sought to leave during the service. *Id.* ¶ 37; Mahoney Decl. ¶ 28.

Miller went third. She stood up and began shouting, "Israel murders children." Ex. 57 (video of disruption and removal). She refused to leave, pushing someone who tried to lead her out the aisle. *See id.* As the safety team removed her, she planted her feet and pushed against them. *Id.*; Pool Decl. ¶ 19; Mahoney Decl. ¶ 16. A co-conspirator filmed her disruption, which Miller posted to social media with the caption, "Mission Church in Carlsbad. Call out those who hide behind religion to justify [I]srael[']s genocide on Palestine." Ex. 57.

Turner-Brown went seventh, screaming "[F]ree Palestine 'from the river to the sea.'" Cooper Decl. ¶ 30. When Pastor Cooper approached her to leave, she screamed "f--k you" repeatedly. *Id.* As he and others tried to guide her out of the sanctuary, she forcefully resisted, including by repeatedly slamming her body against them. *Id.*; Pool Decl. ¶¶ 20-22; Exs. 58-59 (photo and video of removal). As she was resisting, she repeatedly shouted "Love thy neighbor." *See* Ex. 59.

Miller and Turner-Brown joined the mob outside the Church, which steadily grew as the event progressed. Cooper Decl. ¶ 31; *see* Mahoney Decl. ¶ 26; Exs. 60-61 (photos of Miller and Turner-Brown outside). The mob continued to disrupt the event, loudly harassing any worshippers nearby—for example, by shoving bullhorns within a foot of latecomers' ears and blaring their sirens. *See, e.g.*, Cooper Decl. ¶ 35; Mahoney Decl. ¶ 25. Turner-Brown, among others, repeatedly trespassed on Church property even after being warned, further straining the safety team. Mahoney Decl. ¶ 27.

The mob's worst punishment for worshippers came at the end of the event, as several hundred Christians and Jews sought to leave the Church. The front door of the Church, its main point of egress, is separated from the public sidewalk by two small steps. Cooper Decl. ¶ 66. And that public sidewalk is both narrow and the only direct path from the front entrance to the parking lot. *See id.* ¶¶ 65--66; Exs. 47a, 47b (photos

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02992-AGS-AHG

of sidewalk). Miller, Turner-Brown, and the rest of the mob dominated the narrow sidewalk, wielding not only their bodies, but large signs, wagons, and flags to block the only path between the front entrance and the parking lot on the side of the Church. Cooper Decl. ¶¶ 40-42. As the event let out, they crowded the steps in front of the entrance, blocking the doorway and precluding worshippers from leaving. Mahoney Decl. ¶ 32-33; Pool Decl. ¶¶ 24-26; Cooper Decl. ¶¶ 40-42.

The mob's actions created a severe bottleneck inside the Church, as hundreds of attendees sought to leave. Cooper Decl. ¶ 42; Mahoney Decl. ¶¶ 33. Response from the Carlsbad Police Department, too, was delayed. Cooper Decl. ¶ 43. Although the police were stationed nearby, they initially declined to intervene, saying that the mob was on a public sidewalk. *Id.* ¶¶ 43-44. It was only after an extended struggle to exit and repeated requests from worshippers that they did so. *Id.*; Mahoney Decl. ¶¶ 35-37. Officers joined with Church members to form a wall blocking the mob from a larger portion of the sidewalk. Mahoney Decl. ¶ 36; Cooper Decl. ¶ 44. Because the path was narrow, however, the bottleneck remained as people exited. Mahoney Decl. ¶ 37.

Police did not deter Turner-Brown. She moved around the line and stood in the path. Following an inevitable altercation with an attendee and subsequent attempts to block a police officer, she was detained for impeding an officer. *Id.* ¶ 38; Pool Decl. ¶¶ 30-31; Ex. 63 (video of officer leading Turner-Brown away in handcuffs).

Even with police present, the mob continued to hinder and harass exiting attendees. Mahoney Decl. ¶ 37; Cooper Decl. ¶ 45-46. The effect was palpable. Worshippers were terrified. During the service, strategically positioned infiltrators had stood up and aggressively reminded them that they were not safe even in a church sanctuary. And now worshippers were crowded near the exit where they could hear, but largely not see, a hateful, screaming mob obstructing their ability to leave. Terrified families with small children begged others to escort them through the chaos. *Id.* ¶ 42. Pastor Cooper had to shield his four children—then ages 9, 10, 12, and 14—as they fled by the mob that screamed "f--k you" and "you're a Nazi" at them. *Id.* ¶¶ 53-54. It was

5

only by passing through this hostile environment, and only after significant delay, that most worshippers could leave the service.

Building on their success, Miller and Turner-Brown joined with Werth, Provance, and many others to disrupt the Alliance's interfaith worship service on September 7 at the Legacy International Center. Like the Church, the Legacy Center is a Christian venue that regularly hosts worship services and is owned by a ministry that strongly believes Israel is central to God's plan. Cohen-Reeis Decl. ¶ 30. The service opened with prayer from an Orthodox rabbi and worship from various bands including a gospel choir. *Id.* ¶ 31. The core of the event was a series of messages from Pastors, Rabbis, and others regarding unity and the need to bring light into the world. *See id.* ¶ 31. The Church sponsored the service, and Pastor Menard preached at it. Mahoney Decl. ¶ 52. Hundreds attended, including dozens from the Church. *Id.*; Cohen-Reeis Decl. ¶ 32.

To stymie worship, Defendants planned their disruption in two stages. First, they obstructed and harassed worshippers arriving in their cars. Miller, Turner-Brown, Werth, Provance, and others slowly marched back and forth in the entrance to the parking lot with large expletive-laden signs, turning around right as they reached the sidewalk to pace back across the entrance; and because enough of them were marching at the same time, they frequently formed a loop that blocked entering vehicles. *See* Nisan Decl. ¶¶ 21-24; Gay Decl. ¶¶ 7-8; Bennett Decl. ¶¶ 12-13; Walker Decl. ¶¶ 10, 16; Exs. 71-74 (photos and videos of the blockage). Cars could proceed only when Defendants permitted them to do so, which predictably created a backup. *See, e.g.*, Gay Decl. ¶ 9; Nisan Decl. ¶ 23. Defendants ignored requests from security staff and attendees to move from the entrance. *See, e.g.*, Bennett Decl. ¶ 15. And many prospective worshippers turned around after seeing the chaos. *See, e.g.*, Nisan Decl. ¶ 23. Of the approximately 480 worshippers who registered, more than 100 did not attend. Cohen-Reeis Decl. ¶ 35.

As they held worshippers captive in their cars, Defendants harassed them further. Miller repeatedly shoved her bullhorn in car windows and into attendees' ears while shouting at them. Nisan Decl. ¶ 28. Her victims included a senior man who is deaf in

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02992-AGS-AHG

one ear and desperately tries to protect his other. Walker Decl. ¶¶ 24-25. Provance repeatedly struck captive vehicles, terrifying attendees. Nisan Decl. ¶¶ 15, 31. He also made a conspicuous show of filming worshippers, shoving his phone camera as close to their faces as possible, including through open car windows. *Id.*

Others shoved signs in car windows, screamed at attendees, and followed cars into the lot screaming and sounding bullhorn sirens. *Id.* ¶ 24; Bennett Decl. ¶ 15. One harasser jumped on Ruth Mastron's vehicle as she and her husband attempted to enter the parking lot. Bennett Decl. ¶¶ 18-20. The harasser screamed and banged on the windshield. *Id.* And when one Jewish woman tried to address the group about the obstruction, Provance, Miller, and three other agitators surrounded her, with Provance shoving his camera in her face and Miller and another disruptor blaring sirens in her face. Gay Decl. ¶¶ 12-15; Exs. 49-52 (videos and photos of confrontation). When she tried to retreat, Provance and two others pursued her; they were stopped only when a male worshipper stepped in between them and the woman. Gay Decl. ¶¶ 16-17; Walker Decl. ¶ 18; Ex. 53 (photo). Despite repeated requests, nearby police did not intervene. Walker Decl. ¶ 14; Nisan Decl. ¶ 20.

The second phase of Defendants' plan was to disrupt the event itself. For nearly all of the event, dozens of agitators, including Defendants, trespassed on private property to get as close as they could to the stage, where they blared sirens, shouted through bullhorns, banged pots, and otherwise drowned out the religious message. Nisan Decl. ¶¶ 37-40; Mahoney Decl. ¶¶ 57-58; Walker Decl. ¶¶ 31-32; Bennett Decl. ¶ 22; Gay Decl. ¶¶ 20, 28; Ex. 54 (contemporary texts). It severely interfered with the event and caused fear among attendees. *See, e.g.*, Ex. 79 (video of sirens during service).

When one worshipper left the service and tried to talk to the harassers, he learned they were not interested in civilized discourse. Four or five individuals wearing black masks surrounded him, blaring sirens, banging pans, and screaming at him. *See* Bennett Decl. ¶ 24. When he tried to return to the service, he was blocked by other disruptors, including Miller, who blared sirens and banged pots directly in his face. *See id.* ¶¶ 24-31;

7

Exs. 4-8 (photos and videos of confrontations).

As the event ended, the harassers began to move towards the parking lot in an attempt to block exiting worshippers. Gay Decl. ¶ 26. At last, one worshipper's frantic pleas to a police lieutenant that the protesters were going to "stay & attempt to keep us from leaving" led to a contingent of officers securing the parking lot exit. *See id.* ¶¶ 21-27; Ex. 54 (text conversation). Only then could attendees leave without interference.

Defendants' disruptions have been catastrophic to the Church, the Alliance, and their members. Both organizations face practical costs—for example, the Church has had to dramatically expand its safety team, at considerable expense. Cooper Decl. ¶ 50; Pool Decl. ¶ 34. More gravely, the Church and Alliance have suffered major and repeated blows to their religious exercise. Defendants' systemic interference has forced a choice on their members: suppress their religious exercise about Israel or face a mob that threatens them and their children's safety. As Werth promised in a video posted live from the September 7 service, "We will not give them a moment of peace." Nisan Decl. ¶ 34; Ex. 78 (video).

Defendants have given plenty of reason to believe Werth. The disruptions in March and September are not isolated. They are part of a larger pattern of interference with nearly identical tactics—infiltrating and then interrupting events, obstructing traffic into and out of events, and harassing attendees. *See, e.g.*, Cohen-Reeis Decl. ¶¶ 10-20; Bennett Decl. ¶¶ 40-49; Exs. 15-20, 37-43 (photos and videos of other blockages and disruptions). Even Easter Sunday was irreparably marred. *See* Mahoney Decl. ¶¶ 41-51.

Because of Defendants' harassment, many congregants have made the difficult decision to distance themselves from the Church. *See, e.g.*, Cooper Decl. ¶ 55. One young couple, for example, brought their elderly parents to the March 19 event only to request an escort out in the middle of the service, fearing for their safety. *Id.* ¶ 56. They later texted Pastor Cooper their fears that the harassers could have brought weapons into the Sanctuary. *Id.* Their family has not returned to the Church. *Id.* These losses, along with the pall that Defendants have cast over their services, have chilled the Church's and

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02992-AGS-AHG

Alliance's religious exercise.

In response to the disruptions, the Alliance has halted events. Cohen-Reeis Decl. ¶ 41. Even before March 19, its events had been targeted by the same group, including its very first large worship event in October 2024. *See id.* ¶¶ 10-17; *see also id.* ¶ 13 (describing Miller, Werth, and Provance cheering the disruption). Rather than risk worshippers' safety, the Alliance suspended worship events. *Id.* ¶¶ 41-42. The Church also has withdrawn from events supporting Israel. Following March 19, it cancelled one planned event supporting Israel and declined to schedule others for safety concerns. Cooper Decl. ¶¶ 58-59.

This course is not sustainable. God's command to support Israel is not optional for Plaintiffs. *See, e.g.*, Cooper Decl. ¶ 60; Cohen-Reeis Decl. ¶ 43. They cannot in good conscience continue stifling their religious exercise, even in the face of interference and obstruction. To that end, they have planned to host an interfaith worship service on June 10, 2026.

## ARGUMENT

The FACE Act authorizes preliminary injunctive relief. 18 U.S.C. § 248(c)(1). To obtain this relief, a party "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 683-84 (9th Cir. 2023) (en banc). A "stronger showing of one element may offset a weaker showing of another." *Id.* at 683. Thus, "[w]hen the balance of equities tips sharply in the plaintiff's favor, the plaintiff must raise only serious questions on the merits." *Id.* Here, Plaintiffs satisfy all requirements for relief.

## I.    Plaintiffs Are Highly Likely To Succeed On The Merits.

The FACE Act imposes liability on anyone who, "by force or threat of force or by physical obstruction, intentionally injures, intimidates, or interferes with or attempts to [do so] with any person lawfully exercising or seeking to exercise the First

9

Amendment right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2). Broken down, the Act requires proof of three elements: "the defendant 1) engaged in acts of force, threats of force, or physical obstruction, 2) with the intent to injure, intimidate, or interfere with a person who" 3) was exercising or seeking to exercise the right of religious freedom at a place of religious worship. *Spitzer v. Kraeger*, 160 F. Supp. 2d 360, 372 (N.D.N.Y. 2001); *see United States v. Balint*, 201 F.3d 928, 932 (7th Cir. 2000); *Helmann v. Codepink Women for Peace*, 2025 WL 3030582, at \*10 (C.D. Cal. 2025).

The FACE Act also imposes joint and several liability. *See, e.g.*, *United States v. Gregg*, 226 F.3d 253, 259 (3d Cir. 2000). It thus "prohibits people from engaging in joint action" to obstruct. *United States v. Op. Rescue Nat'l*, 111 F. Supp. 2d 948, 958 n.13 (S.D. Ohio 1999); *see, e.g.*, *United States v. Mahoney*, 247 F.3d 279, 284 (D.C. Cir. 2001) (finding violation where defendant's actions "contribut[ed] to the disruption and interference"). And "[f]or purposes of FACE, 'intent' means intending to perform the act and aware of the natural and probable consequences of it." *United States v. Gregg*, 32 F. Supp. 2d 151, 156 (D.N.J. 1998), *aff'd*, 226 F.3d 253; *accord, e.g.*, *Op. Rescue*, 111 F. Supp. 2d at 953.

Here, Defendants' targets were plainly people seeking to exercise their right of religious freedom at places of religious worship.[2] Both events were worship services, and attendees targeted by Defendants sought to corporately worship, pray, and learn in accordance with their religious beliefs. *See, e.g.*, *id.* at \*1 n.2; Cooper Decl. 16-24; Cohen-

---

[2] The FACE Act's reproductive-health provision requires proof that a defendant violated the act "because [the victim] is … obtaining or providing reproductive health services." § 248(a)(1). Courts have interpreted its "because" language to impose a second *mens rea* requirement: the defendant's "motivation" was that the victim was seeking reproductive services. *Sharpe v. Conole*, 386 F.3d 482, 484 (2d Cir. 2004) (relying on plain meaning of "because"). This language is absent from the provision at issue here, the plain meaning of which requires proof only that the targets were in fact seeking to exercise their religion. *See* § 248(a)(2) ("interfere with any person exercising … the First Amendment right of religious freedom"). Beyond plain meaning, the "use of different words" in § 248(a)(1) confirms "Congress intended to convey a different meaning." *United States v. Lemus*, 93 F.4th 1255, 1261 (9th Cir. 2024) (finding presence of mens rea requirement in one provision established the absence of that requirement in a related provision with different language).

Reeis Decl. ¶¶ 29, 31; Ex. 46 (March 19 service recording). The Church and Legacy Center's meeting areas were likewise "place[s] of religious worship." § 248(a)(2). Both were actively in use for that purpose during the disruptions. More broadly, both are consistently used every week for that purpose.

The record is also replete with evidence supporting the remaining elements.

### A.    Defendants Interfered With Free Exercise Through Obstruction.

Under the Act, "physical obstruction" encompasses two types of activities: (1) those "rendering impassable ingress to or egress from … a place of religious worship, or [(2)] [those] rendering passage to or from such a [place] unreasonably difficult or hazardous." § 248(e)(4). Thus, "bodily obstruction" is sufficient but not required; the definition is "broadly phrased" to encompass anything that "render[s] passage … unreasonably difficult." *Mahoney*, 247 F.3d at 284. Accordingly, "[i]t is not necessary to show that … people could not get into" or out of a place of worship. *Kraeger*, 160 F. Supp. 2d at 373. "[E]ncountering interference, harassment, and traffic hazards when attempting to enter or leave" qualify. *Id.* Courts have thus "found that a wide variety of obstructive acts can constitute 'physical obstruction.'" *James v. Rescue*, 705 F. Supp. 3d 104, 124-25 (S.D.N.Y. 2023) (collecting authority). Here, Defendants have repeatedly engaged in physical obstruction to intentionally "interfere with" people who were seeking to exercise their faith.

**1.** Provance, Miller, Werth, and Turner-Brown brazenly violated the FACE Act when they formed part of the chain preventing vehicles from entering the parking area before the September 7 service. *See supra* at 6-7; Nisan Decl. ¶¶ 8-16, 21-33; Bennett Decl. ¶ 12; Gay Decl. ¶ 8; Exs. 73-74 (videos). By forcing cars to stop until they deemed fit to let them through, Defendants "render[ed] impassable ingress" to the worship service. § 248(e)(4). Defendants are far from the first to try this dangerous method of obstruction, which has long resulted in findings of violations (and injunctions).[3]

---

[3] *See, e.g.*, *United States v. Scott*, 2012 WL 224500, at *1 (D. Colo. 2012) (entering injunction where defendant "walk[ed] into the entranceway to the parking lot … as

But even if Defendants' blockade did not render the entrance "impassable," forcing cars to stop and then drive into a mob plainly "render[s] passage … unreasonably difficult or hazardous," which likewise triggers liability. § 248(e)(4); *see, e.g.*, *Spitzer v. Op. Rescue Nat'l*, 273 F.3d 184, 194 (2d Cir. 2001) ("[W]alk[ing] across driveways so as to meet oncoming cars, and then deliberately attempt[ing] to slow or even stop the cars' progress … had the effect of obstructing access … and making egress and ingress unreasonably difficult."); *see also supra* note 3. That much is evidenced by the numerous prospective attendees who turned around rather than braving the mob. Nisan Decl. ¶ 23.

Moreover, worshippers were not *just* forced to drive through Defendants. The disruptors slammed signs against cars, struck vehicles, screamed at drivers and passengers, chased cars, and otherwise aggressively harassed worshippers while holding them captive. *See supra* at 6-7. This harassment was part of the same unreasonable obstruction that each Defendant "contributed to." *Mahoney*, 247 F.3d at 284. Indeed, Miller and Provance exacerbated the hazard further by, respectively, pushing a bullhorn into cars and blaring a siren, and shoving a phone into vehicles while taking pictures. Nisan Decl. ¶ 28, 31.

Werth and Miller are separately liable for directing the blockade. *Id.* ¶¶ 27, 33. The FACE Act encompasses "directing others" to create obstruction. *Op. Rescue*, 111 F. Supp. 2d at 958. So even had they not participated directly, both would remain liable.

That Defendants engaged in physical obstruction "with intent to injure, intimidate, or interfere" with attendees follows quickly from their obstruction. By pacing almost exclusively in the entrance, turning around right at the pedestrian sidewalk, the

---

vehicles approach[ed] in an attempt to physically obstruct the vehicles from entering or leaving"); *United States v. Lindgren*, 883 F. Supp. 1321, 1330-31 (D.N.D. 1995) (entering injunction for obstruction where one defendant "halt[ed] cars by standing in front of them, and [another] prevent[ed] them from moving again by placing parts of her body in them or in front of them"); *id.* at 1328 (finding separate violation where disabled cars blocked driveway, which "rendered the clinic completely impassable to access by automobile"); *Kraeger*, 160 F. Supp. at 376 (entering injunction where defendants "run toward, and stand in or near, the … clinic's driveway, often holding large signs, when patients and staff attempt to enter or leave").

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02992-AGS-AHG

only reasonable inference is that Defendants intended to block cars attempting to enter the parking lot. Moreover, they continued to do so even after seeing vehicles backed into the street and against requests by the owners and guests to move and allow free passage. *See, e.g.*, Bennett Decl. ¶ 15. Indeed, when an attendee tried to confront them, Miller and Provance joined others in surrounding her and chasing her away. *See* Gay Decl. ¶¶ 8-15; Exs. 49-53 (video & photos). Defendants knew what they were doing. The pain, intimidation, and terror of their blockade were the point.[4]

**2.** Miller and Turner-Brown separately violated the FACE Act by joining the mob that obstructed egress from the Church on March 19. *See supra* at 4-6; Cooper Decl. ¶¶ 40-47; Mahoney Decl. ¶¶ 32-35. Both forms of "physical obstruction" are again at issue. By crowding the Church entrance and occupying the sidewalk, Miller and Turner-Brown joined others to "render impassable ... egress from" the Church. § 248(e)(4). Worshippers could not leave. If the mob had not placed itself at the exit, worshippers would not have been bottlenecked. That is obstruction.

Even setting aside the periods when egress was entirely blocked and even assuming that the slow movement after police intervention due to continuing harassment did not render egress "impassable" for those trapped in the lobby, Miller and Turner-Brown still plainly "render[ed] passage … from [the Church] unreasonably difficult or hazardous." § 248(e)(4). It is evidently unreasonable for hundreds of people to be forced to wait for police intervention to leave safely. *See, e.g.*, Cooper Decl. ¶¶ 42-44. And it is particularly unreasonable for those people to also have to walk through a gauntlet of agitators screaming at them from point-blank range through bullhorns. Mahoney Decl. ¶¶ 36-37. Court after court has found egress "unreasonably difficult" in

---

[4] Even if the obstruction could be viewed as not making egress unreasonably difficult—and it cannot—the FACE Act also covers "attempts to … interfere." § 248(a)(2). For the same reasons discussed, Defendants would easily clear that bar. *See, e.g.*, *Op. Rescue*, 111 F. Supp. 2d at 957 (attempt under FACE Act requires intent and "substantial step towards the commission of that activity").

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02992-AGS-AHG

far, far less serious circumstances.[5]

Even without more, participating in the mob blocking a church entrance and the path to the parking lot is sufficient to constitute a violation. But there is more. Miller wielded a flag to obstruct the sidewalk. Cooper Decl. ¶ 41. And even after police had created a path to exit the Church, Turner-Brown continued to impede worshippers and a police officer. *See, e.g.*, Pool Decl. ¶ 30; Ex. 63 (arrest video). Both by blocking people as part of the mob and by separately exacerbating the environment, Miller and Turner-Brown engaged in obstruction. *See Mahoney*, 247 F.3d at 284.

A FACE Act violation likewise follows quickly from these facts. Miller and Turner-Brown plainly "intend[ed] to perform the [disruption] … aware [that] the natural and probable consequences of it" would be blocking egress. *Gregg*, 32 F. Supp. 2d at 156. Both continued to block worshippers even after a massive bottleneck formed and even after the safety team and police repeatedly asked them to move. *See, e.g.*, Mahoney Decl. ¶¶ 34-35; Pool Decl. ¶ 25. Again, they knew what they were doing. The pain and fear were the point.[6]

**B.    Defendants Used Force To Intimidate Worshippers.**

Under the FACE Act, "force" is a "broad[]" term that includes "power, violence, or pressure directed against a person or thing." *Spitzer v. Cain*, 418 F. Supp. 2d 457, 473 (S.D.N.Y. 2006). The Act extends to acts such as "hitting, pushing, shoving, kicking, and knocking over" people. *Kraeger*, 160 F. Supp. 2d at 372. And because "there is no

[5] *See, e.g.*, *Mahoney*, 247 F.3d at 283 (defendants "knelt or lay within five feet of … the main entrance to the clinic" and "[w]hen the police tried to remove them they offered passive resistance and had to be carried away"); *Gregg*, 32 F. Supp. 2d at 156 (defendants laid in entrance, requiring attendees to "step or climb over the[ir] bodies"); *Kraeger*, 160 F. Supp. at 376 ("slowly pac[ing] the entire length of the sidewalk while holding large signs" and "not yield[ing] any space for pedestrians"); *United States v. Scott*, 958 F. Supp. 761, 775-76 (D. Conn. 1997) ("stand[ing] within one foot of [people], forcing them to maneuver around [defendant] to get to the clinic"); *FemHealth USA, Inc. v. Williams*, 2022 WL 4241269, at *5 (M.D. Tenn. 2022) (standing "immediately outside the entrance" and "remain[ing] there for several minutes").

[6] Here too, even if one could construe their efforts as not rendering egress unreasonably difficult, Miller and Turner-Brown plainly attempted to do so. *See supra* note 4.

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02992-AGS-AHG

exception for fleeting and de minimis contact," it also includes more subtle acts of force—for example, "body-pressing." *Cain*, 418 F. Supp. 2d at 473-74 (finding violation); *see also, e.g.*, *Kraeger*, 160 F. Supp. 2d at 375 (finding violation where defendant "walk[ed] so closely to [a person] that he intentionally stepped on [that person's] heel").

Provance, Turner-Brown, and Miller each violated the FACE Act through force. And they were "aware [that a] natural and probable consequence[] of" their force, *Gregg*, 32 F. Supp. 2d at 156, was that people would be "place[d] … in reasonable apprehension of bodily harm to him- or herself or to another," § 248(e)(3) (defining "intimidate"). On September 7, Provance repeatedly smacked trapped vehicles to frighten drivers in an already dangerous situation. *See* Nisan Decl. ¶¶ 12, 31. For their parts, Turner-Brown and Miller used force as they were removed from the sanctuary on March 19. Turner-Brown slammed her body into others, causing those removing her to fear for their safety. *See* Cooper Decl. ¶ 30; Mahoney Decl. ¶ 18. Similarly, Miller hit a worshipper sitting next to her who was trying to guide her out of the row. *See* Ex. 57 (video of interaction). And when she did so, that worshipper recoiled back, evidencing fear of bodily harm. *See id.* In each of these instances, Defendants used force to intimidate worshippers.

\*   \*   \*

In the face of this mountain of evidence, Plaintiffs are likely to succeed on their FACE Act claims. But even if there were doubt, this case obviously involves "serious questions on the merits." *FCA*, 82 F.4th at 684. And as explained below, the equities overwhelmingly favor the religious organizations who want to worship in peace over a group that seeks to deny those worshippers peace.

## II.   Plaintiffs Face Ongoing And Likely Future Irreparable Harm.

Just as "[i]rreparable harm is relatively easy to establish in a First Amendment case," *Cal. Chamber of Com. v. Council for Educ.*, 29 F.4th 468, 482 (9th Cir. 2022), irreparable harm follows from Defendants' unlawful interference with Plaintiffs' exercise of "the First Amendment right of religious freedom," § 248(a)(2); *cf. Singh v. Berger*, 56 F.4th 88, 107-08 (D.C. Cir. 2022) (noting "the parallelism between RFRA and

15

the First Amendment" for purposes of a preliminary injunction). A party is "irreparably harmed by the loss of free exercise rights for even minimal periods of time." *Tandon v. Newsom*, 593 U.S. 61, 64 (2021); *see also, e.g.*, *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 525-26, 546 (1993) (holding that a church's Free Exercise rights were infringed by ordinance restricting its ability to practice animal sacrifice). Inhibiting an organization's ability to worship with others constitutes such a loss. *See, e.g.*, *Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (occupancy limits on religious services irreparably harmed Catholic and Orthodox Jewish groups because "effectively barring many from attending religious services, strike[s] at the very heart of the First Amendment's guarantee of religious liberty"); *Tandon*, 593 U.S. at 64 (similar); *Vietnamese Buddhism Study Temple in Am. v. City of Garden Grove*, 460 F. Supp. 2d 1165, 1172 (C.D. Cal. 2006) (similar).

Here, Plaintiffs suffer both ongoing and likely future irreparable harm traced to Defendants' conduct, either of which is sufficient to warrant relief.

**1.** Defendants' disruptions have created a devastating chilling effect on Plaintiffs' ability to freely exercise their religious beliefs supporting Israel. These disruptions have put them and prospective worshippers to a stark choice: either suppress their religious support for Israel or risk facing an angry mob with a penchant for obstruction and creating dangerous situations. And even then, their worship will be drowned out by bullhorns, sirens, and screaming, which can escalate to physical confrontation. *See id.* In the face of these threats and fears from worshippers, the Alliance stopped hosting worship services. Cohen-Reeis Decl. ¶¶ 41-43. The Church likewise canceled an event and hesitated to plan others. Cooper Decl. ¶¶ 58-59. Even now, as Plaintiffs have resolved that they must follow their faith, they will remain harmed by Defendants' looming threat. Both the Alliance and the Church will have to inform worried worshippers that they cannot guarantee their safety. *Id.* ¶¶ 61-62; Cohen-Reeis Decl. ¶ 44. That is guaranteed to chill attendance and harm religious exercise.

This ongoing harm is sufficient to support injunctive relief. Regardless of future

16

disruptions, the chill from Defendants' disruptions continues to inflict irreparable harm to the Church and the Alliance. *See Cuviello v. Vallejo*, 944 F.3d 816, 832-33 (9th Cir. 2019) ("[A] chill on … free speech rights … even if it results from a threat … constitutes irreparable harm."). But injunctive relief will halt ongoing chilling of First Amendment rights. *See, e.g.*, *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 837-38 (9th Cir. 2020) (declining to stay injunction because its absence would continue chill created by defendants' past conduct).[7] Indeed, an injunction here is a prerequisite to ensuring that the police will take action when needed. *See* Cooper Decl. ¶ 61; *see also Rescue*, 705 F. Supp. 3d at 141 (ordering preliminary injunction and noting that it would "create[] clear guidelines for both police departments and Defendants to follow" (quoting *Kraeger*, 160 F. Supp. 2d at 379)).

**2.** The Church and the Alliance independently face a serious threat of future harm that Defendants actually will disrupt the worship services they hold, including the planned service on June 10, 2026. Such a disruption will infringe on the Church's and Alliance's free exercise by limiting attendance and inhibiting worship. *See supra* at 15-16. Their members also face irreparable harm because the disruption would require them to "confront unreasonable difficulties when seeking to access" the worship service. *E.g.*, *Rescue*, 705 F. Supp. 3d at 121.

The question, then, is whether such an injury is "sufficiently likely," which "require[s] a definitive threat of future harm … not mere speculation." *Flathead-Lolo-Bitterroot v. Montana*, 98 F.4th 1180, 1193 (9th Cir. 2024); *see* Wright & Miller, 11A Federal Practice and Procedure § 2948.1 (3d ed. 2025) ("A strong threat of irreparable injury before trial is an adequate basis."). A useful comparator is *Boardman v. Pacific Seafood Group*, where the Ninth Circuit affirmed an injunction against a defendant acquiring

---

[7] For the same reasons, Defendants' ongoing threat hurts the Church's and Alliance's "ability to recruit" new members. *FCA*, 82 F.4th at 695; *see, e.g.*, *Regents v. ABC, Inc.*, 747 F.2d 511, 520 (9th Cir. 1984) (harm to organizational recruitment is irreparable). Both are aware of people who have not returned. Cooper Decl. ¶¶ 5556; Cohen-Reeis Decl. ¶ 42. These departures are only the tip of the iceberg, as people intimidated from the organizations are not easily available for counting.

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02992-AGS-AHG

another company even though no such acquisition was pending; the court reasoned that the defendant had a history of negotiating in secret, which presented a sufficient threat that it would do so before litigation concluded. 822 F.3d 1011, 1023 (9th Cir. 2016). The threat in this case is far stronger and less contingent than *Boardman*.

As an initial matter, "Defendants' past violations are [themselves] highly suggestive of future harm." *Index Newspapers LLC v. Portland*, 480 F. Supp. 3d 1120, 1153 (D. Or. 2020). That reflects the intuitive fact that "past illegal conduct gives rise to an inference that future violations may occur." *United States v. Laerdal Mfg. Corp.*, 73 F.3d 852, 857 (9th Cir. 1995). Amplifying this inference, Miller and Turner-Brown engaged in similar conduct at both events. Undeterred by Turner-Brown's arrest at the March 19 service, they returned to block traffic in September. Indeed, Miller euphemistically bragged that the protest group she leads, of which Defendants are active members, had "challenged" numerous leaders and "countless weapons, corporations, and conferences via peaceful strategic actions." Ex. 24 (video of speech).

Similarly, Provance's "conduct elsewhere strongly suggests that [he] will not, in fact, comply with FACE's restrictions." *United States v. White*, 893 F. Supp. 1423, 1438 (C.D. Cal. 1995) (granting preliminary injunction). He proudly posted videos of himself using the same tactics elsewhere. During one church's Easter service, Provance coordinated with others to stand up and scream "Free Palestine." Bennett Decl. ¶ 49; Ex. 19 (video). When posting the video, he proclaimed, "No Easter during a genocide!" Bennett Decl. ¶ 49; Ex. 20 (screenshot). He repeated the feat at a book talk by Nancy Pelosi, where he later bragged that Pelosi "was interrupted 7 times during a 45 minute talk" and crowed about how "upset" the disruptions made the "Zionist" moderator. Bennett Decl. ¶ 45-47; Ex. 17 (screenshot); *see* Ex. 16 (video). After the event, Provance joined a mob surrounding an attendee, where he stood inches from the attendee's face screaming, "Attack me, you little bitch!" Bennett Decl. ¶ 48; Ex. 18 (video). At yet another event attended by Alliance members, Provance blocked traffic with a mob waving Palestinian flags at a pro-Israel organization's annual gala in 2024. *See* Cohen-

18

Reeis Decl. ¶¶ 19-20; Exs. 37-40.

Equally strong evidence comes from the egregious nature of Defendants' violations. A "finding of bad faith," after all, "weigh[s] heavily in favor of granting a prospective injunction." *Brock v. Big Bear Mkt.*, 825 F.2d 1381, 1383 (9th Cir. 1987). Defendants snuck into a worship service under false pretenses to engage in seriatim disruptions; blocked and harassed families (including children) as they tried to leave the Church; blocked traffic; terrified attendees by hitting their cars, shoving items in windows, and blasting them with sirens; and trespassed (again) when trying to drown out (again) the September worship service through noise and disruption. *See supra* at 4-8. These were "not ... spur-of-the-moment act[s]." *Lindgren*, 883 F. Supp. at 1328-29. They were egregious, far exceeding any concept of lawful (much less good faith) protest.

Worse still, Defendants' disruptions obviously "required lengthy planning preparation with a number of collaborators" to maximize harm. *Id.* Given the coordination of action, they "must have had substantial time to reflect on their decisions," only amplifying their comfort with the terror they inflicted. *Lindgren*, 883 F. Supp. at 1328 (entering FACE injunction). Similarly, Defendants coordinated to conceal their identities. On September 7, each wore face masks, eye coverings, and other concealing clothing when blocking traffic. *See, e.g.*, Bennett Decl. ¶ 14; Nisan Decl. ¶¶ 9, 32, 34. Of course, an "effort to conceal [their] identity provide[s] further significant evidence of … guilt." *Phillips v. Ornoski*, 673 F.3d 1168, 1190 (9th Cir. 2012).

At bottom, Defendants could not possibly have "demonstrate[ed] [more of] an open disregard for the requirements of the statute." *Su v. USPS*, 2023 WL 3172867, at *7 (W.D. Wash. 2023) (entering injunction). Their "deliberate decision to engage in such flagrant conduct reflects their state of mind, and evidences a cognizable danger that they will engage in similar conduct." *Lindgren*, 883 F. Supp. at 1329 (entering FACE injunction even though only a "single incident" was at issue); *see, e.g.*, *United States v. Roy*, 2007 WL 164539, at *4 (E.D. Cal. 2007) (similar).

Amplifying this risk, Defendants have publicly expressed their motivations to

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02992-AGS-AHG

continue disruptions. Although each has hidden incriminating footprints online, what remains reflects that all four have long viewed the conflict in Gaza as an existential crisis. That crisis has become an obsession, documented across hundreds of social media posts and protests. *See* Bennett Decl. ¶¶ 40, 52, 66; Exs. 11, 29 (video scrolls of Provance's Facebook and Werth's Instagram). Over time, this obsession has snowballed into acerbic and conspiratorial criticism and increasingly urgent pleas for action within the San Diego area. *See* Bennett Decl. ¶¶ 39-71 (detailing this history). [8] All four defendants—and especially Werth—likewise have made public that they attend demonstrations and disruptions focused on Israel and Jews with extreme frequency. *See* Bennett Decl. ¶¶ 50, 58, 64, 68.

Dovetailing with their views on the urgency of the crisis, Defendants have also expressed dissatisfaction with traditional modes of protest. In speeches to the Oceanside City Council, Turner-Brown explained that she rejects being "respectful and courteous" in advocacy because appealing to people's "humanitarian side ... clearly didn't make an impact." *Id.* ¶ 62. Miller mocked people peacefully protesting along a road, stating that "sitting ... holding signs" is not "going to do it for us" and exhorting viewers, "if we want change we are going to have to fight for it." *Id.* ¶ 55; Ex. 23 (video). Going further still, she and Provance have endorsed multiple terrorist leaders known for their advocacy of violent action toward Jews, including both the mastermind behind the October 7, 2023 terror attacks and a member of Al-Qaeda. *See id.* ¶¶ 43-45, 53; Exs. 13-14; 22a-22b (screenshots of endorsements). And Miller, Provance, and Werth have all celebrated similar disruptions to those at issue here. *See, e.g.*, Cohen-Reeis Decl. ¶ 13. To pick one example, Werth praised a video justifying disrupting a worship service, and she specifically targeted Israel's Christian allies ("mega church grifters"), whom she accused

---

[8] Werth and Provance are particularly deep in anti-Israel advocacy. They endorse the conspiracy that Mossad was behind the September 11, 2001, attacks. *See* Bennett Decl. ¶¶ 42, 68; Exs. 12, 30 (social media posts). Provance likewise has publicized the theory that Jews did not exist in history but are only Eastern Europeans who moved to Israel "tempted by $$$$$$ offered by the Rothschilds." Ex. 12.

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02992-AGS-AHG

of being "useful idiots" of the Jews. Cohen-Reeis Decl. ¶ 16-17; Ex. 35.

Defendants have every right to their views. Those beliefs, however, are probative of their future risk of disruption: Given their deep-seated, longstanding, and recently expressed hostility toward Jews and Christians who support Israel, it is readily apparent why Defendants believe the ends justify the means when disrupting interfaith events. *See, e.g.*, *Index*, 480 F. Supp. 3d at 1154 (concluding that "disdainful comments publicly made" by defendants about plaintiffs showed that defendants "are likely to be enabled or tempted to engage in future violations").

In sum, Defendants have the means, motivation, and a repeatedly demonstrated willingness to take aggressive and illegal action to fight anyone daring to express support for Israel. Even among the other disruptors, each stood out for their aggression and involvement. Defendants plainly present at least a "definitive threat of future harm." *Flathead-Lolo-Bitterroot*, 98 F.4th at 1193; *see Boardman*, 822 F.3d at 1023.

**III.    The Balance of the Equities Sharply Tips in Plaintiffs' Favor.**

Considering "the competing claims of injury" and weighing "the effect on each party of the granting or withholding of the requested relief," the balance of equities likewise favors the peaceful worshippers over those with the stated goal of harassment, intimidation, and disruption. *Arc of Cal. v. Douglas*, 757 F.3d 975, 991 (9th Cir. 2014). Indeed, the record "compels a finding that the balance of hardships tips sharply in [their] favor." *FCA*, 82 F.4th at 695.

Plaintiffs face substantial hardship absent an injunction. On their "side of the balance is the weighty public interest in the free exercise of religion." *Singh*, 56 F.4th at 107. As discussed, Defendants' actions continue to actively chill Plaintiffs' free exercise and relatedly present a threat of likely future disruption of events. *See supra* at 16-17. Beyond this harm, these disruptions will likewise lead the Church and Alliance to continue to lose members who fear for their safety and wish to worship in peace. And, of course, the Church and Alliance face threats to the safety of their members due to Defendants' aggressive conduct.

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02992-AGS-AHG

Conversely, any harm to Defendants is minimal. By "request[ing] a tailored injunction," Plaintiffs have ensured the balance of equities remains in favor of injunctive relief. *Ramirez v. Collier*, 595 U.S. 411, 433 (2022). The proposed injunction has two parts: enjoining Turner-Brown, Miller, Provance, Werth, and all other persons acting on their behalf or in concert with them during the pendency of this action: (1) from trespassing on, blocking, impeding, or obstructing access to, ingress into, or egress from the Mission Church; and (2) from demonstrating on the sidewalk abutting the Church entrance and its parking lot that parallels Carlsbad Village Drive. *See* Cooper Decl. ¶¶ 64-68; Ex. 48 (map of proposed zone). Both components fall well within precedent covering similar conduct and harm.

**1.** Defendants necessarily do not suffer cognizable harm from the first part of the injunction, which is tailored to the FACE Act's provisions. *See* § 248(a)(2). It is a "long-settled principle that harm caused by illegal conduct does not merit significant equitable protection." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017). After all, Defendants "cannot reasonably assert that they are harmed in any legally cognizable sense by being compelled to follow the law." *Doe v. Wolf*, 432 F. Supp. 3d 1200, 1214 (S.D. Cal. 2020); *see, e.g.*, *Kraeger*, 160 F. Supp. at 379 (holding the same when entering FACE Act injunction). It is perhaps for that reason that materially identical provisions in similar injunctions have remained unquestioned. *See, e.g.*, *Schenck v. Pro-Choice Network*, 519 U.S. 357, 366 n.3 (1997); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 759 (1994); *Lucero v. Trosch*, 121 F.3d 591, 608 (11th Cir. 1997).

**2.** The second part of the injunction likewise passes muster. Plaintiffs readily acknowledge that shielding the sidewalk immediately in front of the Church may incidentally burden Defendants' ability to protest. But as court after court has recognized, "countervailing interests" outweigh that potential when the First Amendment is satisfied by "an appropriately tailored injunction." *Rescue*, 705 F. Supp. 3d at 137-38 (affirming 15-foot zone around entrances of reproductive health clinics in the Southern and Eastern Districts of New York); *see, e.g.*, *Lucero*, 121 F.3d at 606 ("As

22                                                PS & AS ISO MOTION FOR PREL. INJ.
                                                  CASE NO. 3:25-CV-02992-AGS-AHG

a matter of common sense, [a 25-foot zone] does not seem unreasonable."); *FemHealth*, 2022 WL 4241269, at *5 (similar); *United States v. McMillan*, 946 F. Supp. 1254, 1269 (S.D. Miss. 1995) (similar).

And here, the requested exclusion area, which is less than 10 feet along only one side of the property, is well within First Amendment bounds. Courts have long recognized that "picketing and parading is subject to regulation even though intertwined with expression and association." *Foti v. Menlo Park*, 146 F.3d 629, 640 (9th Cir. 1998). When assessing First Amendment harm, the "test … is 'whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest.'" *Schenck*, 519 U.S. at 371 (quoting *Madsen*, 512 U.S. at 765). Under that standard, the Supreme Court affirmed injunctions in similar cases. *See, e.g.*, *Madsen*, 512 U.S. at 769-70 (36-foot boundary around entirety of clinic property line); *Schenck*, 519 U.S. at 380-81 (similar).[9]

*Schenck* and *Madsen* control. In both, the Court ruled that similar relief was supported by significant interests in "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services." *Schenck*, 519 U.S. at 376. In part "because other options would block the free flow of traffic on the streets and sidewalks," these factors justified "mov[ing] protesters off the sidewalk and to the other side of the street." *Id.* at 375; *see Madsen*, 512 U.S. at 767-68.

Legally, the only difference here is the presence of the interest in protecting free exercise rather than clinic access, but that is not a material difference. The "free exercise of religion is undoubtedly, fundamentally important," *Hunter v. U.S. Dep't of Educ.*, 115 F.4th 955, 968 (9th Cir. 2024), and the obstructions here operated in the same, harmful

---

[9] *See also, e.g.*, *Burson v. Freeman*, 504 U.S. 191 (1992) (upholding 100-foot boundary around polling stations); *Frisby v. Schultz*, 487 U.S. 474, 486 (1988) (upholding prohibition on picketing "before or about" private residences); *Cameron v. Johnson*, 390 U.S. 611, 612-14 & n.1 (1968) (upholding prohibition on picketing "in such a manner as to obstruct or unreasonably interfere with free ingress or egress" to public places or the free use of sidewalks).

23

way as in *Schenck* and *Madsen*: they blocked people from exercising their rights, while creating chaos, disorder, and threats to public safety. *See supra* at 4-8. Thus, "protecting the entrances to the [Church] and the parking lot is a means of protecting unfettered ingress to and egress from the [Church]." *Madsen*, 512 U.S. at 769.

Factually, the proposed exclusion area is necessary "to secure unimpeded physical access to the" Church, *Schenck*, 519 U.S. at 376, due to the "relatively restricted physical area" in front of it, *Pl. P'hd Shasta-Diablo, Inc. v. Williams*, 898 P.2d 402, 410 (Cal. 1995) (upholding 60-foot exclusion zone); *see Madsen*, 512 U.S. at 769 (similar). The narrow sidewalk in front of the Church—less than six feet wide—that is the only place for worshippers to go after exiting the front door. Cooper Decl. ¶¶ 64-66. The proposed injunction would protect that clear vulnerability to ingress and egress. *Id.* Without that protection, Defendants need organize only one or two blockages (at the entrance or on the sidewalk) to obstruct all ingress and egress. *See id.*; Exs. 47a-47b (photos of sidewalk).

The injunction has other limits, too. It focuses on four people, each of whom has celebrated their willingness to violate the law. It is also restricted to only the Church, as opposed to other areas in which the Church or Alliance might otherwise seek to exercise their faith. *Cf. Rescue*, 705 F. Supp. 3d at 137-38 (enforcing zone around reproductive health clinics across the Southern and Eastern Districts of New York). Such a limited injunction is plainly permissible under *Schenck* and *Madsen*. And in the absence of any other cognizable harms, that conclusion slams the balance of equities in Plaintiffs' favor.[10]

**IV.    The Public Interest Favors Injunctive Relief.**

Finally, a preliminary injunction is overwhelmingly "in the public interest." *FCA*,

---

[10] If a court "finds that the relief requested by the plaintiffs is not entirely appropriate, it may order … other relief." *Scott*, 958 F. Supp. at 782 (*sua sponte* modifying requested injunction); *see, e.g., Portland*, 859 F.2d at 687 (similar). If that were the case here, this Court should consider a smaller zone or other limited relief. Similarly, if this Court does not order relief for a particular Defendant, it should still enjoin the others. *See, e.g., NWF v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) ("Irreparable harm may be caused by activities broader than those that plaintiffs seek to enjoin.").

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02992-AGS-AHG

82 F.4th at 683-84. Several strong, overlapping public interests are at stake.

To start, "the free exercise of religion … is obviously in the public interest." *Mayweathers v. Newland*, 258 F.3d 930, 938-39 (9th Cir. 2001) (addressing free exercise in prisons); *accord, e.g.*, *Ramirez*, 595 U.S. at 433; *Diocese of Brooklyn*, 592 U.S. at 19-20; *Hunter*, 115 F.4th at 968. And here, Defendants assaulted the free exercise of not only the Church and the Alliance, but also hundreds of attendees who sought to worship. *See supra* at 3-9.

Consider also the public interests in "public safety and order, promoting the free flow of traffic on streets and sidewalks, [and] protecting property rights." *Schenck*, 519 U.S. at 376; *accord, e.g.*, *Madsen*, 512 U.S. at 767-68; *Rescue*, 705 F. Supp. 3d at 136-37; *Scott*, 958 F. Supp. at 775. Defendants have already damaged each of these public interests by blocking sidewalks, causing traffic jams, brawling with congregants, trespassing, and otherwise placing the public in dangerous situations through their aggressive conduct. *See, e.g.*, *supra* at 3-9.

Finally and more fundamentally, Congress has declared the public interest by enacting the FACE Act. After all, "the passage of the statute is itself an implied finding by Congress that violations will harm the public." *United States v. Nutri-Cology, Inc.*, 982 F.2d 394, 398 (9th Cir. 1992). Because legislative enactments determine where "the balance has been struck" for an injunction, *TVA v. Hill*, 437 U.S. 153, 194 (1978), judicial assessment of public interest is "constrained" where "the responsible public officials ... have already considered [the public] interest" by enacting a law, *Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*, 512 F.3d 1112, 1126-27 (9th Cir. 2008); *see, e.g.*, *Cottonwood Christian Ctr. v. Cypress Redev. Agency*, 218 F. Supp. 2d 1203, 1230-31 (C.D. Cal. 2002) ("RLUIPA alone establishes that the public interest is strongly in favor of granting the injunction."). Thus, preventing further FACE Act violations by Defendants is inherently in the public interest.

## CONCLUSION

For the foregoing reasons, this Court should enter a preliminary injunction.

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02992-AGS-AHG

Dated: March 23, 2026

By: */s/ John C. Brinkerhoff Jr.*
　　John C. Brinkerhoff Jr.

David J. Hacker (SBN 249272)　　　C. Kevin Marshall (*pro hac vice*)
Jeremiah G. Dys (*pro hac vice*)　　　John C. Brinkerhoff Jr. (*pro hac vice*)
Kayla A. Toney (*pro hac vice*)　　　Janessa Mackenzie (*pro hac vice*)
**FIRST LIBERTY INSTITUTE**　　　**JONES DAY**
20001 W. Plano Pkwy, Ste. 1600　　51 Louisiana Ave., NW
Plano, TX 75075　　　　　　　　Washington, DC 20001
Telephone: (972) 941-4444　　　　Telephone: (202) 879-3939
Email: dhacker@firstliberty.org　　Email: jbrinkerhoff@jonesday.com

*Attorneys for Plaintiffs Christian & Jewish Alliance,*
*Ezra Ministries, and Ruth Mastron*

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02992-AGS-AHG

**RULE 5 CERTIFICATE OF COMPLIANCE**

Pursuant to Chambers Rule 5, Counsel for Plaintiffs certifies that they met with Counsel for Defendants via videoconference on Friday, March 13, 2026, and continued to correspond on March 16, 17, 19, and 23 about this Motion.

Date: March 23, 2026

/s/ John C. Brinkerhoff Jr.
John C. Brinkerhoff Jr.
*Counsel for Plaintiffs*

PS & AS ISO MOTION FOR PREL. INJ.
CASE NO. 3:25-CV-02992-AGS-AHG