C. Kevin Marshall (DCSBN 476266)
John C. Brinkerhoff Jr. (DCSBN 1765474)
Janessa B. Mackenzie (DCSBN 90007987)
**JONES DAY**
51 Louisiana Ave., NW
Washington, DC 20001
Telephone: (202) 879-3939
jbrinkerhoff@jonesday.com

David J. Hacker (SBN 249272)
Jeremiah G. Dys (TXSBN 24096415)
Kayla A. Toney (TXSBN 24141332)
**FIRST LIBERTY INSTITUTE**
2001 W. Plano Pkwy, Ste. 1600
Plano, TX 75075
Telephone: (972) 941-4444
dhacker@firstliberty.org

*Attorneys for Plaintiffs Christian & Jewish Alliance, Ezra Ministries, and Ruth Mastron*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

Christian & Jewish Alliance Inc., a California not-for-profit corporation, Ezra Ministries, a California not-for-profit religious corporation, d/b/a The Mission Church, and Ruth Mastron,

*Plaintiffs*,

v.

Daniel Brunner, Aimee Magda Werth, Kristina Turner-Brown, Patrick Hartley, Sasha Miller, Jacob Pagaduan, Jonathan Provance, Maya Karalius, and Does 1-40,

*Defendants*.

Case No. 3:25-cv-02992-AGS-AHG
Judge: Hon. Andrew G. Schopler

**PLAINTIFFS' REPLY IN SUPPORT OF THE MOTION FOR A PRELIMINARY INJUNCTION**

Date: June 9, 2026
Time: 10:00 a.m.
Location: Courtroom 5C

# TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1

ARGUMENT ..... 1

I. Plaintiffs Have Established a Likelihood of Success on the Merits. ..... 1

II. Plaintiffs Have Established Irreparable Harm. ..... 5

III. The Balance of Equities Favors Entry of the Proposed Injunction. ..... 9

CONCLUSION ..... 10

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abrego v. Dow Chem. Co.*,
443 F.3d 676 (9th Cir. 2006) .......... 4

*First Choice Women's Resource Ctrs., Inc. v. Davenport*,
608 U.S. ___ (Apr. 29, 2026) (slip op.) .......... 6

*Gomez v. Vernon*,
255 F.3d 1118 (9th Cir. 2001) .......... 8

*L.A. Press Club v. Noem*,
171 F.4th 1179 (9th Cir. 2026) .......... 6, 7

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) .......... 9, 10

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) .......... 8

*New Beginnings Mins. v. George*,
2018 WL 11378829 (S.D. Ohio 2018) .......... 2

*Regal Knitwear Co. v. NLRB*,
324 U.S. 9 (1945) .......... 10

*Schenck v. Pro-Choice Network*,
519 U.S. 357 (1997) .......... 9

*SEC v. Murphy*,
626 F.2d 633 (9th Cir. 1980) .......... 8

*Spitzer v. Op. Rescue*,
273 F.3d 184 (2d Cir. 2001) .......... 2

*United States v. Dugan*,
450 F. App'x 20 (2d Cir. 2011) .......... 2

*United States v. Laerdal Mfg. Corp.*,
93 F.3d 852 (9th Cir. 1995) ........ 7, 8

*United States v. Odessa Union*,
833 F.2d 172 (9th Cir. 1987) ........ 8

*United States v. Rhodes*,
2024 WL 1269182 (D. Mont. 2024) ........ 8

*United States v. White*,
893 F. Supp. 1423 (C.D. Cal. 1995) ........ 2

*United States v. Wilson*,
2 F. Supp. 2d 1170 (E.D. Wis. 1998) ........ 4

**STATUTES**

18 U.S.C. § 248,
Freedom of Access to Clinic Entrances Act ("FACE Act") ........ *passim*

42 U.S.C. § 1983 ........ 2

**RULES**

Fed. R. Civ. P. 65(d)(2)(C) ........ 10

**OTHER AUTHORITIES**

U.S. CONST. amend I ........ *passim*

139 Cong. Rec. S15655 (Nov. 16, 1993) ........ 4

S. Rep. No. 103-117 (1993) ........ 4

## INTRODUCTION

Defendants barely challenge the record Plaintiffs submitted to support a narrow injunction allowing them to worship in peace. Nowhere in the response brief do Defendants dispute their campaign against Israel supporters or their roles in causing a terrifying bottleneck on March 19 and forcing vehicles through a mob on September 7. Nowhere do they dispute their broader pattern of harassment or the extensive paper trail of their plans to silence worshipers by "disturbing their peace." They instead offer legal arguments that fail on both the law and the preliminary record, and then raise immaterial questions about Plaintiffs' evidence without ever actually denying it.

Relief is warranted. Defendants do not dispute public interest, and the other factors favor relief. Plaintiffs should be able to worship in peace and without fear.

## ARGUMENT

### I. Plaintiffs Have Established a Likelihood of Success on the Merits.

Defendants focus most of their response on likelihood of success. The extensive preliminary record reflects clear liability. On March 19, Sasha Spite Miller and Kristina Turner-Brown joined a mob that crowded the Church exit and blocked the path to the parking lot, causing a bottleneck that required police intervention as hundreds of terrified worshipers tried to leave. MPI 11–12, 20–21.[1] And all four Defendants obstructed the worship service on September 7 by blocking the narrow entrance to the parking lot, creating a backup, terrifying worshipers who were forced to slowly drive through a screaming mob, and causing others to simply leave. *Id.* at 13–14, 18–20. Miller, Turner-Brown and Provance also used force to amplify their harassment. *Id.* at 21–22.

Although an unresolved dispute of fact is not a barrier to relief, the merits do not turn on any here. Other than challenging a peripheral issue—the force Miller and Turner-Brown used as they were removed from the sanctuary on March 19, Def. MPI

---

[1] Plaintiffs cite their motion for preliminary injunction, ECF No. 35, as "MPI," and Defendants' response, ECF No. 45, as "Def. MPI Resp." Defendants' motion to dismiss, ECF No. 40, and motion to strike, ECF No. 42, are cited as "MTD" and "MTS." Plaintiffs' responses to the motion to dismiss, ECF No. 47, and motion to strike, ECF No. 49, are cited as "Pl. MTD Resp." and "Pl. MTS Resp."

Resp. 17—Defendants do not dispute the facts. They instead raise a series of legal challenges to three elements of liability. None has merit. But even if the issues were close, Plaintiffs have plainly raised at least "serious questions" about them. MPI 9, 15.

**Obstruction.** Defendants first argue that the purportedly "routine" facts of this case do not show obstruction because they (purportedly) did not impose "a dedicated, sustained blockade" and worshipers ultimately could get through after a (purportedly) "short delay." Def. MPI Resp. 12–18. Even if their downplaying of the facts were accurate (it is not), Defendants are wrong on the law. "Actual physical obstruction … is not required," and "just because more extreme examples have been found to constitute physical obstruction does not mean that only those type of actions establish a physical obstruction." *New Beginnings Mins. v. George*, 2018 WL 11378829, at *13 (S.D. Ohio 2018). Plaintiffs provided a wealth of authority on obstruction, including cases involving only individual defendants and cases where, unlike here, nobody was actually blocked. MPI 18–21 & nn.3, 5; *see also, e.g.*, *United States v. Dugan*, 450 F. App'x 20, 22 (2d Cir. 2011) (holding that an individual who kneeled at a clinic door obstructed even though "nobody sought to enter"). Defendants cite nothing to support splitting with consensus.

Next, Defendants repeatedly claim that their actions were "constitutionally protected" because they were expressing a viewpoint. But "[n]o court has validated [that] argument[] in the slightest." *United States v. White*, 893 F. Supp. 1423, 1434 (C.D. Cal. 1995); *see* Pl. MTD Resp. 32–34; MPI 30. The First Amendment does not protect obstruction, force, or trespass. And Defendants' method of "protest" involved stopping people in order to better harass them. Even if their "purpose [was] to communicate their views, their activities had the effect of obstructing access … and making egress and ingress unreasonably difficult." *Spitzer v. Op. Rescue*, 273 F.3d 184, 194 (2d Cir. 2001).[2]

[2] Defendants also speculate that the fact police did not initially intervene on September 7 shows the First Amendment protected them. Def. MPI Resp. 13. They ignore that police did intervene, both on March 19 and September 7. *Id.* at 5, 8. More importantly, police could not do so earlier due to policy requiring them to wait until "actual violence is immediately pending" at demonstrations before taking action. Cooper Decl. ¶ 61. An injunction changes that calculus. *See id.* Besides, courts typically do not defer to law enforcement in constitutional interpretation. *See generally* 42 U.S.C. § 1983.

**Place of Worship.** Defendants next reassert that the September 7 service at Legacy International Center was not at a "place of religious worship." As discussed, they are wrong. *See* Pl. MTD Resp. 27–32. That phrase means a place that religious adherents designate for religious worship. That ordinary meaning is backstopped by constitutional necessity, as "primary purpose" or "primary use" inquiries would impermissibly scrutinize religious beliefs and discriminate in legal protections between religions. *Id.*

That said, the preliminary record shows that Plaintiffs would prevail even under Defendants' misguided understanding of the law. The lone evidence that the Center is not a place of religious worship is a webpage describing the Center's meeting spaces, which Defendants claim shows it has a "primary use as a commercial hospitality facility." Def. MPI Resp. 19. Setting aside that even their cited webpage markets to religious uses, the Center's views are irrelevant. Defendants' own tests look either to whether *a religious group or leadership* designates the area as primarily for worship or to whether the place *is primarily used* for worship. The record is undisputed that Plaintiffs see the Center as a place of worship because it is "a safe space for both Jews and Christians to worship together." Cohen-Reeis Decl. ¶ 30. And the Center is primarily used for worship too. It "is a Christian venue" that "hosts … regular services for multiple churches each and every week" and "frequently hosts worship services from pastors around the world." *Id.* To the extent the Center's website is relevant, the "Events" page is dominated with worship, with only one clear non-religious event in the past several years. *See* http://legacyeventssd.com/events. So while Defendants' interpretation is simply wrong, it is also beside the point at this stage.

**Intent.** Finally, Defendants claim they lack the requisite intent because they purportedly did not know they were disrupting religious exercise. Def. MPI Resp. 20–21. Both sides have briefed this issue in detail. *See* Pl. MTD Resp. 21–25; MPI 17 n.2. In short, numerous circuits have held that the phrases **(1)** "*intentionally* … interferes with" and **(2)** "*because* that person is … obtaining reproductive health services" in § 248(a)(1) are *separate* intent requirements. The former requires intentional action (obstruction)

with knowledge of probable consequences (interference). The latter requires showing that the fact the interfered-with party is seeking abortion services caused the defendant to act. Legislative history is in lockstep. *See* S. Rep. No. 103-117, at 52 (1993). Critically, the free-exercise provision at issue, § 248(a)(2), requires proof of only the first intent element. Pl. MTD Resp. 21–23. Nowhere does it require interference "because" of religious exercise, a conspicuous difference from otherwise mirroring its reproductive-healthcare neighbor in § 248(a)(1). *Id.* This distinction is particularly important for religious minorities, who would otherwise be required to prove that harassers were targeting religion, rather than what they thought were cultural practices.

In response, Defendants ignore what § 248(a)(2) actually says and instead offer only one argument to split with interpretive consensus: That a sponsor said § 248(a)(2) would provide "the same protection" § 248(a)(1) "would give abortion." 139 Cong. Rec. S15655, S15660 (Nov. 16, 1993). But **(1)** that statement has little relevance because it did not concern intent and in fact was "untethered to any statutory language," *Abrego v. Dow Chem. Co.*, 443 F.3d 676, 692 (9th Cir. 2006); **(2)** even if it did concern intent, it would be contrary to the "committee report, [which] is entitled to considerably greater weight than comments made during a floor debate," *id.* at 686–87; **(3)** even if it were in the report, legislative history cannot override statutory text, *see id.*; and **(4)** even setting aside all else, the reproductive-healthcare provision itself does not require proof that the defendant knew that the interfered-with parties' conduct legally counted as "seeking … reproductive healthcare," *see, e.g.*, *United States v. Wilson*, 2 F. Supp. 2d 1170, 1171–72 (E.D. Wis. 1998) (rejecting identical argument). Even under that inquiry, the question would be whether the fact that Plaintiffs were seeking to exercise their faith *caused* Defendants to violate the act. *See* Pl. MTD Resp. 23–24. It undoubtedly did.

Once again, though, Defendants would fail on the current record even under their novel standard. The core "obstruction" on March 19 came as Miller and Turner-Brown blocked people from leaving the Church. By that point, the two had heard over twenty minutes of religious hymns and prayer, followed by messages literally explaining to them

why Plaintiffs' support for Israel was religious. Cooper Decl. ¶¶ 20–24. Both admit that awareness, asserting that they waited until Wilf began speaking to start screaming and did not "disrupt any religious service such as prayer, worship or the singing of hymns." ECF 45-1, at 10 ¶ 7; *id.* at 13 ¶ 6. By the time they blocked egress, they knew they were obstructing people who had been worshiping *both* through song *and* by hearing Wilf.

More broadly, each Defendant has also made clear they understand the link between the Plaintiffs' religious beliefs and support for Israel. Prior to September 7, Werth posted an image of the Alliance's homepage along with an extended comment decrying "mega church grifters" and "end-timer Christian Zionists," who she called "useful idiots" "[t]o Jewish Zionists." Ex. 36. Provance and Turner-Brown both targeted churches' Easter services to protest Israel support. Exs. 16, 17. Turner-Brown shouted "love thy neighbor" as she was removed on March 19, Ex. 59, while Miller accused the Church of "hid[ing] behind religion to justify [I]srael['s] genocide on Palestine," Ex. 57. And shortly after this suit was filed, Werth and Provance set up a grotesque nativity display outside of Mastron's organization with the sign, "If Jesus was born today, Zionist Israel would kill him." Ex. 80; Nisan Decl. ¶ 46. Defendants understand the link between Christians, Jews, and Israel. They just do not think it is valid.

While Defendants leave no doubt that *they* view the issue as purely political, the FACE Act concerns *Plaintiffs'* free exercise. There is no dispute that Plaintiffs sincerely support Israel. Defendants' arguments about whether that support is "properly" religious or political are irrelevant and nonjusticiable. Pl. MTS Resp. 31–32.

## II. Plaintiffs Have Established Irreparable Harm.

Defendants fare no better on irreparable harm. Plaintiffs suffer both an ongoing chilling effect on their free exercise from Defendants' disruptions and a strong threat of more irreparable harm from future disruptions. *See* MPI 22–28. Either is sufficient.

**Ongoing Harm.** Defendants' disruptions have predictably caused Plaintiffs to suffer a "devastating chilling effect" on their "ability to freely exercise their religious beliefs supporting Israel." MPI 23–24. Plaintiffs have stopped hosting services about

Israel due to Defendants' harassment. *Id.* And even as Plaintiffs have determined that they must resume some engagement, they must take precautions in ways that harm their exercise of rights, including by warning attendees about the risk of disruption and by limiting events to the Church. Cohen-Reeis Decl. ¶ 44; Cooper Decl. ¶ 62.

Defendants respond that this chill is "speculative" and "self-inflicted." Not so. The Ninth Circuit's decision in *L.A. Press Club v. Noem*, 171 F.4th 1179 (9th Cir. 2026), released a few days after Plaintiffs' motion, is instructive. There, the court reiterated that "chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury" distinct from whether "there is a sufficient likelihood that [plaintiffs] will again be wronged in a similar way." *Id.* at 1187–88. There, reporters claimed that law-enforcement harassment at protests chilled their First Amendment rights. *Id.* at 1186. The court held that chill followed from (1) "adverse changes to First Amendment activities" (2) based on "a reasonable fear that government reprisals are likely to occur." *Id.* As applied, "Plaintiffs' fear of reprisal … [was] reasonable because Defendants [had previously] inflicted such injuries on Plaintiffs" multiple times in the past. *Id.* And that chill established ongoing irreparable harm to support an injunction. *Id.* at 1190; *see also First Choice v. Davenport*, 608 U.S. __ (slip op. at 13) (2026) ("[A] party suffering an *objectively reasonable chill* to its First Amendment associational rights has an injury in fact.").

*L.A. Press* is on point. Defendants rightly do not dispute that private actors can violate "the First Amendment right of religious freedom" through the FACE Act. MPI 22–23 (quoting § 248(a)(2)). And the record shows repeated harassment, backstopped by similar conduct at related events. *Id.* at 23–26. That harassment has created a "reasonable fear" of more harassment, leading to "adverse changes to First Amendment activities." 171 F.4th at 1188. And because Plaintiffs "continue to suffer ongoing, concrete harm," they have shown ongoing irreparable harm. *Id.* at 1187, 1189–90.

Defendants' responses are meritless. They assert that the "claimed chill is not traceable to [their] conduct" because they have not "appeared at … any event [of Plaintiffs] in the intervening period between September 7, 2025 and the filing of this

motion." Def. MPI Resp. 22. But there have been no services about Israel for them to disrupt *because Defendants succeeded in chilling* Plaintiffs into canceling existing services and not hosting any others. *See* Cooper Decl. ¶¶ 58–59; Cohen-Reeis Decl. ¶¶ 41–42. Their only other claim is that no chill exists because Plaintiffs are trying to reengage in a limited way with a service. Def. MPI Resp. 17. But chill qualifies if it induces people "to alter or limit" their First Amendment exercise. *L.A. Press*, 171 F.4th at 1189–90 (chill existed because reporters would "stand further away from future protests or … wear protective equipment"). That plainly has occurred and continues to occur here.

**Future Harm.** Because Plaintiffs have shown ongoing harm, there is no need to inquire into whether "there is a sufficient likelihood that they will again be wronged in a similar way." *Id.* at 1187, 1190; *see* MPI 23–24. But Plaintiffs have made that showing too. As discussed, numerous factors show a definitive threat of future harm. *See id.* at 24–28. Defendants' obsessive views on Israel have devolved into a stated desire to harass those who support Israel. *Id.* at 25–28. And each has done so repeatedly, invading sanctuaries, targeting supporters, and disrupting events for their cause. *Id.* They often cover their faces, making identification difficult. *Id.* And they publicly celebrate disruptions on social media, praising the work of their "comrades." *See, e.g.*, Cohen-Reeis Decl. ¶ 13. The disruptions here are simply a small part of the "countless … strategic actions" Defendants have taken against supporters of Israel, Ex. 24, with the stated goal to "not give them a moment of peace," Ex. 78.

Defendants do not dispute any of this. Embracing their role in each disruption, their briefs and declarations offer self-justification. They wrap themselves in a faux First Amendment that ignores the voluminous record of harassing families and shutting down worship. And even before this Court, they take the position that religious organizations "should not be permitted to misuse religion" or "merge politics and religion" by hosting ticketed events on private property about Israel, at least not without letting them punish attending worshipers for expressing support. MTS 10.

This recalcitrance matters. "[R]epeated self-justification is sufficient to show a

likelihood of future violation." *United States v. Laerdal Mfg. Corp.*, 93 F.3d 852, 856 (9th Cir. 1995); *see, e.g.*, *SEC v. Murphy*, 626 F.2d 633, 656 (9th Cir. 1980) (holding the same for "continued insistence" that defendant "has done nothing wrong"); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (similar); *see also United States v. Rhodes*, 2024 WL 1269182, at *14 (D. Mont. 2024) (granting injunction due to defendant's insistence that illegal conduct was "political" speech "intended for the public good").

Rather than present contrary evidence or express remorse, Defendants fall back on burden of proof, coyly arguing that "Plaintiffs have not shown that Defendants have announced any intent to appear at the June 10 event" or that "any of them have said they will" "organize[] activity directed at" the Church. Def. MPI Resp. 23. Announced intention is obviously not required, particularly for a group that favors ambush tactics. More broadly, "[c]ourts must beware of attempts to forestall injunctions through … promises of reform that seem timed to anticipate legal action." *Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir. 2001); *accord, e.g.*, *Murphy*, 626 F.2d at 656; *United States v. Odessa Union*, 833 F.2d 172, 176–77 (9th Cir. 1987). That is particularly apt here, where there are at best lawyerly statements of no present intent to repeat conduct that Defendants still go out of their way to stress is, in their view, both lawful and morally necessary.

Defendants' other responses, limited to only a small sliver of record evidence related only to Provance, similarly focus on meaningless distinctions. They quibble, for example, with Provance's comment, "No Easter during a genocide," arguing that it is not clear when or where he made the statement. Def. MPI Resp. 24–25. The key context they ignore is that it accompanied a video of Provance disrupting a worship service. *See* Ex. 19. It is one of many videos like it, which themselves are only a small fraction of his activity. To the extent additional details matter—and it is not clear how they do—Provance could have affirmatively explained himself. His declaration is silent on that issue and the few other arguments Defendants make.[3]

[3] *Compare* Def. MPI Resp. 25 (asserting that it is "impossible to determine who said" "Attack me, you little B****!" in Exhibit 18), *with* Ex. 18 (obviously showing Provance shouting it at :03–:05); *compare* ECF 45-1, at 6 ¶ 9 (Provance claiming he

At bottom, Defendants' plan has been to "disrupt [Plaintiffs'] peace." Cohen-Reeis Decl. ¶ 13 & img.2. And the purpose of their disruptions is to disincentivize expression of support for Israel. They succeeded. And that chill creates ongoing irreparable harm that warrants protection. But even looking to future harm, Defendants improperly demand certainty. The record shows a sufficient threat to justify relief.

## III. The Balance of Equities Favors Entry of the Proposed Injunction.

Defendants fare no better on the equities. They do not appear to dispute the equities of the requested injunction's first part, prohibiting them from obstructing access to the Church. For good reason. They have no interest in illegal conduct. *See* MPI 29.

They likewise face strong headwinds on the proposed injunction's second part, which is tailored to protect the narrow path between the Church entrance and parking lot. Other than reiterating that they acted lawfully and that Plaintiffs' harms are speculative, Defendants wager their case entirely on arguing that the injunction is unconstitutional. Def. MPI Resp. 26–29. This is a bold position. The Supreme Court has twice affirmed broader injunctions over First Amendment challenges. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994); *Schenck v. Pro-Choice Network*, 519 U.S. 357 (1997); *see also* MPI 29–31 (collecting authority). Bolder still, Defendants do not mention the relevant holdings of these controlling decisions, citing only one and only to point out an immaterial distinction.[4] More to the point, *Madsen* already considered and rejected the exact three arguments Defendants raise. They have no more merit here.

***First***, Defendants stress that sidewalks are public forums. *See* Def. MPI Resp. 27–28. That is true. It is also baked into the holdings of *Madsen* and *Schenck*, both of which

---

recorded others as an "act of a citizen journalist"), *with* Ex. 49 (video example of Provance's "journalism" (*i.e.*, harassment)); *compare* Def. MPI Resp. 25 (strawmanning Plaintiffs as criticizing Provance for "waving Palestinian flags"), *with* Cohen-Reeis Decl. ¶ 20 & img.6 (the example Defendants straw man showing Provance blocking a vehicle).

[4] Defendants argue that *Madsen* is different because the disruptions there "negatively impacted the health of patients" and administration of services. Def. MPI Resp. 22. But "that is not a material difference" because of the irreparable injury to free exercise and the otherwise identical harms present here. MPI 23–24. Additionally, *Madsen*'s First Amendment analysis did not turn on that distinction.

held that appropriately tailored injunctions are constitutionally valid even when applied to a "traditional public forum." *Madsen*, 512 U.S. at 764; *see also* MPI 30. And as discussed, the proposed injunction passes constitutional muster under their standards. *Id.* at 29–31.

***Second***, Defendants say that the injunction's "in concert with" language is "unconstitutionally overbroad." Def. MPI Resp. 28. The defendants in *Madsen* said the same thing, and the Supreme Court held that "the phrase itself does not prohibit any conduct, but is simply directed at unnamed parties who might later be found to be acting 'in concert' with the named parties." 512 U.S. at 775–76. It is an utterly common provision that simply makes clear that "defendants may not nullify a decree … through aiders and abettors, although they were not parties." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13–14 (1945). Indeed, injunctions already extend to "persons who are in active concert or participation" with parties. Fed. R. Civ. P. 65(d)(2)(C). This objection is meritless.

***Third***, Defendants argue that the injunction discriminates based on viewpoint because it happens to cover only people who oppose Israel. Def. MPI Resp. 28–29. Once again, *Madsen* rejected an identical argument, which "would … classify virtually every injunction as content or viewpoint based" given that injunctions necessarily apply "only to a particular group." 512 U.S. at 762–63. In that case, the injunction covered only one side of the abortion debate due to the "lack of any similar demonstrations by those in favor of abortion and any consequent request that their demonstrations be regulated by injunction." *Id.* The same logic holds true here.

* * *

This case is not about the validity of divergent beliefs on pressing issues. It is about how people act on those beliefs. Plaintiffs simply want to worship in peace. Defendants want to prevent them from doing so. Every factor favors Plaintiffs, and the equities tilt sharply toward them. Relief is warranted.

## CONCLUSION

This Court should enter the full preliminary injunction. In the alternative, this Court should enter injunctive relief as to part one of the injunction.

Dated: May 8, 2026

By: */s/ John C. Brinkerhoff Jr.*
John C. Brinkerhoff Jr.

David J. Hacker (SBN 249272)
Jeremiah G. Dys (*pro hac vice*)
Kayla A. Toney (*pro hac vice*)
**FIRST LIBERTY INSTITUTE**
2001 W. Plano Pkwy, Ste. 1600
Plano, TX 75075
Telephone: (972) 941-4444
Email: dhacker@firstliberty.org

C. Kevin Marshall (*pro hac vice*)
John C. Brinkerhoff Jr. (*pro hac vice*)
Janessa B. Mackenzie (*pro hac vice*)
**JONES DAY**
51 Louisiana Ave., NW
Washington, DC 20001
Telephone: (202) 879-3939
Email: jbrinkerhoff@jonesday.com

*Attorneys for Plaintiffs Christian & Jewish Alliance, Ezra Ministries, and Ruth Mastron*