**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*,<br>v.<br>PARTY FOR SOCIALISM AND LIBERATION NEW JERSEY, AMERICAN MUSLIMS FOR PALESTINE NEW JERSEY, TOVA FRY also known as TERRY KAY, ALTAF SHARIF, MATT DRAGON, ERIC CAMINS, JANE DOE, JOHN DOE,<br>*Defendants.* | Civil No.: 25-cv-16049 (KSH) (JRA)<br><br>**OPINION** |

**Katharine S. Hayden, U.S.D.J.**

## I. Introduction

The six named defendants move to dismiss the sole count in the complaint filed by the United States of America (hereafter "the government"). That count alleges that each violated the Freedom of Access to Clinic Entrances Act ("FACE Act"), 18 U.S.C. § 248(a)(2), during a protest outside Congregation Ohr Torah in West Orange, New Jersey, on November 13, 2024. The motions are filed by Tova Fry ("Fry") (D.E. 62), American Muslims for Palestine New Jersey ("AMP-NJ") (D.E. 63), Matt Dragon ("Dragon") (D.E. 64), Altaf Sharif ("Sharif") (D.E. 65), Eric Camins ("Camins") (D.E. 66), and the Party for Socialism and Liberation New Jersey ("PSL-NJ") (D.E. 103). The Court decides the motions on the papers.

The FACE Act does not impose liability for disruptive, offensive, or hostile advocacy as such. As relevant here, § 248(a)(2) prohibits a person from intentionally injuring, intimidating, or interfering with — or attempting to injure, intimidate, or interfere with — a person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship "by force or threat of force or by physical obstruction." 18 U.S.C. § 248(a)(2).

As more fully discussed *infra,* the Court grants the motions and dismisses as to all defendants, with leave to amend.

## II. Background

The facts that follow are taken from the complaint and are assumed true for purposes of this opinion only.

### A. An event, and a letter

Dr. Moshe Glick ("Glick") is a healthcare professional who lives in West Orange. (D.E. 1, Compl. ¶ 1.) In the fall of 2024, he "organized a religious event centered on the Jewish obligation to live in the Land of Israel," which the complaint pleads is a tenet of the faith. (*Id.* ¶ 17.) It was "designated as an Israel real estate fair and 'Ruach,' a spiritual event." (*Id.*) He planned to hold it in his house, in a room he had set aside for communal prayer and study. The room contained a Jewish library, prayer books, and sacred texts, and he had previously hosted prayer groups there. (*Id.*)

The complaint alleges that after the events of October 7, 2023, in Israel, Jewish gatherings in the United States had "faced heightened security risks," which Glick took seriously. (*Id.* ¶¶ 18-19.) With this in mind, he hired private security and coordinated with the West Orange Police Department and the Jewish Federation for his planned event. (*Id.* ¶ 19.)

On or about November 4, 2024, Glick's Ring camera recorded a woman delivering a letter to his door. (*Id.* ¶ 20.) The complaint identifies her as defendant Fry. (*Id.* ¶¶ 11, 20.) The letter was signed by American Muslims for Palestine and other organizations. (*Id.* ¶ 20.) It demanded that Glick cancel the event and directed him to "immediately terminate any and all hosting, participation, support, facilitation, and conspiracy to support such events." (*Id.*) The complaint alleges that the letter "demand[ed] cancellation of the event or threaten[ed] legal

action." (*Id.*) The Ring camera also captured Fry using her cell phone to photograph the front of the house. (*Id.* ¶ 21 & Image 1.) The complaint alleges this signaled her intent to circulate Glick's address. (*Id.* ¶ 21.) According to the complaint, Glick considered Fry's visit to be a serious threat "particularly given recent, prior incidents targeting Jewish events." (*Id.* ¶ 22.)

The complaint asserts that Glick had found posts on pro-Palestinian social media accounts publicizing his home address as the site of a planned protest. (*Id.* ¶ 23.) He knew what had happened outside Adas Torah Synagogue in Los Angeles that June, where demonstrators blew long horns and chanted "Globalize the Intifada." (*Id.*) When he handed the letter to his private security team, they found that PSL-NJ and AMP-NJ were posting on Instagram, calling on supporters to gather near Glick's home on November 13, 2024. (*Id.* ¶ 24.) One post urged protestors to "hide their identities with masks." (*Id.*) The posts also embedded a flyer issued by a Jewish organization that advertised eight events around the country that month. Two events were circled in red: Glick's event and one scheduled for November 7, 2024, in Bergenfield, New Jersey. (*Id.* ¶ 25 & Image 2 (Screenshot).) Image 2 also shows a poster reading "NO BUSINESS ON STOLEN LAND — PROTEST LAND THEFT IN OUR BACKYARD," giving a date, a time, and the intersection of Ellis Street and Forest Avenue in West Orange, above a row of organizational insignia that includes PSL-NJ and AMP-NJ. The complaint asserts that the November 7th event in Bergenfield was disrupted by a violent protest organized by "AMP and others." (*Id.* ¶ 26.)

**B. The event is relocated to Ohr Torah**

According to the complaint, Glick's private security team told him they could not guarantee his safety at his house because of the letter and what had happened at the Bergenfield protest. (*Id.* ¶ 27.) The event was relocated to Congregation Ohr Torah, a synagogue a short

walk from Glick's house; the move was arranged with the West Orange Police Department, the Essex County Sheriff's Office, the Jewish Federation of West Orange, and Glick's private security team. (*Id.*)

The evening at the synagogue was to include prayer, a memorial service for the late Rabbi Avi Goldberg, a Torah sermon, religious songs drawn from biblical verses, prayerful dancing, teaching about the obligation to live in Israel, the real estate fair, and a barbecue in the parking lot – "all part of the religious observance." (*Id.* ¶ 28.)

On November 12, 2024, Glick emailed local law enforcement about safety given the Bergenfield protest five days earlier and assaults on November 8th on Israeli soccer fans in Amsterdam, which had followed social media calls for a "Jew hunt." (*Id.* ¶ 29.) He asked whether the protestors had a permit, where they would be allowed to assemble, and how many officers would be there. (*Id.*) Local law enforcement informed him that the protestors did not have a permit; that five Essex County Sheriff's deputies and two West Orange officers would be at the event; and that officers would conduct extra patrols near his home. (*Id.*) According to the complaint, Glick, his private security team, the Jewish Federation, the police, "anticipated potential violence." (*Id.*)

**C. November 13, 2024**

On the evening of the event, approximately 50 protestors gathered at an intersection near Glick's home. (*Id.* ¶ 30.) Many wore masks. (*Id.*) Many carried vuvuzelas, long plastic horns, which the complaint describes as capable of causing permanent noise-induced hearing loss and as banned at many sporting venues. (*Id.* ¶¶ 30-31.)

At about 6:50 p.m., "upon learning the event had moved to Congregation Ohr Torah," the protestors marched toward the synagogue, "passing Jewish homes and shouting at residents."

(*Id.* ¶ 32.) They reached a fire station next door to the synagogue "where law enforcement formed a defensive line to prevent them from approaching the synagogue property where worshipers had gathered." (*Id.* ¶ 33.) The complaint asserts that worshipers on the synagogue grounds saw the protestors coming and were frightened; they asked the police to barricade the property or at least order the protestors to move across the street. (*Id.* ¶ 34.) Law enforcement asked them to cross the street or, failing that, to stop at the fire station. (*Id.* ¶ 35.) One protestor said, "We're not stopping." (*Id.* ¶ 36.) Fry asked defendant Dragon, "Where is the entrance?" referring to the synagogue and Dragon told her it was the next building over. (*Id.* ¶ 37.) An officer told the protestors to step back, stating "You're making me nervous." (*Id.* ¶ 38.) "The protestors – now a mob – defied the police's requests and instead surged through the police line causing the officers to retreat and scatter." (*Id.* ¶ 39.)

The complaint alleges that the "mob, led by Defendant Dragon, marched onto synagogue property, shouting and blowing vuvuzelas." (*Id.* ¶ 40.) Police repeatedly told them to stay off the property. (*Id.* ¶ 41.) "Members of the mob" cursed the officers and spread out across the front lawn where the worshipers had gathered. (*Id.*) The horns drowned out the memorial service and the Torah sermon. Worshipers could not hear. (*Id.* ¶ 42.)

Two members of the crowd found Glick. Jane Doe came within inches of his face and blew her vuvuzela directly into his ear. (*Id.* ¶ 43.) He swatted the vuvuzela away. (*Id.* ¶ 44 & Image 3.) "Sharif, observing that Glick swatted Jane Doe's vuvuzela, became visibly enraged. Sharif then blew his vuvuzela directly in Glick's face, so close that Glick was able to grab it." (*Id.* ¶ 45.) Glick swatted it away. (*Id.* ¶ 46 & Image 4.) Sharif "squared off, staring directly at Glick, and then charged at" him "with intent to cause serious bodily harm." (*Id.* ¶ 47.) Glick "retreated in fear." (*Id.* ¶ 48 & Image 5.)

Two people standing nearby saw the charge coming. One was defendant Camins. The other was David Silberberg ("Silberberg"), a 65-year-old worshiper. (*Id.* ¶ 49.) "[B]oth reacted in a manner demonstrating they recognized Sharif's intent to harm Glick." Camins put out a hand and shook his head at Sharif. (*Id.*) Sharif kept going. (*Id.*) "In defense of Glick," Silberberg then sprayed pepper spray into Sharif's eyes, which stopped him. (*Id.*) After about seven seconds passed, Sharif's eyesight returned, and he looked at Silberberg. (*Id.* ¶ 50.) The complaint illustrates its assertion with Image 6 that "Camins, who had initially attempted to restrain Sharif, changed his stance, pointed at Silberberg, and shouted, 'The Jew is here!'" (*Id.* ¶ 51 & Image 6.)

Sharif, a head taller and 20 years younger than Silberberg, reached over Silberberg's shoulder and took hold of the back of his neck. (*Id.* ¶¶ 52-53.) He brought his other arm over Silberberg's other shoulder and locked his hands, encircling the older man's neck. (*Id.* ¶ 54 & Image 7.) He put his full weight into the hold "to throw Silberberg to the ground on synagogue property." Once Silberberg was on the ground, the complaint pleads that Sharif dragged him down the hill from the front lawn toward the synagogue's parking lot. (*Id.* ¶ 55.) He flipped Silberberg over and "drilled his head into the ground." (*Id.* ¶ 56 & Image 8.) At the bottom of the hill, Sharif stood without releasing the chokehold. Silberberg, bent double with his head below Sharif's waist, was then dragged another 10 or 15 feet to the parking lot. (*Id.* ¶ 57.)

The crowd, including Camins and Jane Doe, followed the two down the hill. (*Id.* ¶ 58.) Bystanders "feared for Silberberg's life" due to the nature of the attack and the men's different age and build. (*Id.* ¶ 59.) Glick called for police officers but they were stationed in front of the synagogue at the top of the hill, too far away to intervene. (*Id.*) Worshipers ran to help. One tried to pry Silberberg loose and could not. (*Id.* ¶ 60.) Glick struck Sharif on the head with a

flashlight, and Sharif's hold finally loosened enough for the others to pull Silberberg to safety. (*Id.*)

The complaint asserts that Sharif, Jane Doe, and Camins falsely told police that Silberberg had tackled Sharif. (*Id.* ¶ 61.) Police ordered the protestors off the property. (*Id.* ¶ 62.) As they went, they shouted epithets at the worshipers: "And you got your fucking shit rocked, didn't you?" "You're next! You're next!" "Moshe Glick you can't hide!" (*Id.* ¶ 63.) An officer noted that someone had set off a stink bomb. The complaint asserts based on information and belief that an unidentified John Doe protestor had deployed it "to further obstruct the Jewish congregants attempts to worship." (*Id.* ¶ 64.)

The complaint pleads that the protestors "led by Defendant Dragon" kept some people from attending the event altogether and forced the worshipers "to move the service to another location within synagogue property." (*Id.* ¶ 65.) It further pleads that the unpermitted protest blocked the public sidewalk along one side of the synagogue, so that a worshiper's only choices were to walk through the crowd or to walk in the road, in the dark, in heavy traffic. (*Id.* ¶ 66.)

**D. This action**

The government filed this action on September 29, 2025, under section 248(a)(2) of the FACE Act, seeking injunctive relief, statutory damages for aggrieved persons, and civil penalties. (*Id.* ¶¶ 68-82.) On March 10, 2026, the government sought a stay of discovery pending resolution of the instant motions. (D.E. 72.) As no defendant objected, Magistrate Judge Almonte granted the request. (D.E. 77.)

StandWithUs and the First Liberty Institute sought, and were granted, leave to appear as amici curiae in support of the government and in opposition to the motions to dismiss. (D.E. 90-1.) Their brief contends that a civil court may not sit in judgment on the religious character of

the Ohr Torah event, which they describe as an observance of *aliyah* and *shloshim*, the thirty-day mourning period following a death; and that § 248(e)(4) protects a synagogue's grounds and routes of access, not merely its front door. (D.E. 90-1 at 4-19.)

## III. Standard of Review

A complaint survives Rule 12(b)(6) if it pleads "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court accepts the complaint's factual allegations as true and draws reasonable inferences in the plaintiff's favor. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231, 233 (3d Cir. 2008). That courtesy does not extend to legal conclusions, and "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court therefore separates the complaint's factual allegations from its characterizations, disregards the latter, and asks whether what remains makes the claim plausible. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786-87 (3d Cir. 2016). Review is confined to the pleadings, together with any integral documents relied on in the pleadings, and any undisputedly authentic documents attached to the motion to dismiss if plaintiff's claims are based on those documents. *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 n.7 (3d Cir. 2016).

## IV. Discussion

### A. The statute

Section 248(a)(2) prohibits a person from, "by force or threat of force or by physical obstruction," intentionally injuring, intimidating, or interfering with or attempting to injure, intimidate, or interfere with "any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2).

The statute provides its own definitions. To "interfere with" is "to restrict a person's freedom of movement." *Id.* § 248(e)(2). To "intimidate" is "to place a person in reasonable apprehension of bodily harm to him- or herself or to another." *Id.* § 248(e)(3). "Physical obstruction" means "rendering impassable ingress to or egress from a facility that provides reproductive health services or to or from a place of religious worship, or rendering passage to or from such a facility or place of religious worship unreasonably difficult or hazardous." *Id.* § 248(e)(4).

The Court begins with the statute's text. The parties identify no controlling Third Circuit authority construing § 248(a)(2) in a case involving alleged interference with religious worship, and the Court has located none. The Court accordingly applies the statutory text, informed where useful by persuasive FACE authority and governing First Amendment doctrine.[1]

Three features of the provision matter here.

First, the person-directed provisions of the statute reach a defendant who, "by force or threat of force or by physical obstruction," intentionally injures, intimidates, or interferes with—or attempts to injure, intimidate, or interfere with—a covered person. *Terry v. Reno*, 101 F.3d 1412, 1418-19 (D.C. Cir. 1996) (FACE "does not target protected speech" but "prohibits three types of conduct:" force, threats of force, and physical obstruction). Accordingly, nonviolent, nonobstructive advocacy through voice, handbills, signs, symbolic gestures, and similar expression remains outside FACE even if it is unwelcome or offensive. *See Am. Life League, Inc. v. Reno*, 47 F.3d 642, 652, 656 (4th Cir. 1995).

---

[1] The Second Circuit has construed the statutory phrase "place of religious worship" in *Jingrong v. Chinese Anti-Cult World Alliance, Inc.*, 16 F.4th 47, 49, 58-59 (2d Cir. 2021). *Helmann v. Codepink Women for Peace*, No. 24-5704, 2025 WL 3030582 (C.D. Cal. June 13, 2025), addresses alleged threats of force in social media posts directed at a synagogue. Neither is controlling in this Circuit.

Second, a "threat of force" must be a constitutionally unprotected true threat: a serious expression, assessed in context, of an intent to commit unlawful violence against a particular person or group. The speaker must at least recklessly disregard a substantial risk that communication will be understood as threatening violence. *Counterman v. Colorado*, 600 U.S. 66, 69, 73-74, 78 (2023). Political hyperbole does not qualify. *Watts v. United States*, 394 U.S. 705, 707-08 (1969) (per curiam). Nor does abstract advocacy of the use of force or law violation, unless the "advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969) (per curiam).

Third, unlike § 248(a)(1), § 248(a)(2) does not separately require that a defendant act "because" a person is exercising a protected right or "in order to" deter that person from doing so.[2] The government must nevertheless plausibly allege that the defendant intentionally injured, intimidated, interfered with or attempted to injure, intimidate, or interfere with a person lawfully exercising or seeking to exercise the First Amendment right to the free exercise of religion at a place of worship, by force, threat of force, or physical obstruction.

**B. Sharif's motion is granted**

Sharif seeks dismissal under Rule 12(b)(6), arguing that the complaint's allegations are conclusory and contradicted by video incorporated into the complaint, which he contends shows that he and other demonstrators never crossed onto synagogue property or obstructed either

---

[2] Fry and Sharif argue that § 248(a)(2) incorporates an equivalent motive requirement. The Court disagrees. Congress included "because" and "in order to" language in § 248(a)(1), but not in § 248(a)(2). As a practical matter, the statutory language requiring place be "in a place of worship" and interdicting conduct against "a person seeking to exercise the First Amendment right of worship" make motive inherent. The statute nevertheless requires a plausible allegation that the defendant intentionally used one of the specified means to injure, intimidate, or interfere with protected religious exercise. *See Helmann*, 2025 WL 3030582, at *14.

access point. (D.E. 65-1 at 9-18). He further argues that the alleged sidewalk scuffle was not connected to anyone's religious worship, that his conduct was protected First Amendment expression, and that the complaint neither alleges his involvement in relocating the event from Glick's home nor identifies the home as a qualifying place of worship under the FACE Act. (*Id.* at 19-23).

**1. The Court will not consider the video**

Before reaching the merits, the Court must determine the record on which it will decide these motions. Sharif has submitted the footage obtained from the Essex County Prosecutor's Office along with a defense-prepared summary compilation, and his lead argument is that the complaint's account is "contradicted by its own incorporation of uncontested video." (D.E. 65-1 at 9-17; Rygus Decl. ¶¶ 4, 7-9 & Exs. B, C.) He asks the Court to draw that conclusion and dismiss by watching the video.

The Court declines to do so. On a Rule 12(b)(6) motion, the inquiry is limited to the pleadings, exhibits attached to them, and undisputedly authentic documents on which the claims are based. *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d at 133. On the present record, Sharif has not established that the footage or defense-prepared compilation is properly considered on a Rule 12(b)(6) motion. Nor has he established that the completeness, context, and accuracy of the submitted compilation are undisputed. In reply, Sharif narrows his request to a single file, "4-Full Incident.mp4," and argues that the complaint's still images were taken from that recording. The complaint reproduces still images and narrates alleged events, true, but it does not attach, identify, or unambiguously incorporate the video file Sharif submits. Whether the images derive from that particular file, whether the submitted file is complete and unaltered, and whether it supplies the relevant visual and temporal context remain questions answerable

through materials outside the complaint. On this record, the Court cannot treat the defense-submitted video as incorporated by reference or as an undisputedly authentic document on which the government's claim is based.

Sharif also relies on an annotated Google Maps image to argue that the confrontation involving him and Silberberg occurred away from Congregation Ohr Torah's entrance, grounds, and parking area. This point in the litigation is not the time for the Court to pore over defense-created annotations or make factual inferences from that image.

Judicial notice does not supply an alternative basis to consider the materials. Rule 201 permits notice only of adjudicative facts not subject to reasonable dispute. Fed. R. Evid. 201(b); *see United States v. Mitchell*, 365 F.3d 215, 252 (3d Cir. 2004) (explaining that judicial notice is appropriate only where the fact noticed is not subject to dispute); *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007) (recognizing that judicial notice cannot be used to establish disputed facts). The defense-submitted video and annotated map are offered not to establish neutral facts such as the existence or location of a street or building, but to prove disputed propositions about the completeness and meaning of the recording, the location and character of the alleged confrontation, property boundaries, and routes of access. Rule 201 does not permit the Court to resolve those factual disputes at the pleading stage. The Court therefore declines to consider the recordings or the annotated map in resolving this motion.

**2. The complaint does not plausibly plead the required statutory nexus**

The complaint alleges that Sharif used force or attempted to use force against Glick and Silberberg. The government must plead facts supporting a plausible inference that, by force, threat of force, or physical obstruction, the defendant intentionally injured, intimidated, or interfered with a person lawfully exercising or seeking to exercise religious freedom at a place of

worship. The Court does not read § 248(a)(2) of the FACE Act as federalizing every physical confrontation that occurs on the grounds of a place of worship, which is the essence of what is pleaded in the complaint. Its chronology recites the source of the confrontations involving Sharif and others. It says that the Jane Doe defendant blew a vuvuzela into Glick's ear and Glick swatted it away. (Compl. ¶¶ 43-44.) Sharif, observing that event, allegedly became "visibly enraged." (*Id.* ¶ 45.) Then "Sharif, observing that Glick swatted Jane Doe's vuvuzela, blew his own vuvuzela directly in Glick's face, so close that Glick was able to grab it." (*Id.*) Using a screen grab (Image 3) as the source, the complaint pleads that Glick grabbed Sharif's vuvuzela and swatted it away "as Sharif used the vuvuzela as a weapon." (*Id.* ¶ 46.) The next paragraphs allege that "[f]urther enraged, Sharif squared off, staring directly at Glick, and then charged at Glick with intent to cause serious bodily harm. As Image 5 shows, Glick retreated in fear as Sharif charged toward him." (*Id.* ¶¶ 47-48.) This is when the complaint describes the confrontation with Silberberg, "standing nearby," who stepped into the fray "in defense of Glick," spraying pepper spray in Sharif's eyes. (*Id.* ¶ 49.)

Those allegations describe a rapidly escalating sequence of physical confrontations: Jane Doe's conduct toward Glick prompted Glick's response toward her; Glick's response toward Jane Doe then prompted Sharif's conduct toward Glick; Sharif's conduct toward Glick prompted Silberberg's response toward Sharif; and the confrontation between Sharif and Silberberg culminated in their tumbling down the hill and further pummeling – which, notwithstanding the allegations in the government's complaint about who the bad guys were, resulted in state charges against Glick and Silberberg. The pleaded facts, while colorfully set forth, do not allege that Sharif's alleged use of force was directed at halting, disrupting, or otherwise affecting prayer, the memorial service, the Torah sermon, or any other religious observance taking place in the

synagogue, or at preventing Glick or Silberberg from entering, leaving, or participating in the scheduled events.

The plausible, arguably inescapable inference to be drawn from paragraphs 43 to 60 is that there was a confrontation, a brawl, or a fight that erupted when Jane Doe blew her vuvuzela at Glick somewhere in the vicinity of a synagogue. For the FACE Act to apply to the centerpiece of the allegations would mean every push, shove, brawl, or forceful conduct occurring during a protest like the one alleged here automatically becomes a FACE Act violation. It would demonize protestors who exercise their own First Amendment rights as being part of a mob – which this complaint does when in paragraph 11 "protestors" become "a mob." The complaint must plead facts supporting a plausible inference that Sharif's force was intentionally directed at injuring, intimidating, or interfering with Glick's and/or Silberberg's exercise or attempted exercise of religion; arguably these facts just as easily support the inference that Glick and Silberberg interfered with Sharif's First Amendment right to be part of the protest.

The complaint pleads that the confrontation among Jane Doe, Glick, Sharif, and Silberberg developed through a series of escalating interactions: Glick's responses to the vuvuzelas allegedly prompted Sharif's conduct toward Glick; Silberberg then sprayed Sharif with pepper spray; and Sharif and Silberberg thereafter engaged in the alleged physical altercation. In making the encounter among Jane Doe, Glick, Sharif, and Silberberg the centerpiece of its complaint, the government relies heavily on where their confrontation took place: on synagogue property while religious activities were planned and arguably underway. That circumstance supplies the where, but it alone does not supply the what: Sharif's intentional interference with Glick's or Silberberg's exercise of religious freedom. The sweet spot is

narrower than the pleaded facts allege. A person's presence at a religious event supplies the statutory setting but getting into a scuffle during a protest, a scuffle that took place somewhere on the grounds of the place of worship, definitely away from its entrance, does not mean that person's conduct falls under FACE Act interdiction.

The complaint likewise does not plausibly connect Sharif to the separately alleged obstruction of the public sidewalk. It alleges that the group of protestors made passage to or from the synagogue unreasonably difficult or hazardous, but does not allege that Sharif blocked a route, stood at an entrance, directed others to obstruct passage, or otherwise participated in the alleged physical obstruction. (*Id.* ¶ 66.) The Court therefore does not decide whether the crowd-level allegations concerning the sidewalk, synagogue grounds, or noise may establish physical obstruction or another statutory violation. More to the point, were the Court to decide that the described obstruction was a sufficient allegation to satisfy the FACE Act, then every protestor there would be a defendant.

The statute's limits must be applied with care. Because FACE regulates conduct that may occur alongside core political expression, courts must distinguish the force, threats of force, and physical obstruction the statute prohibits from protected—even if forceful, unwelcome, or upsetting—protest activity. *See New York ex rel. Spitzer v. Operation Rescue National*, 273 F.3d 184, 195-97 (2d Cir. 2001) (cautioning that "an erroneous application of F.A.C.E. threatens to impinge legitimate First Amendment activity" and that unpleasant or emotionally difficult protest activity does not automatically establish a violation); *Terry*, 101 F.3d at 1418-20 (upholding FACE because it prohibits only force, threats of force, and physical obstruction while preserving nonviolent, nonobstructive protest and peaceful picketing); *Am. Life League, Inc.*, 47 F.3d at 652, 656 (holding that FACE regulates proscribable conduct rather than protected speech

and expressly leaves peaceful picketing and other First Amendment-protected expression outside its reach).

**3. Sharif's argument concerning Glick's residence**

The Court need not reach Sharif's argument concerning the earlier planned gathering at Glick's residence. It notes, however, that as pleaded the complaint neither connects Sharif to the relocation nor, as addressed more fully *infra*, adequately pleads the residence as a "place of religious worship" within § 248(a)(2).

Sharif's motion (D.E. 65) is granted, and the claim against him is dismissed.

**C. Camins's motion is granted**

Camins argues that the government improperly treats protected pro-Palestinian speech and assembly as conduct prohibited by the FACE Act; that the complaint does not adequately allege that the event involved religious exercise protected by § 248(a)(2); and that application of the statute here would violate the Establishment Clause and his rights of free speech and assembly. (D.E. 66-1 at 5-17.) He also invokes *Younger v. Harris*, 401 U.S. 37 (1971), based on state criminal proceedings arising from the same evening, and joins his codefendants' remaining arguments concerning the sufficiency of the complaint. (*Id.* at 14-16.)

**1. The complaint does not plausibly allege intentional participation in force**

As with Sharif's motion, the Court carefully examines what the complaint says about Camins, and the allegations are very narrow. The government does not allege that he personally struck Silberberg, physically restrained him, blew a vuvuzela, physically obstructed access to the synagogue, or communicated a threat of force. Nor does the claim rest on Camins's presence at the protest, his political views, or his criticism of the event. Instead, the government relies on a single allegation that Camins incited violence. The government contends in its omnibus

opposition that when Camins pointed toward Silberberg and uttered "the Jew is here!" that "[i]n context, and with all inferences drawn in favor of the United States, this phrase can be seen as an exhortation to the mob to an imminent lawless action—*i.e.*, to an attack David Silberberg." (D.E. 82, Opp., at 17.) Putting aside that the government is not entitled to "all" inferences, the question is whether what Camins said *plausibly* supports an inference that Camins used the statement to solicit or facilitate force.

The Court concludes that it does not. There needs be context to infer that "the Jew is here" is a statement inciting violence. The complaint does not supply that. No facts are pleaded suggesting Sharif and Camins were acting in concert so as to raise a weak inference that "the Jew" was someone Sharif was on the lookout for, or by identifying Silberberg this way, Camins was telling Sharif to beat him up. As pleaded, the complaint requires speculation that Camins said "the Jew" as a trigger for violence or even less plausibly, that the term "the Jew" automatically put Silberberg in a dangerous situation.

Context is missing. More, what context there is underscores the insufficiency of the allegations against Camins. It alleges that, moments earlier, Camins extended a hand and shook his head to *stop* Sharif from charging Glick. (Compl. ¶ 49.) Silberberg then sprayed Sharif with pepper spray, and after Sharif's sight returned, Camins allegedly pointed toward Silberberg and spoke. (*Id.* ¶¶ 49-51.) This makes all the more distant what Camins intended when he spoke.

Section 248(a)(2) does not impose liability for offensive or hostile expression as such. The government's theory is not that Camins's words were a true threat but rather that he purposefully said what he did to solicit or facilitate another person's use of force, or otherwise to participate intentionally in conduct prohibited by § 248(a)(2). *Cf. United States v. Hansen*, 599 U.S. 762, 776-78 (2023) (construing "encourages or induces" in the criminal-law sense to

encompass purposeful solicitation and facilitation of a specific unlawful act). The Court need not determine the precise doctrinal label for that theory or the full range of circumstances in which words may establish responsibility for another person's prohibited conduct. Whatever its label, the theory requires factual allegations supporting a plausible inference that Camins purposefully used the statement to bring about or assist prohibited force. He could just as easily be warning Sharif that Silberberg was threatening violence against Sharif. Swinging between speculations is not plausibly inferring. Because the complaint does not plausibly allege intentional participation by Camins in conduct prohibited by § 248(a)(2), the Court need not reach his remaining arguments.

Camins's motion (D.E. 66) is **granted**, and the claim against him is dismissed.

**D. Fry's motion is granted**

Fry argues the letter she hand-delivered and the photograph she took were not true threats (D.E. 62-1 at 4-9); Glick's home was not a place of worship (*Id.* at 9-11); her own obstruction and religiously discriminatory intent were not adequately pleaded (*Id.* at 11-16); and the real estate fair the protest was about was commercial, not religious (*Id.* at 16-19). She separately seeks dismissal under Rule 12(b)(1), arguing that the claimed harms are not traceable to anything she did. (*Id.* at 19-20.)

Fry's alleged conduct comes in two parts: what she did on November 4, 2024, at Glick's house, and what she did on November 13, 2024, at the synagogue. Neither is pleaded as force, threat of force, or physical obstruction.

**1. The letter and the photographs are not pleaded as a true threat**

The Court notes, initially, that it is unclear from the complaint whether the real estate fair scheduled for Glick's home was added to events already scheduled at the synagogue that same

evening or whether once it was moved to the synagogue additional activities were added to the real estate fair, arguably changing its character. Compare "[t]he event, designated as an Israel real estate fair and 'ruach' (Spiritual) event, was initially scheduled for November 13, 2024, at Glick's private home" (Compl. ¶ 17) with "[t]he event at Congregation Ohr Torah was to include prayer, a religious memorial service for the late Rabbi Avi Goldberg, a Torah sermon, religious songs with biblical verses, prayerful dancing, educational activities about the religious obligation to live in Israel, a real estate fair, and a festive barbecue in the synagogue's parking lot—all part of the religious observance" (*Id.* ¶ 28.) Who "designated" the event described in paragraph 17? What does "was to include" mean in paragraph 28?

The complaint states that the letter Fry delivered, which was signed by AMP and other organizations, "demand[ed] cancellation of the event or threaten[ed] legal action" and directed Glick to "immediately terminate any and all hosting, participation, support, facilitation, and conspiracy to support such events." (*Id.* ¶ 20; D.E. 62-1, Letter.) The complaint calls the letter "threatening," but the Court looks past that characterization to its pleaded content. (Compl. ¶¶ 11, 20; *see Iqbal*, 556 U.S. at 678.) A demand backed by threatened legal action is not, without more, a threat of force within § 248(a)(2).

FACE separately proscribes force, threats of force, and physical obstruction, and defines intimidation as placing a person in reasonable apprehension of bodily harm. 18 U.S.C. § 248(a)(2), (e)(3). A threat of force under FACE must communicate a serious expression of intent to inflict bodily harm or commit unlawful violence. *See United States v. Dillard*, 795 F.3d 1194, 1199-1201 (10th Cir. 2015) (explaining that FACE's prohibition of threats of force reaches a "true threat," a communication that, in context, a reasonable person would understand as a serious expression of intent to inflict bodily injury); *Counterman*, 600 U.S. at 74-75 (explaining

that true threats encompass statements in which the speaker means to communicate a serious expression of intent to commit unlawful violence against a particular person or group). Here, the letter invokes legal process rather than threatening physical violence. Its language does not refer to violence, injury, or physical consequence of any kind. The letter is best described as a "cease-and-desist" letter warning Glick of legal action if he held an event that the signatories of the letter deemed to violate state, federal, and international law. Dozens of lawyers and legal organizations signed it. (D.E. 62-1, Letter). Thus, no threat of force has been pled as to Fry's delivery of the letter. *See Grand v. City of University Heights*, No. 22-1594, 2024 WL 4403700, at *16-17 (N.D. Ohio Oct. 1, 2024), *aff'd*, 159 F.4th 507 (6th Cir. 2025) (holding that a cease-and-desist letter warning that unauthorized residential religious assembly could result in building-code citations and "additional remedies" did not constitute a "threat of force" under § 248(a)(2) because it did not communicate an intent to inflict bodily harm).

The complaint alleges Fry then stood outside Glick's house on a public street and took a picture. (Id. ¶ 21 & Image 1.) The complaint alleges only that Fry photographed the home to signal an intent to circulate its address; it does not allege that she in fact circulated or publicized it. Although the government's opposition brief at times characterizes Fry as having "publiciz[ed]" Glick's address, this is not what the complaint sets forth. Photographing a building visible from a public sidewalk is not itself force or a threat of force, and the complaint pleads no accompanying statement, gesture, or symbol from which a reasonable observer would take a serious expression of intent to inflict bodily harm. *Counterman*, 600 U.S. at 74; *Virginia v. Black*, 538 U.S. 343, 359-60 (2003).

The government's strongest argument rests on context: following the October 7, 2023 attack in Israel, the Adas Torah protest, and the Bergenfield protest one week later, a stranger's

photograph of a Jewish organizer's home could be perceived as menacing. (D.E. 82 at 14-18.) Context may bear on the true-threat inquiry; a statement made "against a known background of targeted violence" (*Id.*) can be threatening without being explicit. *See Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1077-78 (9th Cir. 2002), *as amended* (July 10, 2002). But the complaint does not connect Fry to that background. It does not allege that she had any part in Bergenfield, or in Adas Torah, or in any prior act of violence; it does not allege that she in fact published the address; it does not allege that she said anything at all at the door.

The government relies on *Planned Parenthood* for the proposition that an otherwise nonthreatening disclosure of identifying information may constitute a true threat when, in context, it conveys an implicit threat of violence. As Fry points out in reply (D.E. 88 at 2-3), the government "misses the essential holding in *Planned Parenthood*." The allegations actually pleaded do not plausibly place Fry's conduct in the materially different context presented in *Planned Parenthood*. There, the challenged "wanted"-style posters named particular abortion providers and the district court evaluated them in light of evidence that materially similar posters identifying abortion providers had preceded the murders of physicians named on them. 290 F.3d at 1085-86. Here, the complaint alleges only that Fry photographed Glick's home and thereby signaled an intent to circulate its address. It does not allege that Fry published the address, participated in prior violence, or used a communication resembling the incendiary materials at issue in *Planned Parenthood*. Compare the social media posts the *Helmann* court examined, 2025 WL 3030582 at *12-15 (a nonbinding but instructive FACE Act decision), where the complaint plausibly alleged that the organizer embedded the synagogue's address and event date in an inverted red triangle—allegedly a symbol used to identify Jewish targets for violence—and

where the organizer's alleged history of violent and disruptive protests provided relevant contextual support for construing the posts as true threats.

**2. Glick's home is not pleaded to be a place of religious worship**

Moreover, Paragraph 70 pleads that Fry "intimidated [Glick] into relocating the religious event from his designated prayer space." That theory requires the prayer space in Glick's house to be "a place of religious worship" within § 248(a)(2). On this complaint, it is not.

The Second Circuit's nonbinding but persuasive decision in *Jingrong*, 16 F.4th 47, provides the most developed appellate treatment of the phrase "place of religious worship," and both Fry and Sharif rely on it. (D.E. 62-1 at 9-11; D.E. 65-1 at 22-23.) *Jingrong* holds that "a place of religious worship" is "anywhere that religious adherents collectively recognize or religious leadership designates as a space primarily to gather for or hold religious worship activities." 16 F.4th at 49. Although *Jingrong* recognized that a qualifying place may be temporary, movable, or structureless, it stressed that a site does not qualify solely because worship occurs there incidentally, using "one's home" as an example. *Id.*

The complaint pleads that Glick himself set aside a room in his private residence for communal prayer and study. He kept a Jewish library and sacred texts in it, and hosted numerous prayer groups there. (Compl. ¶ 17.) But the complaint does not allege that adherents collectively recognize the room as a place primarily for worship or that religious leadership had so designated it. Nor do the allegations displace the pleaded character of the building as Glick's home. Under *Jingrong*'s test, the allegations fall short.

**3. Fry's presence in the crowd is pleaded only in conclusions**

The complaint's allegations about Fry on November 13, 2024, are that she "joined a mob that broke through a police line, marched onto the Congregation Ohr Torah synagogue property,

and physically obstructed Jewish worshipers from accessing the religious event." (*Id.* ¶ 11.) The only pleaded fact about anything Fry personally did that evening is that she asked Dragon where the entrance was. (*Id.* ¶ 37.)

Asking a question is not obstruction. The rest of paragraph 11 is a recitation of the statutory elements attached to defendant's name, which is the paradigm of what *Iqbal* and *Twombly* exclude. *Iqbal*, 556 U.S. at 678-81. The complaint does not allege that Fry blocked a door, or stood in a walkway, or touched a worshiper, or blew a horn, or said anything to anyone at the synagogue. The statute requires more than being part of a group, or crowd of protestors; there must be pleaded facts about the actor's own conduct. That is true even where, as here, the complaint alleges substantial conduct by others in the crowd. *Iqbal*, 556 U.S. at 676-77 (holding that, because vicarious liability is inapplicable in a *Bivens* action, a plaintiff must plead that each government-official defendant, through that official's own individual actions, violated the Constitution); *Santiago v. Warminster Township*, 629 F.3d 121, 130-31 (3d Cir. 2010) (holding that allegations must identify the conduct of each defendant and contain sufficient factual matter to make the asserted claim plausible as to that defendant).

**4. Fry's Rule 12(b)(1) argument is rejected**

Fry separately argues that the complaint fails to plead an injury fairly traceable to her, and that the case must be dismissed for want of jurisdiction under Rule 12(b)(1). (D.E. 62-1 at 19-20.) On the theory advanced, Fry's argument concerns the sufficiency of the allegations connecting her conduct to the claimed statutory violation, not a jurisdictional limitation on the government's authority to bring this action. The Court therefore addresses the argument under

Rule 12(b)(6), and dismissal rests on the complaint's failure to state a claim rather than on Rule 12(b)(1).[3]

Fry's motion (D.E. 62) is **granted**, and the claim against her is dismissed.

**E. Dragon's motion is granted**

Dragon argues that the complaint offers only conclusory assertions that he "led" the protest and offers no facts that he personally used force or threats, physically obstructed access, or intended to injure, intimidate, or interfere with worshipers, as the FACE Act requires. (D.E. 64 at 11-14.) He further argues that his alleged participation in a loud demonstration was protected First Amendment activity rather than a "true threat," and that the Court lacks jurisdiction to facilitate or shield alleged international law violations associated with the real estate event.[4] (*Id.* at 14-19.)

The pleaded facts concerning Dragon are really sparse: he was present at the demonstration. (Compl. ¶ 13.) When Fry asked him where the entrance was, he answered that the synagogue was the next building over. (*Id.* ¶ 37.)

Everything else is conclusory. Paragraphs 13, 40, 65, and 72 allege that Dragon "led a mob" that "broke through a police line" and marched onto synagogue property. The government

---

[3] Fry also argues that a real estate fair is not a form of Jewish religious observance, so no one at Ohr Torah was exercising the First Amendment right of religious freedom. (D.E. 62-1 at 16-19.) Having found that the allegations specific to her are insufficient, the Court need not address this argument.

[4] Dragon's point is that this Court "lacks jurisdiction to shield and facilitate the commission of war crimes in violation of international law." (D.E. 64 at 16-18.) He invokes the Fourth Geneva Convention and the conclusions of the International Court of Justice concerning Israeli settlement practices. (*Id.*) The argument is rejected. Jurisdiction rests on 28 U.S.C. §§ 1331 and 1345: this is a civil action arising under a federal statute, brought by the government. (Compl. ¶¶ 4-5.) Nothing in the Fourth Geneva Convention purports to divest a district court of that jurisdiction, and a treaty does not displace domestic law of its own force unless it is self-executing or Congress has implemented it. *Cf. Medellín v. Texas*, 552 U.S. 491, 504-05 (2008).

argues that breaking through a police line is, by definition, force under § 248(a)(2), relying on *Bernini v. City of St. Paul*, 665 F.3d 997, 1006 (8th Cir. 2012). (D.E. 82 at 18.) But as Dragon points out in reply (D.E. 87 at 3-4), *Bernini* does not support that proposition. It addressed the reasonableness of officers' use of force under the Fourth Amendment in response to a crowd that intended to penetrate a police line. It neither construed "force" under the FACE Act nor addressed demonstrator liability under § 248(a)(2). The government's contrary reading converts an officer's reasonable perception of a developing crowd-control threat into a categorical statutory rule of demonstrator liability. A rule that *Bernini* neither announced nor supports.

The complaint also alleges that "[t]he mob's actions led by Defendant Dragon" caused people to stay away and forced the service to move. The operative word in each is "led." The complaint never explains how Dragon was a leader, how his leadership "caused people" to stay away, and how his leadership resulted in moving the service. A conclusory assertion of leadership bereft of any facts from which one could plausibly infer Dragon was a leader is exactly the sort of allegation *Iqbal* instructs courts to set aside. 556 U.S. at 680-81.

The complaint's sole factual allegation concerning Dragon's personal conduct, i.e., telling Frye which building is the synagogue, is neither force nor a threat of force, and it obstructs nothing. The sidewalk allegation does not cure that defect. In paragraph 66, the complaint pleads that "[t]he unpermitted protest obstructed the public sidewalk on one side of synagogue rendering passage for worshipers unreasonably difficult and hazardous," unquestionably a charge against the protest as an undifferentiated whole. The FACE Act imposes liability on persons for what they do, and the complaint does not allege that Dragon was among those standing on that sidewalk, or that he directed anyone to stand there. As earlier pointed out bolstering insufficiently pleaded counts by characterizing the protest as a whole as

disruptive will not suffice and treads on First Amendment rights of protest. Dragon argues that his "presence at an energetic and loud demonstration" is protected speech (D.E. 64 at 14-16) and given the paucity of what is pleaded about him, his point is valid. Peaceful public demonstration and expression of grievances, unaccompanied by violence, true threats of violence, or obstruction, are protected by the First Amendment. *See Edwards v. South Carolina*, 372 U.S. 229, 235-37 (1963) (holding that the state could not criminalize petitioners' peaceful expression of unpopular views, where there was no violence or threat of violence and no obstruction of traffic or interference with streets or sidewalks). The complaint does not plead that Dragon used force, threats of force, physical obstruction, or any other unlawful conduct.

Dragon's motion (D.E. 64) is **granted**, and the claim against him is dismissed.

**F. AMP-NJ's and PSL-NJ's motions are granted**

AMP-NJ and PSL-NJ move to dismiss under Rule 12(b)(6). Both contend that the complaint principally rests on their social media promotion of a protest, which they characterize as protected political speech. They argue that the posts did not constitute force, threats of force, or physical obstruction under the FACE Act and that the complaint does not adequately allege their participation in, direction of, or responsibility for the alleged conduct at Congregation Ohr Torah. (D.E. 63-1 at 5-11; D.E. 103-1 at 7-21.) PSL-NJ additionally argues that this action is a viewpoint-discriminatory or retaliatory effort to suppress pro-Palestinian advocacy. (D.E. 103-1 at 17-21.)

**1. The allegations concerning the organizations**

The complaint alleges that AMP-NJ and PSL-NJ "organize[] anti-Israel protests" and have participated in demonstrations targeting Jewish institutions. (Compl. ¶¶ 9-10, 67.) It further alleges that the organizations "organized and promoted the violent protest at

Congregation Ohr Torah" on November 13, 2024. (*Id.* ¶¶ 9-10.) It alleges that AMP's name appeared among the signatories to the letter delivered to Glick's home; that AMP-NJ and PSL-NJ posted on social media calling for supporters to gather near Glick's home on November 13; and that AMP urged protestors to conceal their identities with masks. (*Id.* ¶¶ 20, 24.) The posts embedded a flyer advertising events around the country, including Glick's, and publicized a protest at the intersection of Ellis Street and Forest Avenue in West Orange. (*Id.* ¶ 25 & Image 2.)

The complaint also alleges that the organizations promoted the protest "knowing it would foreseeably lead to violence and intimidation" and that, by urging supporters to mask their identities and target the event, they were "responsible for the resulting violations." (*Id.* ¶ 71.)

**2. The pleaded posts are not threats of force**

The government principally contends that the organizations' social media posts themselves support a direct violation of § 248(a)(2). (D.E. 107 at 8-13.) They do not. A social media post is not itself force or physical obstruction, and the pleaded content must plausibly communicate a threat of force. *See Counterman*, 600 U.S. at 69, 73-74 (defining true threats as statements communicating a serious expression of an intent to commit unlawful violence against a particular individual or group).

*Helmann* is useful by contrast. There, the complaint alleged a synagogue-address post containing a symbol allegedly associated with extermination of Jews, against a pleaded history of the organizer's violent protests. 2025 WL 3030582, at *12-15. Those context-specific allegations supported a threat inference.

As explained above, the government's reliance on *Planned Parenthood* is misplaced. That case involved materials identifying particular physicians by name and home address,

against the backdrop of a demonstrated pattern in which physicians featured on materially similar "WANTED" and "GUILTY" posters were attacked and, in some instances, murdered. *Planned Parenthood*, 290 F.3d at 1058,1062-65, 1079. This complaint alleges no comparable identifying information giving the posts at issue a violent meaning. The government's additional authorities are equally inapposite. *United States v. Kosma*, 951 F.2d 549, 551-52 (3d Cir. 1991) involved repeated, explicit threats to murder the President by shooting and cyanide poisoning, including specified times and locations. In *Dillard*, 795 F.3d at 1196, 1200-01, the defendant wrote directly to a physician, invoked the recent murder of an abortion provider, disclosed that "thousands" knew the physician's habits, routines, residence, and associates, and warned that someone might place an explosive under her car.

The pleaded post here announces a protest, expresses opposition to the event, and provides the date, time, and a public intersection at which participants were to assemble: "NO BUSINESS ON STOLEN LAND — PROTEST LAND THEFT IN OUR BACKYARD." (Compl. ¶ 25 & Image 2.) The pleaded post identifies a public intersection as the assembly point and does not mention Glick, his residence, Congregation Ohr Torah, a religious service, or any person as a target. It does not threaten violence, refer to physical harm, identify an individual for attack, or use a symbol that the complaint alleges had a settled violent meaning. On the allegations before the Court, it is a call to assemble and engage in political advocacy in a public forum. Such speech is protected, even when its viewpoint is sharply contested or its subject matter deeply divisive. *See Edwards*, 372 U.S. at 235-37; *Brandenburg*, 395 U.S. at 447-48.

The fact that the post embedded a flyer identifying Glick's event does not change that conclusion. The flyer itself publicized the event, and the complaint alleges no threat of violence in the organizations' use of it. At most, the allegations show that the posts identified the event as

the object of protest. Identifying the subject of a public protest is not, without more, a threat of force.

The complaint also alleges that AMP urged protestors to cover their faces. (Compl. ¶ 24.) The complaint specifically attributes the alleged instruction to wear masks to AMP, not PSL-NJ. That allegation may bear on the government's theory of anticipated misconduct or intent if coupled with additional facts. But wearing a mask, or urging others to wear one, is not itself force, a threat of force, or physical obstruction. The allegation also does not establish that either organization directed, authorized, or participated in later unlawful conduct by an attendee.

The complaint's generalized allegations concerning the organizations' prior protests likewise do not fill the gap. It alleges that "AMP and others" organized a November 7, 2024, protest in Bergenfield. (*Id.* ¶¶ 10, 23.) A reference to "AMP," without factual allegations identifying AMP-NJ as the actor or explaining its relationship to the referenced entity, does not plausibly attribute the conduct to AMP-NJ. The complaint pleads no facts connecting PSL-NJ to either event. While the complaint alleges that the Bergenfield protest triggered reactions in Glick and his security team, that is conduct on their part, not AMP-NJ's.

Thus, unlike the allegations in *Helmann*, the complaint does not connect either AMP-NJ or PSL-NJ to an organization-specific history of violence that could give an otherwise facially nonthreatening post a different meaning in context. The Court must assess the claims against the entities actually named as defendants, based on factual allegations concerning those entities rather than allegations about an affiliated or similarly named organization. *See Claiborne Hardware*, 458 U.S. at 918-20, 930-32 (rejecting liability based merely on association with a group whose members engaged in violence and holding that liability against the NAACP could not rest on a member's conduct absent a finding that the member had actual or apparent authority

to commit or threaten violence on the NAACP's behalf, or that the NAACP ratified the unlawful conduct). The unintended but inevitable conclusion to be drawn by relying on the Bergenfield event to supply forbidden motive is that further protests by AMP or AMP-NJ are actionable.[5]

AMP-NJ's motion (D.E. 63) and PSL-NJ's motion (D.E. 103) are **granted**, and the claim against each organization is dismissed.

**G. Leave to amend**

Leave to amend is to be given freely when justice requires. Fed. R. Civ. P. 15(a)(2). In this Circuit, a district court dismissing a civil rights complaint under Rule 12(b)(6) generally must permit a curative amendment unless amendment would be inequitable or futile. *Phillips*, 515 F.3d at 245; *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *see Foman v. Davis*, 371 U.S. 178, 182 (1962).

The complaint is therefore dismissed without prejudice as to each moving defendant, and the government may file an amended complaint within 30 days of the accompanying Order. The Court expects that amendments will include facts that clarify whether what paragraph 28 describes as the "event at Congregation Ohr Torah [which] was to include prayer, a religious memorial service for the late Rabbi Avi Goldberg, a Torah sermon, religious songs with biblical verses, prayerful dancing" and "a festive barbecue in the synagogue's parking lot," had been scheduled before the "Israel real estate fair and 'Ruach' (Spiritual) event" in paragraph 17 was added as "educational activities about the religious obligation to live in Israel [and] a real estate

[5] PSL-NJ also argues that this civil enforcement action reflects viewpoint discrimination and retaliation for protected pro-Palestinian advocacy. (D.E. 103-1 at 17-21.) The Court need not reach that argument because the claim against PSL-NJ is dismissed on the independent ground that the complaint does not adequately plead a FACE Act violation by PSL-NJ nor facts establishing a basis to hold it responsible for conduct by others.

fair"; or whether, as the Court queried earlier in this opinion, the prayer, religious memorial service, Torah sermon, religious songs, prayerful dancing, and barbecue were added after the real estate fair and Ruach moved to the synagogue. Clarification on this point will aid the Court and the parties and the information is available to the plaintiff at this pleading stage.

## V. Conclusion

For the foregoing reasons, the motions to dismiss filed by Tova Fry (D.E. 62), American Muslims for Palestine New Jersey (D.E. 63), Matt Dragon (D.E. 64), Altaf Sharif (D.E. 65), Eric Camins (D.E. 66), and the Party for Socialism and Liberation New Jersey (D.E. 103) are granted. The sole claim under the FACE Act is dismissed without prejudice as to each moving defendant. The government may file an amended complaint within 30 days of the accompanying Order.

Dated: September 30, 2026

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.